**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| JOSEPH A. DENBOW and SEAN R. RAGSDALE, *on their own and on behalf of a class of similarly situated persons*,<br><br>                              *Petitioners*,<br>     v.<br><br>MAINE DEPARTMENT OF CORRECTIONS and RANDALL A. LIBERTY, Commissioner of Maine Department of Corrections *in his official capacity*,<br><br>                              *Respondents.* | Case No. _____<br><br>**Petition for Writ of Habeas Corpus and Complaint for Injunctive and Declaratory Relief**<br><br>**Class Action Complaint**<br><br>**IMMEDIATE RELIEF SOUGHT** |

## INTRODUCTION

1. COVID-19 is a deadly virus that disproportionately sickens and kills medically vulnerable people housed in closed congregate settings like cruise ships, nursing homes, and prisons.[1] As Maine's Governor's Chief Legal Counsel recently explained to this Court, "indoor settings where a large number of people sit stagnant, remain in close proximity to one another, breathe the same air, touch common personal and fixed property, and remain there for an extended period of time present an especially dangerous environment for community spread, particularly for persons who are elderly or who have certain compromising medical

---

[1] John M. Barry, *The Single Most Important Lesson from the 1918 Influenza*, New York Times (March 17, 2020), https://cutt.ly/PtQ5uAZ (Opinion piece by author of "The Great Influenza: The Story of the Deadliest Pandemic in History," noting comparison between current COVID-19 outbreak and the 1918 influenza outbreak widely considered one of the worst pandemics in history).

conditions."[2] Although this statement was originally made in support of the government's restriction on in-person religious gatherings, it applies with even greater force to Maine's prisons, where people (including many who are medically vulnerable) spend much of the day in close contact with approximately 50 to 80 other prisoners and prison staff who circulate to and from the community each day.

2. With no vaccine or known cure for the virus, physical distancing is critical and, for those most vulnerable to the virus, it can be a matter of life or death. As explained by the Director of the Maine Center for Disease Control and Prevention, "[p]hysical distancing is the best vaccine that we have."[3] For people who are particularly medically vulnerable to serious illness or death from COVID-19—including those with underlying medical conditions such as diabetes, heart disease, and lung disease—physical distancing is also a form of necessary preventative medical care.[4] Other mitigation measures like frequent hand-washing, use of alcohol-based hand-sanitizer, and widespread testing, are additional important preventative measure for everyone—and especially those at highest risk.[5]

---

[2] Langhauser Decl., *Calvary Chapel of Bangor v. Mills*, Docket No. 20-cv-156-NT, ECF No. 21 (May 8, 2020).

[3] Maine CDC briefing: April 1, 2020, https://www.youtube.com/watch?v=nX4ljxGU4VI (quote from Maine CDC Director Dr. Nirav Shah).

[4] Social Distancing, U.S. Centers for Disease Control and Prevention (last accessed Apr. 6, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html; *see also* Parrish Decl. ¶ 35 ("To protect medically vulnerable individuals—as well as other individuals and staff—it is necessary to be able to engage in adequate physical distancing *at all times*").

[5] Parrish Decl. ¶¶ 25–28, 30; *see also Hand Hygiene in COVID-19*, U.S. Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/hcp/hand-hygiene.html (last visited May 9, 2020); Emily Mosites, *Assessment of SARS-CoV-2 Infection Prevalence in Homeless Shelters – Four U.S. Cities, March 27-April 15, 2020*, U.S. Centers for Disease Control and Prevention (May 1, 2020), https://bit.ly/3dKZHmY (acknowledging widespread

3. There can be no dispute that, if there was a vaccine or a pharmaceutical treatment for COVID-19, the prison would be obliged to provide it to prisoners—even if providing the treatment would be costly or inconvenient.[6] But no vaccine or treatment is available. Instead, for medically vulnerable people who are mostly likely to face serious illness and death from the virus, prevention is the most important type of care. Indeed, there is consensus among medical experts that physical distancing is critical for individuals at high risk of serious illness or death from COVID-19, like the Petitioners and proposed Class Members.[7]

4. Yet, despite encouraging and even requiring these mitigation measures for the vast majority of people,[8] the State of Maine fails to ensure that such preventative treatment is available to prisoners, and, to the contrary, prevents most prisoners from social distancing. Indeed,

---

positive yet asymptomatic cases of COVID-19 and concluding that "[t]esting *all* persons can facilitate isolation of those who are infected to minimize ongoing transmission in" homeless shelters, another closed congregate setting like prisons*); Consideration for Use if Test-Based Strategies for Preventing SARS-CoV-2 Transmission in Nursing Homes*, U.S. Centers for Disease Control and Prevention (last visited May 9, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/nursing-homes-testing.html  (recommending widespread testing and retesting in nursing homes, another closed congregate setting with many medically vulnerable individuals). The Maine CDC states that people at higher risk of serious illness should "limit close contact with others," "avoid crowds," and "practice social distancing." *Coronavirus (COVID-19) Frequently Asked Questions*, Maine CDC (May 6, 2020), https://www.maine.gov/dhhs/mecdc/infectious-disease/epi/airborne/documents/Public-COVID19-FAQ-6May2020.pdf

[6] *See, e.g.*, *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Abu-Jamal v. Wetzel*, No. 3:16-CV-2000, 2017 WL 34700, at \*18 (M.D. Pa. Jan. 3, 2017) (prisons cannot "deliberately den[y] providing treatment to inmates with a serious medical condition and chosen a course of monitoring instead").

[7] Parrish Decl. ¶¶ 34-36.

[8] *Cavalry Chapel of Bangor v. Mills*, No. 1:20-CV-00156-NT, 2020 WL 2310913, at \*3-\*4 (D. Me. May 9, 2020) (listing state-imposed restrictions and stay-at-home mandates).

the prison setting makes social distancing all but impossible, prohibits access to alcohol-based hand-sanitizer, and limits necessary medical care to manage underlying medical conditions.[9]

5.  Maine's Department of Correction ("DOC") also refuses to provide medical furlough or rehabilitative services to Petitioners and Class Members, even when necessary to enable them to physically distance and protect themselves from infection. For example, although DOC provides medical furlough for other types of care that is available only outside the prison setting,[10] DOC has refused to grant *any* medical furloughs to enable medically vulnerable prisoners to physically distance during COVID-19.[11]

6.  Similarly, DOC has applied stricter-than-usual criteria for community confinement—adding many new technical requirements on top of the statutory criteria. Under these criteria, DOC has refused to grant community confinement to medically vulnerable prisoners who have an imminent release date, who are classified as "minimum" or "community" security, and who (absent COVID-19 restrictions) would be allowed to work in the community.[12] As one prison case worker recently candidly and bluntly told

---

[9] *See, e.g.*, Am. Compl., *Loisel v. Clinton*, Docket No. 19-cv-00081-NT, ECF No. 26 (June 26, 2019) (alleging violation of the Eighth Amendment and Americans with Disabilities Act on behalf of a proposed class for failure to provide treatment for Hepatitis C); *see also id.* at ¶ 46 (alleging that medication for Hepatitis C that is withheld from many prisoners is available to MaineCare beneficiaries diagnosed with chronic HCV).

[10] 34-A M.R.S. § 3035(C)(2); DOC Policy 27.04 (available at https://www.maine.gov/corrections/PublicInterest/policies.shtml, click on Policy 27.04).

[11] Sideris Decl., Att. B (email from DOC Classification Director stating that "[t]he department is not utilizing the medical furlough to release clients during the COVID19 pandemic").

[12] *See, e.g.*, Debow Decl. ¶¶ 9-14; Ragsdale Decl. ¶¶ 8-11.

one of the Petitioners, , "there's nobody being released because of medical conditions, so you can get that idea right out of your head."[13]

7. Petitioners Joseph Denbow and Sean Ragsdale are medically vulnerable prisoners forced to live in crowded settings where they are exposed to close contact with dozens of other prisoners and staff every day—any of whom could be carriers of the COVID-19 infection. Not only does DOC require Petitioners to live in crowded settings—in which physical distancing is impossible—but it also denies them access to alcohol-based hand sanitizer and provides for hand-washing only in a communal bathroom shared with approximately fifty other prisoners. Despite the heightened risks posed by such settings, DOC has tested only two prisoners (out of 340) in the Mountain View Correctional Facility, where Petitioners are housed.[14]

8. The combination of crowded settings, poor hygiene, and the absence of adequate testing in DOC facilities means that the virus could be rapidly spreading undetected throughout the prisons at this very moment.  This is not just a hypothetical risk.  The outbreaks in correctional facilities around the country,[15] illustrate that the risk of harm posed to prisoners, prison staff, and the entire community is real, concrete and imminent.[16]

---

[13] Denbow Decl. ¶ 13.

[14] Maine DOC Daily Dashboard (May 11, 2020), https://www.maine.gov/corrections/home/MDOC%20COVID19%20Web%20Dashboard%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.pdf.

[15] Sam Kelly, *134 inmates at Cook County Jail confirmed positive for COVID-19*, CHICAGO SUN-TIMES (Mar. 30, 2020). https://cutt.ly/6tYTqi5.

[16] The State recently emphasized the risks of "community spread" from in-person religious gatherings of more than 10 people, stating that holding such gatherings in violation of the statewide order "subjects all persons attending such gatherings to an avoidable risk of community spread; and that this risk in turn threatens unnecessarily the health and lives of Maine

9.  To protect against this imminent risk of serious illness and death, Petitioners bring this action on behalf of themselves and all similarly situated medically vulnerable prisoners incarcerated by the Maine Department of Corrections. Medically vulnerable prisoners include prisoners over 55 or those with underlying health conditions, such as asthma, diabetes, and heart disease.[17] Petitioners also seek to represent the following three subclasses of similarly situated persons: **(1)** medically vulnerable prisoners with an earliest release date within one year (the earliest date by which a vaccine may be expected)[18], **(2)** medically vulnerable prisoners classified as minimum risk or community custody, and **(3)** prisoners who are medically vulnerable because of conditions that are protected under federal disability rights laws. This lawsuit seeks emergency class relief to protect vulnerable class members before it is too late. If the Court does not immediately grant requested relief—including ordering the Department to provide necessary information and a safe release plan—Petitioners request an expedited hearing. Given the rapid spread of this highly contagious virus, time is of the essence.[19]

---

citizens and, if not contained, the stability of the State's first-responder and health care systems." Langhauser Decl., *Cavalry Chapel of Bangor v. Mills*, Docket No. 20-156-NT, ECF No. 21 (May 8, 2020). The same risks are even more present in prisons, in which people are in closed and crowded settings—not just for a couple of hours once a week—but all day, every day, and in which prison staff travel to and from the facility each day, as potential vectors of the disease.

[17] Goldenson Decl. ¶ 39.

[18] Declaration of Dr. Nirav Shah, *Cavalry Chapel of Bangor v. Mills*, Docket No. 20-cv-156-NT, ECF No. 20 (May 8, 2020).

[19] *See, e.g.*, COVID-19 Dashboard by the Center for Systems Science and Engineering at Johns Hopkins University, Coronavirus Resource Center, *available at* https://coronavirus.jhu.edu/map.html; Kevin Miller, *Three more deaths, 50 new COVID-19 cases reported in Maine*, Portland Press Herald (May 14, 2020), https://www.pressherald.com/2020/05/14/three-more-deaths-50-new-covid-19-cases-reported-in-

## I.   JURISDICTION AND VENUE

10. Petitioners bring this putative class action pursuant to 22 U.S.C. § 2241 for relief from incarceration that violates their Eighth Amendment rights under the U.S. Constitution, and that violates the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq*., and the Rehabilitation Act, 29 U.S.C. § 794.

11. This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 2241 (habeas corpus), 28 U.S.C. § 1651 (All Writs Act), and Article I, § 9, cl. 2 of the U.S. Constitution (Suspension Clause) / 28 U.S.C. § 1331 (federal question jurisdiction).

12. Venue is proper in this judicial district pursuant to 28 U.S.C. § 2241(d) because the Petitioners and all other class members are in custody in this judicial district and venue. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Petitioners' claims occurred in this district.

## II.   PARTIES

13. Petitioner Sean R. Ragsdale is incarcerated in Mountain View Correctional Facility. He is 56 years old. He is at high risk for serious illness or death from COVID-19 because he has a long-term chest infection, diabetes, and Hepatitis C, which has caused him liver damage. Mr. Ragsdale uses an inhaler in order to breathe normally, takes insulin twice a day, and as a result of his disabilities has been given work restrictions by doctors to not stand on his feet for prolonged periods of time or do strenuous activity. Medication for Hepatitis C is medically indicated to treat Mr. Ragsdale's condition and prevent further liver disease, but

---

maine/ (referencing Maine's "rising cases numbers" which Maine's CDC director called "concerning").

DOC has not provided that medication. Although payments have been suspended while he is in prison, he receives Social Security income (SSI) for his disabilities. He was convicted of two counts of aggravated trafficking of drugs and has completed most of his sentence of imprisonment, with a planned release date in approximately two months, on July 17, 2020. He is currently classified as "community" custody, meaning that, but for the current COVID-19 restrictions, he would be approved to work in the community during the day. Mr. Ragsdale is an individual with a disability for purposes of the ADA and the Rehabilitation Act.

14. Petitioner Joseph A. Denbow is incarcerated in Mountain View Correctional Facility. He is 54 years old. He is at high risk for serious illness or death from COVID-19 because he suffers from asthma, chronic obstructive pulmonary disease (COPD) and is in remission from colorectal cancer. He is incarcerated for driving without a license and aggravated forgery, for initially giving the traffic officer his brother's name instead of his own. He has completed most of his two-year prison sentence, with an earliest release date of August 30, 2020. He is currently classified as "minimum" security and, before the current COVID-19 restrictions, worked in the community doing odd-jobs like sheet rocking and painting, and would return to the facility at night. Mr. Denbow is an individual with a disability for purposes of the ADA and the Rehabilitation Act.

15. Respondent Randall A. Liberty is the Commissioner of the Maine Department of Corrections. In that role, he has "general supervision, management and control of the research and planning, grounds, buildings, property, officers, employees and clients of any correctional facility, detention facility or correctional program." 34-A M.R.S. § 1402(1). Commissioner Liberty is sued in his official capacity.

16. Respondent Maine DOC is "responsible for the direction and general administrative supervision, guidance and planning of adult and juvenile correctional facilities and programs within the State." 34-M.R.S. §1202.

## III.   FACTUAL ALLEGATIONS

### A. **COVID-19 Poses a Significant Risk of Illness, Injury, or Death**

17. The novel coronavirus that causes COVID-19 has led to a global pandemic.[20] As of May 15, 2020, at 8 AM, there were 4,444,670 reported COVID-19 cases throughout the world[21] In the United States alone, the Centers for Disease Control and Prevention ("CDC") reports 1,384,930 cases and 83,947 deaths as of May 14, 2020.[22] As of May 14, 2020, Maine has had 1,405 coronavirus cases and seen 207 hospitalizations and 69 deaths as a result of the virus.[23] All these numbers are likely underestimates because of limited availability of testing.[24]

18. Projections indicate that as many as 240,000 people in the U.S. will die from COVID-19, accounting for existing interventions.[25]

---

[20] Betsy McKay et al., *Coronavirus Declared Pandemic by World Health Organization*, WALL ST. J. (Mar. 11, 2020, 11:59 PM), https://cutt.ly/UtEuSLC.

[21] Johns Hopkins University COVID-19 Case Tracker, available at https://coronavirus.jhu.edu/, last accessed May 15, 2020; John Hopkins University COVID-19 Dashboard, available at https://coronavirus.jhu.edu/map.html, last accessed May 8, 2020.

[22] COVID-19 Tracker, U.S. Centers for Disease Control and Prevention, https://www.cdc.gov/covid-data-tracker/index.html (last accessed May 14, 2020)

[23] https://www.maine.gov/dhhs/mecdc/infectious-disease/epi/airborne/coronavirus.shtml (last accessed May 14, 2020)

[24] Goldenson Decl. ¶ 13.

[25] Rick Noack, et al., *White House Task Force Projects 100,000 to 240,000 Deaths in U.S., Even With Mitigation Efforts*, Wash. Post. (April 1, 2020, 12:02 a.m.), https://cutt.ly/5tYT7uo.

19. The virus is known to spread from person to person through respiratory droplets, close personal contact, and from contact with contaminated surfaces and objects.[26] There is no vaccine against COVID-19, and there is no known medication that is effective to prevent or treat it.[27] Social distancing—deliberately keeping at least six feet of space between persons to avoid spreading illness[28]—and a vigilant hygiene regimen, including hand hygiene, are critical for protecting against transmission of COVID-19.[29]

20. These measures are particularly important because the coronavirus spreads aggressively, and people can spread it even if they do not feel sick or exhibit any symptoms.[30] The only assured way to curb the pandemic is through dramatically reducing contact for all.[31] Every American institution—from schools[32] to places of worship,[33] from businesses[34] to

---

[26] Centers for Disease Control and Prevention, *Interim Infection Prevention and Control Recommendations for Patience with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings*, https://cutt.ly/ztRAo0X.

[27] Parrish Decl. ¶ 16; Goldenson Decl. ¶ 19.

[28] Johns Hopkins University, *Coronavirus, Social Distancing and Self-Quarantine*, https://cutt.ly/VtYYiDG.

[29] Goldenson Decl. ¶ 19; Parrish Decl. ¶ 16.

[30] Goldenson Decl. ¶ 18; Parrish Decl. ¶¶ 20-23.

[31] Harry Stevens, *Why Outbreaks Like Coronavirus Spread Exponentially, and how to "Flatten the Curve,"* Wash. Post. (March 14, 2020), https://cutt.ly/etYRnkz.

[32] Centers for Disease Control, *Interim Guidance for Administrators of US K-12 Schools and Child Care Programs*, https://cutt.ly/ItRPq5n.

[33] Centers for Disease Control, *Interim Guidance for Administrators and Leaders of Community- and Faith-Based Organizations to Plan, Prepare, and Respond to Coronavirus Disease 2019 (COVID-19)*, https://cutt.ly/KtRPk1k.

[34] Centers for Disease Control, *Interim Guidance for Businesses and Employers to Plan and Respond to Coronavirus Disease 2019 (COVID-19)*, https://cutt.ly/stRPvg4.

legislatures[35]—has been exhorted to reduce the number of people in close quarters, if not

empty entirely.[36] They have also been told to undertake aggressive sanitation measures,

such as cleaning and disinfecting all surfaces for exacting periods of time with products

with particular alcohol contents, and closing off any areas used by a sick person.[37]

21. Once contracted, COVID-19 can cause severe damage to lung tissue, including a

permanent loss of respiratory capacity, and it can damage tissues in other vital organs, such

as the heart and liver.[38]

22. People over the age of 50 face a greater risk of serious illness or death from COVID-19.[39]

In a February 29, 2020 preliminary report, individuals age 50-59 had an overall mortality

rate of 1.3%; 60-69-year-olds had an overall 3.6% mortality rate, and those 70-79 years old

had an 8% mortality rate.[40]

23. People of any age who suffer from certain underlying medical conditions, including lung

disease, heart disease, chronic liver or kidney disease (including hepatitis and dialysis

patients), diabetes, epilepsy, hypertension, compromised immune systems (such as from

---

[35] Nat'l Conf. of State Legislatures, *Coronavirus and State Legislatures in the News*, https://cutt.ly/4tRPQne.a.

[36] *Cavalry Chapel of Bangor v. Mills*, No. 1:20-CV-00156-NT, 2020 WL 2310913, at *3-*4 (D. Me. May 9, 2020) (listing state-imposed restrictions and stay-at-home mandates in Maine).

[37] Centers for Disease Control, *Cleaning and Disinfecting Your Facility*, https://cutt.ly/atYE7F9.

[38] Parrish Decl. ¶¶ 4-5; *see also* Centers for Disease Control, *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, https://cutt.ly/etRPVRl

[39] Xianxian Zhao, et al., *Incidence, clinical characteristics and prognostic factor of patients with COVID-19: a systematic review and meta-analysis* (March 20, 2020), https://cutt.ly/etRAkmt.

[40] *Age, Sex, Existing Conditions of COVID-19 Cases and Deaths* Chart, https://cutt.ly/ytEimUQ (data analysis based on WHO China Joint Mission Report).

cancer, HIV, or autoimmune disease), blood disorders (including sickle cell disease), inherited metabolic disorders, stroke, developmental delay, and asthma, also have an elevated risk.[41] Early reports estimate that the mortality rate was 13.2% for those with cardiovascular disease, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer.[42]

24. In many people, COVID-19 causes fever, cough, and shortness of breath. However, many people in higher risk categories who develop serious illness will need advanced support.[43] This requires highly specialized equipment like ventilators that are in limited supply, and an entire team of care providers, respiratory therapists, and intensive care physicians.[44]

25. In serious cases, COVID-19 causes acute respiratory disease syndrome, which is life-threatening: even those who receive ideal medical care with ARDS have a 30% mortality rate.[45] Even in non-ARDS cases, COVID-19 can severely damage lung tissue, which

---

[41] *Coronavirus disease (COVID-19) advice for the public: Myth buster*s, World Health Organization, https://cutt.ly/dtEiCyc ("Older people, and people with pre-existing medical conditions (such as asthma, diabetes, heart disease) appear to be more vulnerable to becoming severely ill with the virus.").

[42] *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, World Health Organization (Feb. 28, 2020), at 12, https://cutt.ly/xtEokCt (finding fatality rates for patients with COVID-19 and co-morbid conditions to be: "13.2% for those with cardiovascular disease, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer").

[43] Goldenson Decl. ¶ 17; Parrish Decl. ¶ 29.

[44] Parrish Decl. ¶ 29; *see also* Novel Coronavirus 2019 (COVID-19), https://www.maine.gov/dhhs/mecdc/infectious-disease/epi/airborne/coronavirus.shtml#situation (listing the number of available ventilators and intensive care hospital beds in Maine).

[45] Letter from Faculty at Johns Hopkins School of Medicine, School of Nursing, and Bloomberg School of Public Health to Hon. Larry Hogan, Gov. of Maryland, March 25, 2020, https://cutt.ly/stERiXk; *see also* Goldenson Decl. ¶ 11.

requires an extensive period of rehabilitation, and in some cases, cause permanent loss of breathing capacity.[46] COVID-19 may target the heart, causing cardiac complications up to and including heart failure.[47] COVID-19 can also trigger an over-response of the immune system and result in widespread damage to other organs, including permanent injury to the kidneys and neurologic injury.[48]

26. These complications can manifest at an alarming pace. Patients can show the first symptoms of infection in as little as two days after exposure, and their condition can seriously deteriorate in as little as five days or sooner.[49]

27. According to recent estimates, the fatality rate of people infected with COVID-19 is about ten times higher than a severe seasonal influenza, even in advanced countries with highly effective health care systems.[50] Patients who do not die from serious cases of COVID-19 may still face prolonged recovery periods, including extensive rehabilitation from neurologic damage, loss of digits, and loss of respiratory capacity.[51]

28. As of May 14, 2020, the United States leads the world in confirmed cases of COVID-19.[52]

   As of May 14, 2020, Maine has had 1,565 confirmed coronavirus cases and seen 207

---

[46] Parrish Decl. ¶ 5.

[47] Parrish Decl. ¶ 5.

[48] *Id.*

[49] CDC, *Interim Clinical Guidance*, *supra* note 38.

[50] Betsy McKay, *Coronavirus vs. Flu Which Virus is Deadlier*, WALL ST. J. (Mar. 10, 2020, 12:49 PM), https://cutt.ly/itEmi8j.

[51] *Id.*

[52] Donald G. McNeil, Jr., *The U.S. Now Leads the World in Confirmed Coronavirus Cases*, New York Times (March 26, 2020), https://cutt.ly/QtQ7zz6.

hospitalizations 69 deaths as a result of the virus.[53] Many of the deaths attributed to the coronavirus happened in congregate care nursing facilities.[54] There is no way to know when the number of daily cases will abate—on May 14, the State CDC Director acknowledged a "concerning" "increase of cases . . . over the past days."[55]

B.  **The Dangers of COVID-19 Are Heightened in Prisons**

29. The imperatives of social distancing and hygiene apply with special force to prisons, where the government controls almost entirely a person's ability to avoid others and to maintain adequate sanitation. Persons who live or work in prisons face a particularly acute threat of illness, permanent injury, and death, beyond that faced by the general public.[56]

30. As another court has explained, "Prisons are tinderboxes for infectious disease. The question whether the government can protect inmates from COVID-19 is being answered every day, as outbreaks appear in new facilities."[57] For example, dramatic outbreaks have occurred in the Cook County Jail, Rikers Island in New York City, and multiple prisons in Ohio.[58] In one Ohio prison, more than 80% of the approximately 2,500 prisoners tested

---

[53] Novel Coronavirus 2019 (COVID-19), Maine CDC, https://www.maine.gov/dhhs/mecdc/infectious-disease/epi/airborne/coronavirus.shtml (last visited May 15, 2020).

[54] Maine DHHS Press Release (Apr. 28, 2020), https://www.maine.gov/dhhs/press-release.shtml?id=2460746 (last visited May 15, 2020).

[55] Kevin Miller, *Three more deaths, 50 new COVID-19 cases reported in Maine*, Portland Press Herald (May 14, 2020), https://www.pressherald.com/2020/05/14/three-more-deaths-50-new-covid-19-cases-reported-in-maine/.

[56] Goldenson Decl. ¶¶ 39-40.

[57] *United States v. Rodriguez*, No. 2:03-cr-0271, 2020 WL 1627331, (E.D. Pa., Apr. 1, 2020).

[58] Goldenson Decl. ¶ 37 (citing sources).

positive.[59] Eight of the ten largest-known infections sources in the U.S. are associated with jails or prisons.[60]

31. People in congregate environments, which are places where people live, eat, and sleep in close proximity, face increased danger of contracting COVID-19, as evidenced by the rapid spread of the virus in cruise ships[61] and nursing homes.[62] It is virtually impossible for people in prisons to engage in the necessary social distancing and hygiene required to mitigate the risk of transmission. High numbers of shared contact surfaces, limited access to medical care, and high numbers of people with chronic, often untreated, illnesses living in close proximity with each other exacerbate the dangers in correctional settings.

32. Correctional facilities house large groups of people together, and move people in groups to eat, recreate, and obtain medical care.[63] They frequently have insufficient medical care for the population even outside times of crisis.[64] Incarcerated people, rather than

---

[59] Goldenson Decl. ¶ 37 (citing sources).

[60] Goldenson Decl. ¶ 37.

[61] *See* Parrish Decl. ¶¶ 10-12. The CDC is currently recommending that travelers defer cruise ship travel worldwide. "Cruise ship passengers are at increased risk of person-to-person spread of infectious diseases, including COVID-19." *COVID-19 and Cruise Ship Travel*, Centers for Disease Control and Prevention, https://cutt.ly/7tEEQvT.

[62] The CDC notes that long-term care facilities and nursing homes pose a particular risk because of "their congregate nature" and the residents served. *Preparing for COVID-19: Long-term Care Facilities, Nursing Homes*, Centers for Disease Control and Prevention, https://cutt.ly/7tEEITH.

[63] *See, e.g,* Nathalie Baptiste, *Correctional Facilities are the Perfect Incubators for the Coronavirus*, (March 6, 2020), https://cutt.ly/GtRSi3e; Goldenson Decl. ¶¶ 26-28.

[64] *See, e.g.*, Steve Coll, *the Jail Health-Care Crisis*, The New Yorker (Feb. 25, 2019), https://cutt.ly/ftERHNg; *see also* Am. Compl., *Loisel v. Clinton*, Docket No. 1:19-cv-00081-NT, ECF No. 26 (June 26, 2019) (alleging inadequate medical care in the Maine Department of Corrections for prisoners with another infectious disease, Hepatitis C); Dan Neumann, *Four fired nurses raise the alarm about Maine's for-profit prison contractor*, Beacon (Dec. 13, 2018),

professional cleaners, are responsible for cleaning the facilities, with minimal supervision.[65]

33. Outbreaks of the flu regularly occur in jails and prisons, including an influenza outbreak in two prison facilities in Maine in 2011.[66] During the H1N1 epidemic in 2009, jails and prisons dealt with a disproportionately high number of cases,[67] including in the Cumberland County Jail, in Portland Maine.[68]

34. In addition to Dr. Parrish and Dr. Goldenson, whose declarations are attached to this petition, numerous public health experts, including Dr. Gregg Gonsalves,[69] Ross

---

https://mainebeacon.com/four-fired-nurses-raise-the-alarm-about-maines-for-profit-prison-contractor/.

[65] *See, e.g.,* Ragsdale Decl. ¶ 16; Denbow Decl. ¶ 19. Wendy Sawyer, *How much do incarcerated people earn in each state?*, Prison Policy Initiative, (April 10, 2017); https://cutt.ly/qtER2bh (noting that "custodial, maintenance, laundry" and "grounds keeping" are among the most common jobs for incarcerated people).

[66] Influenza Outbreaks at Two Correctional Facilities – Maine, March 2011, Centers for Disease Control and Prevention (Apr. 6, 2012), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6113a3.htm.

[67] *See, e.g.,* Meyer Decl. at ¶ 19, Docket No. 20-cv-1803-AKH, ECF No. 42 (Mar. 16, 2020), https://drive.google.com/file/d/1rVxt85J-LCDLQLBMFDaNu49PczCdnLvs/view. This H1N1 "swine flu" pandemic outbreak spread dramatically in jails and prisons in 2010, but that strain of virus had a low fatality rate because of the characteristics of the virus—COVID-19's fatality rate is far higher. David M. Reutter, *Swine Flu Widespread in Prisons and Jails, but Deaths are Few* (Feb. 15, 2010), https://cutt.ly/ytRSkuX.

[68] *Swine Flu Spreads in Jail*, Ellsworth American (June 9, 2009), https://www.ellsworthamerican.com/maine-news/health-news/swine-flu-spreads-in-jail/.

[69] Kelan Lyons, *Elderly Prison Population Vulnerable to Potential Coronavirus Outbreak,* Connecticut Mirror (March 11, 2020), https://cutt.ly/BtRSxCF.

MacDonald,[70] Dr. Marc Stern,[71] Dr. Oluwadamilola T. Oladeru and Adam Beckman,[72] Dr. Anne Spaulding,[73] Homer Venters,[74] Jaimie Meyer,[75] the faculty at Johns Hopkins schools of nursing, medicine, and public health,[76] and Josiah Rich[77] have all strongly cautioned that people booked into and held in correctional settings are likely to face serious, even grave, harm due to the outbreak of COVID-19.

35. Prisons are not hermetically sealed. By their nature, the people who go in—especially correctional and medical staff—typically come out in very short order. Failing to prevent and mitigate the spread of COVID-19 endangers not only those within the institution, but the entire community. Hence, immediate and aggressive action is the only mitigation effort

---

[70]Craig McCarthy and Natalie Musumeci, *Top Rikers Doctor: Coronavirus 'Storm is Coming,'* New York Post (March 19, 2020), https://cutt.ly/ptRSnVo.

[71] Marc F. Stern, MD, MPH, *Washington State Jails Coronavirus Management Suggestions in 3 "Buckets,"* Washington Assoc. of Sheriffs & Police Chiefs (March 5, 2020), https://cutt.ly/EtRSm4R.

[72] Oluwadamilola T. Oladeru, et al., *What COVID-19 Means for America's Incarcerated Population – and How to Ensure It's Not Left Behind*, (March 10, 2020), https://cutt.ly/QtRSYNA.

[73] Anne C. Spaulding, MD MPDH, *Coronavirus COVID-19 and the Correctional Jail,* Emory Center for the Health of Incarcerated Persons (March 9, 2020).

[74] Madison Pauly, *To Arrest the Spread of Coronavirus, Arrest Fewer People*, Mother Jones (March 12, 2020), https://cutt.ly/jtRSPnk.

[75] Meyer Decl., Docket No. 20-cv-1803-AKH, ECF No. 42 (Mar. 16, 2020), https://drive.google.com/file/d/1rVxt85J-LCDLQLBMFDaNu49PczCdnLvs/view.

[76] Letter from Faculty at Johns Hopkins School of Medicine, School of Nursing, and Bloomberg School of Public Health to Hon. Larry Hogan, Gov. of Maryland, March 25, 2020, https://cutt.ly/stERiXk.

[77] Amanda Holpuch, *Calls Mount to Free Low-risk US Inmates to Curb Coronavirus Impact on Prisons*, The Guardian (March 13, 2020 3:00 p.m.), https://cutt.ly/itRSDNH.

that Respondents can undertake to comport with public health guidance and to prevent a catastrophic outbreak at the facility.

C. **Persons Incarcerated in Maine's Prisons Face Grave and Immediate Danger Due to COVID-19**

36. Beyond the general public health presented by the COVID-19 pandemic, persons incarcerated in Maine's prisons face a particularly acute threat of illness, permanent injury, and death.

37. As of May 14, 2020, Maine has had 1,405 coronavirus cases and seen 207 hospitalizations and 69 deaths as a result of the virus.[78] No part of Maine has been spared, and the virus has shown up in every county in the state. Penobscot County, where Mountain View Correctional Facility is located, had 91 confirmed cases as of May 14, 2020[79] and has experienced spreading of coronavirus through community transmission.[80] Cumberland County, where Maine Correctional Center and Southern Maine Women's Reentry Center

---

[78] COVID-19 Situation Reports, Maine CDC, available at https://www.maine.gov/dhhs/mecdc/infectious-disease/epi/airborne/coronavirus.shtml#situation (last accessed May 15, 2020).

[79] COVID-19 Situation Reports, Maine CDC, available at https://www.maine.gov/dhhs/mecdc/infectious-disease/epi/airborne/coronavirus.shtml#situation (last accessed May 15, 2020).

[80] Charles Eichacker, *Coronavirus is spreading in Penobscot County through community transmission*, Bangor Daily News, April 10, 2020, available at https://bangordailynews.com/2020/04/10/news/penobscot/coronavirus-is-spreading-in-penobscot-county-through-community-transmission/, last accessed May 8, 2020.

are located, had 778 cases as of May 14, 2020[81] and also has confirmed community transmission of the virus.[82]

38. Despite the need to maintain 6 feet of distance and not congregate in gatherings larger than 10 people,[83] prisoners in Maine Department of Corrections facilities cannot perform basic physical distancing. Petitioners, for example, live in dorms with approximately fifty other people, with whom they share common rooms, sinks, showers, and toilets. They sleep in small rooms with three other people.[84]

39. Despite the need for masks in areas where physical distancing is difficult, DOC does not enforce the requirement to wear masks in the common rooms or dorms. Nor do corrections officers wear masks while standing within six feet from their colleagues. Although incarcerated people have been given two cloth masks (made from the same material as the prison-issue boxer briefs), prisoners are sometimes unable to sanitize them between uses, and, when they are able to wash them, they quickly break down.

40. In any event, when others around them are not wearing them, masks offer only limited benefit for a wearer who is trying to protect themselves from catching the infection.[85] The

---

[81] COVID-19 Situation Reports, Maine CDC, available at https://www.maine.gov/dhhs/mecdc/infectious-disease/epi/airborne/coronavirus.shtml#situation (last accessed May 15, 2020).

[82] Eichacker, *Coronavirus is spreading in Penobscot County through community transmission*, note 80, supra.

[83] Frequently Asked Questions, Me. Dep't of Health and Human Servs., https://www.maine.gov/dhhs/mecdc/infectious-disease/epi/airborne/documents/Public-COVID19-FAQ-8May2020.pdf (last visited May 15, 2020).

[84] Denbow Decl. ¶¶ 15-26; Ragsdale Decl. ¶¶ 13-24.

[85] Parrish Decl. ¶ 14.

Maine CDC has made clear that "[e]ven if you wear a facemask, you should also use other prevention methods," and that wearing facemasks should "not take the place of other prevention measures,"[86] like physical distancing and proper hygiene.

41. Yet the only hand hygiene to which Petitioners have access is the bathroom sink used by approximately fifty other prisoners.  The DOC-provided hand sanitizer is not effective against COVID-19. The Maine CDC states that people should "[u]se an alcohol-based hand sanitizer that contains 60 percent to 95 percent alcohol."[87] The hand sanitizer that DOC provides to prisoners is alcohol free.[88]

## D. **Existing Procedures and Protocols Will Not Be Sufficient to Ensure the Safety of Class Members or the General Public**

42. Because of the severity of the threat posed by COVID-19, and its potential to rapidly spread throughout a correctional setting, public health experts recommend the rapid release from custody of people most vulnerable to COVID-19.[89] Release is necessary to protect the

---

[86] Frequently Asked Questions, Maine Dep't of Health and Human Servs., https://www.maine.gov/dhhs/mecdc/infectious-disease/epi/airborne/documents/Public-COVID19-FAQ-6May2020.pdf.

[87] Frequently Asked Questions, Maine Dep't of Health and Human Servs., https://www.maine.gov/dhhs/mecdc/infectious-disease/epi/airborne/documents/Public-COVID19-FAQ-6May2020.pdf

[88] Denbow Decl. ¶ 17; Ragsdale Decl. ¶ 20.

[89] *See* Goldenson Decl. ¶¶ 43-44; Parrish Decl. ¶ 35 ("When physical distancing is not possible in one setting, people should be moved out of that setting to the greatest extent possible"); Meyer Dec., *supra* note 75 at ¶¶ 37–38 (noting that population reduction in jails will be "crucially important to reducing the level of risk both for those within [jail] facilities and for the community at large," and that stemming the flow of intakes is a part of the necessary intervention); Stern Decl. at ¶¶ 9–10, *Dawson v. Asher*, 20-cv-409 (W.D. Wash.), ECF No. 6, (noting that release is "a critically important way to meaningfully mitigate" the risks of harm to persons who are at high risk of serious illness or death, as well as to support the broader community health infrastructure).

people with the greatest vulnerability to COVID-19 from transmission of the virus, and also facilitate greater risk mitigation for prisoners, staff, and the broader community. Release of the most vulnerable people from custody would also reduce the burden on the region's health care infrastructure by reducing the likelihood that an overwhelming number of people will become seriously ill from COVID-19 at the same time.

43. Jail administrators in Cuyahoga County, Ohio[90]; San Francisco, California[91]; Jefferson County, Colorado[92]; Montgomery, Alabama[93]; and the State of New Jersey,[94] among others, have concluded that widespread jail release is a necessary and appropriate public health intervention. Similarly, as of May 8, 2020, jails in Maine had reduced their populations by more than 40 percent since January 2020.[95]

---

[90] Scott Noll, *Cuyahoga County Jail Releases Hundreds of Low-Level Offenders to Prepare for Coronavirus Pandemic*, (March 20 2020 6:04 p.m.), https://cutt.ly/CtRSHkZ.

[91] Megan Cassidy, *Alameda County Releases 250 Jail Inmates Amid Coronavirus Concerns, SF to Release 26,* San Francisco Chronicle (March 20, 2020), https://cutt.ly/0tRSVmG.

[92] Jenna Carroll, *Inmates Being Released Early From JeffCo Detention Facility Amid Coronavirus Concerns*, KDVR Colorado (March 19, 2020 2:29 pm.), https://cutt.ly/UtRS8LE.

[93] *See In Re: Covid-19 Pandemic Emergency Response,* Administrative Order No. 4, Montgomery County Circuit Court (March 17, 2020).

[94] Erin Vogt, *Here's NJ's Plan for Releasing Up to 1,000 Inmates as COVID-19 Spreads* (March 23, 2020), https://cutt.ly/QtRS53w.

[95] Daily Dashboard, Dep't of Corrections, https://www.maine.gov/corrections/home/MDOC%20COVID19%20Web%20Dashboard%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.pdf (last visited May 15, 2020).

44. DOC has taken some precautions in an attempt to limit the risk of an outbreak of COVID-19, including adopting a phased approach to the COVID-19 response.[96] Due to "concerns of community transmissions," DOC is in "Phase Two," which includes the following:

    a.  suspending visitation, work release and other community-related activities,[97]

    b.  implementing screening measures for staff,[98]

    c.  providing for increased cleaning and provision of cleaning supplies,

    d.  posting signage about hand washing and general fact sheets about COVID-19

    e.  using Personal Protective Equipment (PPE) for med-line and MAT staff,

    f.  providing the flu vaccine those who want it but have not received it,

    g.  providing daily briefings at all facilities,

    h.  suspending self-serve dining,

    i.  pre-planning with local hospitals, and

    j.  designating isolation areas at each facility, and limiting staff working among multiple facilities.[99]

45. Although not mentioned in Phase Two precautions, DOC has also provided two cloth masks per incarcerated individual, and, in some facilities, created alternative systems for providing meals. DOC has stated that it "will enter phase three [precautions] when there is

---

[96] Statement of Commissioner Liberty, Maine Dep't of Corrections (Mar. 27, 2020), https://www.maine.gov/corrections/home/3.27.20%20Statement%20from%20Commisioner%20Liberty.pdf.

[97] Statement of Commissioner Liberty, Maine Dep't of Corrections (Mar. 20, 2020), https://www.maine.gov/corrections/home/Response%20from.%20Randall%20Liberty.pdf.

[98] Statement of Commissioner Liberty, Maine Dep't of Corrections (Mar. 20, 2020), https://www.maine.gov/corrections/home/Response%20from.%20Randall%20Liberty.pdf.

[99] *Id.*; *see also* Statement of Commissioner Liberty, Maine Dep't of Corrections (Mar. 27, 2020), https://www.maine.gov/corrections/home/3.27.20%20Statement%20from%20Commisioner%20Liberty.pdf.

a suspected or confirmed case within a DOC facility."[100] Yet DOC did not enter Phase

three after a confirmed positive case of a corrections worker at the Bolduc facility.[101]

46. DOC's plan, should there be an outbreak in the facility, is limited to: notifying state

agencies and the medical community according to state protocol, increasing the use of PPE,

suspending programming "as necessary," isolating intakes in cohorts, instituting

"alternative method for medical distribution" and "alternative method for food services, as

necessary" and triaging sick calls.[102]

47. Notwithstanding the efforts that DOC has taken, physical distancing in the facility remains

impossible, testing is limited, and rapid transmission of the disease in the facility remains

all but assured:

    a. **Physical distancing:** Prisoners typically sleep two or four to a cell, share
      showers with 30 to 80 other inmates, and spend much of the day in small and
      crowded dayrooms where physical distancing is impossible. When traveling
      throughout the facility to go to the meal hall or elsewhere, prisoners are bunched
      together and cannot physically distance because there is no enough space.

    b. **Testing:** Despite concerns with asymptomatic and pre-symptomatic transmission
      of the virus, DOC has performed only limited testing of prisoners with symptoms
      of COVID-19. As of May 14, 2020, DOC has tested only 26 inmates, or 1.3
      percent of incarcerated adults.[103] DOC does not test prisoners or staff who are

---

[100] Statement of Commissioner Liberty, Maine Dep't of Corrections (Mar. 27, 2020),
https://www.maine.gov/corrections/home/3.27.20%20Statement%20from%20Commisioner%20
Liberty.pdf.

[101] Statement of Commissioner Liberty, Maine Dep't of Corrections (Mar. 31, 2020),
https://www.maine.gov/corrections/home/3.31.20%20Statement%20from%20Commissioner%20
Liberty.pdf.

[102] Statement from Randall A. Liberty, Commissioner Department of Corrections, March 27,
2020,
https://www.maine.gov/corrections/home/3.27.20%20Statement%20from%20Commisioner%20
Liberty.pdf.

[103] Daily Dashboard, https://bit.ly/2Z1Ay3r (last visited May 14, 2020).

exposed to someone who tests positive unless they have symptoms themselves. For example, DOC did not test prisoners or staff who were exposed to the Bolduc employee who tested positive because "no clients or staff became symptomatic as a result of exposure."[104] A symptom-based approach to testing is particularly concerning in prison because some prisoners are so afraid of being forced into segregation or isolation that they have expressed they will not self-report any symptoms of COVID-19.[105] Numerous prisoners have said that, even if they start to feel symptoms, they will try to hide them.[106]

c. **Hygiene:** Hand sanitizer has been provided but it contains no alcohol, contrary to CDC guidelines.[107] Although DOC provides prisoners with gloves and spray bottles of cleaning solution to clean the dormitories, bathrooms, there is minimal supervision to ensure consistent or thorough cleaning. No bleach or bleach-based products are provided for cleaning.

d. **Masks**: Prisoners and staff are not required to wear masks at all times, and often do not wear them.

48. At current populations and staffing levels, it is impossible for DOC to ensure that all medically vulnerable inmates can perform physical distancing as described in CDC[108] and other public health guidelines, namely, providing all incarcerated persons a six-foot radius (113 ft$^2$) or more of distance between any other persons at all times, including during meals, transportation, provision of medication, recreation, counts, and all other activities.

---

[104] Megan Gray, *Maine prisons pressured to release more inmates, and information, during pandemic*, Portland Press Herald (May 3, 2020), https://www.pressherald.com/2020/05/03/maine-prisons-pressured-to-release-more-inmates-and-more-information-during-pandemic/.

[105] Denbow Decl. ¶ 23; Ragsdale Decl. ¶ 21.

[106] *Id.*

[107] *See, e.g.*, https://www.fda.gov/drugs/information-drug-class/qa-consumers-hand-sanitizers-and-covid-19

[108] Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

E. **DOC Has Categorically Refused Access to Medical Furlough and Severely Limited Home Confinement to Medically Vulnerable Prisoners**

49. In light of these serious risks, immediate release of medically vulnerable Petitioners remains a necessary public health intervention.[109] Release is needed to prevent irreparable harm to the medically vulnerable Class Members, and to reduce the incarcerated population in DOC facilities to enable adequate social distancing for all prisoners and staff.[110]

50. Yet unlike other correctional facilities in Maine,[111] DOC has not engaged in widespread or systematic release of people who are medically vulnerable, near the end of their sentence, or otherwise eligible for home confinement.[112]

51. DOC has the authority to release prisoners on medical furlough when "medically necessary" and on supervised community confinement (SCCP) when certain statutory

---

[109] *See supra* ¶ 33.

[110] *Id.* Further, in the prison context, the ABA urges that "Governmental authorities in all branches in a jurisdiction should take necessary steps to avoid crowding that… adversely affects the … protection of prisoners from harm, including the spread of disease." ABA Standard on Treatment of Prisoners 23-3.1(b).

[111] Randy Billings, *Increase in arrests of Portland's homeless worries civil liberties group*, Portland Press Herald (Apr. 7, 2020), https://www.pressherald.com/2020/05/07/uptick-in-homeless-arrests-worries-civil-liberties-group/ (quoting Cumberland County Sheriff as stating that "the jail has reduced its population by about 31 percent by releasing people with 90 days or fewer left on their sentences, and other nonviolent offenders eligible for home confinement").

[112] Although DOC's incarcerated population has decreased by approximately 11% since January 2020, this is because DOC has temporarily halted most new admissions and many prisoners are being released on their planned release date. The average sentence for prisoners in DOC custody is only 1.6 years. However, according to the DOC website, there are only 64 prisoners currently on SCCP, out of a total 1934 prisoners. Daily Dashboard (May 14, 2020), https://bit.ly/3fRsJmQ.

criteria are satisfied. *See* 34-A M.R.S. § 3035(2)(C)[113]; 34-A M.R.S. § 3036-A.[114] In each of these circumstances, DOC retains custody and oversight over prisoners in the community.

52. Advocates have been urging DOC for months to protect all prisoners—especially those who are medically vulnerable—by granting home confinement or other measures to enable physical distancing in the community. In a letter sent on March 19, 2020, the ACLU of Maine urged that prisons and jails "do not needlessly keep people incarcerated who are especially vulnerable to COVID-19."[115] In another letter sent on April 20, 2020, a coalition of organizations urged the Department of Corrections to exercise its authority—including under medical furlough and SCCP—"to release enough people so that those left inside can adhere to CDC guidelines for safe physical distancing."[116] In outreach on behalf of individual prisoners, moreover, the ACLU of Maine and other attorneys have requested

---

[113] By statute, the Commissioner "may grant to a client under sentence to the department . . . furlough from the facility in which the client is confined under the following conditions," including granting furlough "for the obtaining of medical services for a period longer than 10 days if medically required." 34-A M.R.S. § 3035(2)(C).

[114] By statute, the Commissioner "may transfer any prisoner committed to the department to be transferred from a correctional facility to supervised community confinement," so long as (A) the prisoner has served 2/3 of a more-than-five-year sentence or ½ of a five-years-or-less sentence, (B) the prison has 18 months or less remaining on the term of imprisonment (incorporating any good time credits), (C) is classified as minimum or community security. 34-A M.R.S. § 3036-A. Conditions for SSCP include completing a work, education, or treatment program; living in an approved residence; submitting to a curfew, travel restrictions, drug tests, and searches; and abstaining from alcohol and drugs. *Id.*

[115] March 18, 2020 Letter, available at
https://www.aclumaine.org/sites/default/files/aclu_coronavirus_criminal_justice_maine_letterhead_03182020.pdf.

[116] April 20, 2020 Coalition Letter, available at
https://www.aclumaine.org/sites/default/files/coalition_letter_to_mills_admin_04.20.20.pdf.

SCCP, medical furlough, or and other accommodations to protect specific medically vulnerable prisoners.[117] These requests have been rejected.

53. Despite its broad authority, DOC has "not expanded eligibility for home confinement to additional groups of inmates" since the pandemic erupted and instead is "using an even stricter set of criteria than usual."[118] In addition to the statutory criteria and typical guidelines, DOC has applied additional "parameters" to limit the number and type of people who are eligible for home confinement. The new and stricter guidelines include the following:

  a. Client's current release date must be less than one year (*even though the statute allows for a default of 18 months*),

  b. Client is not currently serving a sentence for a crime committed against a person (*even though this is not a typical statutory or policy requirement*),

  c. Client may not have a criminal history that includes a crime against a person, fugitive from justice, or several prior revocations of probation (*even though these are not typical statutory or policy requirements*),

  d. Client must be approved as community custody by the Department's classification instrument (*even though the statute allows for minimum as well as community custody*),

  e. Client's placement plan must include stable housing, medical services (as needed), and treatment / programming services (as appropriate) (*even though*

---

[117] *See, e.g.*, Sideris Decl. & Att. A, B.

[118] Megan Gray, *Maine prisons pressured to release more inmates, and information, during pandemic*, Portland Press Herald, May 3, 2020, available at https://www.pressherald.com/2020/05/03/maine-prisons-pressured-to-release-more-inmates-and-more-information-during-pandemic/ (last accessed May 4, 2020); *see also* Daily Dashboard, Maine Dep't of Corrections (May 6, 2020), https://www.maine.gov/corrections/home/MDOC%20COVID19%20Web%20Dashboard%205-6-2020.pdf.

*many prisoners get medical care through MaineCare, which is suspended during periods of incarceration).*[119]

54. DOC also provides several nonspecific factors, including the client's medical history and current medical conditions, the client's history on probation and/or SCCP, and the client's treatment and programming progress and compliance while incarcerated.[120]

55. Although one would assume that "medical conditions" would *support* release, the experience of Petitioners suggests that DOC treats the presence of underlying medical conditions as a reason not to release otherwise eligible prisoners. Indeed, Petitioner Denbow's case worker told him that "there's nobody being released because of medical conditions, so you can get that idea right out of your head."[121]

56. Similarly, in refusing timely accommodation for Petitioner Ragsdale, the Attorney General's office explained that "[a]t present, he receives medication and medical treatment on site," whereas "[i]n the community, he would have to visit pharmacies and medical providers to obtain treatment."[122] The AG's office made the same point in opposing Petitioner Denbow's release as requested in state court, stating that "multiple prescription medications . . . are presently provided to him in prison by the prison's private medical contractor, but in the community, he would have to find access to medications through a

---

[119] Daily Dashboard, Maine Dep't of Corrections, https://www.maine.gov/corrections/home/MDOC%20COVID19%20Web%20Dashboard%205-8-2020.pdf.

[120] Daily Dashboard, Maine Dep't of Corrections, https://www.maine.gov/corrections/home/MDOC%20COVID19%20Web%20Dashboard%205-8-2020.pdf.

[121] Denbow Decl. ¶ 13.

[122] State Resp. to Demand Letter (May 7, 2020).

doctor's office or pharmacy."[123] Upon information and belief, to the extent any medically vulnerable individuals are currently released on SCCP, it is in spite of their medical risk and not because of it. Many medically vulnerable inmates who would be safe on SCCP are not being meaningfully considered.

57. DOC has also refused to grant expedited review or processing for people who are medically vulnerable. Petitioner Ragsdale, for example, applied for home confinement more than one month ago, but did not get any response until his lawyer sent a demand letter. Even after that, all he received was more paperwork to complete, and a notice that "[t]here is no guarantee that your application will be processed immediately" and that "[a]t this time very limited home investigations are being done. If it is not done now, it will be done when normal operations resume."

58. The Department has also applied a categorical prohibition against using medical furlough to enable medically vulnerable prisoners to physically distance during the state of emergency—regardless of medical necessity. DOC has stated that the medical furlough program is typically used to transition clients into medical programs when current medical conditions are not able to be attained while they are incarcerated. Yet even though physical distancing is necessary for at-risk prisoners, DOC has refused to use medical furlough to enable medically vulnerable prisoners to physically distance during the state of emergency and facilitate greater physical distancing for those who remain inside. Instead, the Director

---

[123] State Resp., *Denbow v. State* (Apr. 27, 2020) (Appendix of State Filings at 40).

of Classification has represented that "the department is not utilizing the medical furlough to release clients during the COVID-19 pandemic."[124]

59. In short, DOC has refused to use medical furlough and has applied community release so narrowly as to effectively be unavailable for the people who need it most. In normal times, such an approach may be merely unwise. In this pandemic, it is unconstitutional and unlawful because it unnecessarily and deliberately exposes medically vulnerable prisoners to an unacceptable risk of serious illness or death.

60. The imminent reopening of Maine's economy only makes the plight of prisoners more dangerous. Outbreaks in other crowded settings have continued to increase even as Maine contemplates reopening.[125] Prisons are inextricably linked to the wider community, and a rise in community cases increases the risk COVID-19 will infiltrate the prisons. Once the virus infiltrates the prisons (if it has not already done so), it will likely spread rapidly—increasing risk for prisoners, prison staff and their families, the medical works who are responsible for treating them, and the community as a whole.

## IV.     CLASS ACTION ALLEGATIONS

61. Petitioners bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedures on behalf of themselves and a class of similarly situated individuals.

---

[124] Sideris Decl., Att. B (email from DOC Classification Director).

[125] Kevin Miller, Virus outbreaks reported at Portland meat plant, Bangor homeless shelter, Portland Press Herald (Apr. 29, 2020), https://www.pressherald.com/2020/04/29/maine-cdc-reports-16-new-coronavirus-cases-one-additional-death/ (recording outbreaks in a Tyson Foods meat-processing plant Bangor's Hope House Health and Living Center, which includes a homeless shelter). Charles Eichacker, *Westbrook nursing home becomes 7th in Maine with a coronavirus outbreak*, Bangor Daily News (May 6, 2020) https://bangordailynews.com/2020/05/06/news/portland/westbrook-nursing-home-becomes-7th-in-maine-with-a-coronavirus-outbreak/.

62.  Petitioners Sean R. Ragsdale and Joseph A. Denbow seek to represent a class of all current and future inmates who, by reason of age or medical condition, are particularly vulnerable to injury or death if they were to contract COVID-19.

63. The "Medically-Vulnerable" subclasses are defined as all current and future persons held by DOC who qualify as high-risk under the CDC guidelines, including individuals over the age of 55, as well as all current and future persons incarcerated by DOC of any age who experience (a) lung disease, including asthma, chronic obstructive pulmonary disease (e.g. bronchitis or emphysema), or other chronic conditions associated with impaired lung function; (b) heart disease, such as congenital heart disease, congestive heart failure and coronary artery disease; (c) chronic liver or kidney disease (including hepatitis and dialysis patients); (d) diabetes or other endocrine disorders; (e) epilepsy; (f) hypertension; (g) compromised immune systems (such as from cancer, HIV, receipt of an organ or bone marrow transplant, as a side effect of medication, or other autoimmune disease); (h) blood disorders (including sickle cell disease); (i) inherited metabolic disorders; (j) history of stroke; (k) a developmental disability; and/or (l) a current or recent (last two weeks) pregnancy.

64. This action has been brought and may properly be maintained as a class action under Federal law. It satisfies the requirements for class certification under Rule 23 of the Federal Rules of Civil Procedure, including the numerosity, commonality, typicality, and adequacy requirements for maintaining a class action under Fed. R. Civ. P. 23(a).

65. Joinder is impracticable because (1) the classes are numerous; (2) the classes include future members, and (3) the class members are incarcerated, rendering their ability to institute

individual lawsuits limited, particularly in light of cancelation of all legal visitation and court closures.

66. On information and belief, there more than 900 people in the proposed Class. A significant portion of prisoners in DOC custody are medically vulnerable. According to DOC's own estimates, approximately 925 prisoners in DOC custody have underlying medical conditions that could place them at heightened risk for serious illness or death from COVID-19.[126] On top of this number are the additional prisoners who are medically vulnerable solely because of their age.

67. Petitioners also seek to represent three subclasses of individuals, **(A)** those who are set to be released within one year (the "Imminent Release Subclass"), **(B)** those who are classified by DOC as minimum or community security (the "Minimum Security Subclass"), and **(C)** those who are medically vulnerable because of disabilities protected by federal disability rights law (the "Disabilities Subclass").

    a. **Imminent Release Subclass**: Many Class Members are set to be released within one year, with the average sentence in the Maine Department of Corrections only 1.6 years. Members of this Subclass will soon be released to the community, and keeping them in prison simply makes it more like that they will become infected in the closed, congregate setting of prison, and carry the infection with them upon release to the community.

---

[126] Sideris Decl. Att. B (DOC Classification Director stating that there are approximately 925 prisoners with preexisting conditions).

b. **Minimum Security Subclass:** With many dorms filled with prisoners who are minimum security or community security, the second subclass is also sizeable. Members of this Subclass have been identified by DOC has presenting extremely low risk to security. Continued incarceration exposes them to a high risk of serious illness or death.

c. **Disabilities Subclass:** Persons who are medically vulnerable to COVID-19 because of underlying medical conditions are protected, not only by the Eighth Amendment to the United States Constitution, but also be federal disability rights laws like the ADA and the Rehabilitation Act.

68. Common questions of law and fact exist as to all members of the proposed class. All have a right to receive adequate COVID-19 prevention, testing, and treatment. All are deprived of the ability to physically distance in DOC facilities, all are harmed by DOC's insufficient testing, and all are deprived of necessary hand hygiene such as alcohol-based hand sanitizer. Further, all members of the Class are harmed by the DOC's categorical refusal to consider medical furlough, or to expedite and facilitate home confinement for medically vulnerable individuals.

69. Named Petitioners have the requisite personal interest in the outcome of this action and will fairly and adequately protect the interests of the class. Petitioners have no interests adverse to the interests of the proposed class. Petitioners retained *pro bono* counsel with experience and success in the prosecution of civil rights litigation. Counsel for Petitioners know of no conflicts among proposed class members or between counsel and proposed class members.

70. Respondents have acted on grounds generally applicable to all proposed class members, and this action seeks declaratory and injunctive relief. Petitioners therefore seek class certification under Rule 23(b)(2).

71. In the alternative, the requirements of Rule 23(b)(1) are satisfied, because prosecuting separate actions would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of contact for the party opposing the proposed classes.

A. **THE COURT SHOULD GRANT PETITIONERS THE RELIEF THEY SEEK**
**Petitioners' Incarceration Amidst the Likely COVID-19 Outbreak in DOC Facilities**
**Violates their Right to Constitutional Conditions of Confinement**

72. Corrections officials have a constitutional obligation to provide for detainees' reasonable safety and to address their serious medical needs. *See DeShaney v. Winnebago County Dept. of Soc. Services*, 489 U.S. 189, 200 (1989) ("[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." ); *Youngberg v. Romeo*, 457 U.S. 307, 315–16, 324 (1982) (the state has an "unquestioned duty to provide adequate . . . medical care" for incarcerated persons); *Wilson v. Seiter*, 501 U.S. 294, 300 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Brown v. Plata*, 563 U.S. 493, 531-32 (2011); *Farmer v. Brennan*, 511 U.S. 825, 834 (remanding for determination whether correctional officer violated Eighth Amendment by failing to prevent "a substantial risk of serious harm").

73. An inmate's entitlement to medical treatment "reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards" is undisputed. *United States v. DeCologero,* 821 F.2d 39, 43 (1st Cir. 1987).

74. This obligation requires corrections officials to protect detainees from infectious diseases like COVID-19; officials may not wait until someone tests positive for the virus, and an outbreak begins. *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993) ("That the Eighth Amendment protects against future harm to inmates is not a novel proposition. . . . It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them"); *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) ("[C]orrectional officials have an affirmative obligation to protect [forcibly confined] inmates from infectious disease"); *see also Farmer v. Brennan*, 511 U.S. 825, 833 (1994) ("[H]aving stripped [prisoners] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course.").

75. "[T]o prove an Eighth Amendment violation, a prisoner must satisfy both of two prongs: (1) an objective prong that requires proof of a serious medical need, and (2) a subjective prong that mandates a showing of prison administrators' deliberate indifference to that need." *Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir. 2014).

76. Under the objective prong, the risk of infection with COVID-19 represents a serious medical need for Petitioners and medically vulnerable Class Members. As another court recently explained, "[f]or infected inmates, the virus can lead to pneumonia," and "[i]n the worse pneumonia cases, COVID-19 victims suffer diminishing oxygen absorption, with resulting organ failure," and victims "chok[ing] to death." *Wilson v. Williams*, No. 4:20-

CV-00794, 2020 WL 1940882, at *8 (N.D. Ohio Apr. 22, 2020). "While not every inmate who contracts the virus will die, [medically vulnerable prisoners] are at a much greater risk of doing so." *Id.* "They have a very serious medical need to be protected from the virus." *Id.*

77. Under the subjective prong, with respect to an impending infectious disease like COVID-19, deliberate indifference is satisfied when corrections officials "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," even when "the complaining inmate shows no serious current symptoms." *Helling*, 509 U.S. at 33 (holding that a prisoner "states a cause of action . . . by alleging that [corrections officials] have, with deliberate indifference, exposed him to conditions that pose an unreasonable risk of serious damage to future health"); *see also Hope v. Pelzer,* 536 U.S. 730, 738 (2002) (citing *Farmer,* 511 U.S. at 842) (court "may infer the existence of [deliberate indifference] from the fact that the risk of harm is obvious").

78. DOC's refusal to enable physical distancing in its facilities, or to provide meaningful access to medical furlough or home confinement for the medically vulnerable class—ensuring they will be unable to physically distance and protect themselves from the virus—qualifies as deliberate indifference. *See, e.g.*, *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 644 (5th Cir. 1996) ("even where a State may not want to subject a detainee to inhumane conditions of confinement or abusive jail practices, its intent to do so is nevertheless

presumed when it incarcerates the detainee in the face of such known conditions and practices."). [127]

79. Even if DOC's current spacing of detainees and provision of healthcare would serve the legitimate purpose of prison health and safety in normal times, those procedures are now endangering health and safety in the wake of COVID-19. *See Plata*, 563 U.S. 493 (ordering release of inmates to correct overcrowding that violated Eighth Amendment); Memorandum and Order, *Thakker v. Doll*, No. 20-CV-0480 (M.D. Pa. Mar. 31, 2020) (categorically releasing petitioners who "suffer[] from chronic medical conditions and face[] an imminent risk of death or serious injury if exposed to COVID-19).

## B. DOC'S, Practices, and Procedures in the Face of COVID-19 Violate the ADA and the Rehabilitation Act

80. The Disability Subclass includes everyone in the medically vulnerable class who is vulnerable because of a disability as defined under federal law. This includes everyone in the medically vulnerable subclass except those vulnerable solely because of age or pregnancy status. All other conditions that increase risk for COVID-19 complications or death—including lung conditions, asthma, heart conditions, diabetes, kidney disease, livery disease, HIV, immune dysfunction, autoimmune disorders, cancer treatment, and history of organ or bone marrow transplantation—are disabilities under federal disability rights laws. By categorically refusing medical furloughs and severely limiting home confinement for medically vulnerable prisoners, DOC's policies and practices violate the ADA and the Rehabilitation Act.

---

[127] *See also*, Public Health Experts' Declarations, *supra* note 89.

81. Title II of the ADA requires that public entities refrain from discriminating against qualified individuals on the basis of a disability. 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act imposes parallel requirements on public entities that receive federal funds, as does the Maine DOC. *See Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001). In order to avoid disability discrimination in the Maine DOC in this public health emergency, release is a reasonable and nondiscriminatory method to ensure that the members of the Disability Subclass are able to receive necessary preventative care—the ability to physically distance.

### 1. The ADA and Section 504 Apply to the Respondents and Members of the Disability Subclass

82. Petitioners and Class Members in the Disability Subclasses are protected people with disabilities under the ADA and Section 504. They are all medically vulnerable to COVID-19 complications or death due to their disabilities. "Disability" is defined broadly, to include, inter alia, a "physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). "Major life activity" is itself broadly defined, and includes "the operation of a major bodily function," such as "functions of the immune system, normal cell growth . . . neurological, brain, respiratory, circulatory, [or] endocrine" systems. 42 U.S.C. § 12102(2)(B). Petitioners and Members of the Disability Subclasses have disabilities that substantially limit a major life activity or major bodily function.[128]

---

[128] Several conditions within the disability subclasses are expressly identified in regulations as presumptively covered disabilities. 28 C.F.R. § 35.108(d)(2)(iii) ("it should easily be concluded" that "[c]ancer substantially limits normal cell growth . . . diabetes substantially limits endocrine

83. Petitioners and Class Members are "qualified" for Defendants' programs, services, and activities, including provision of necessary medical treatment, including medical furlough when necessary; home confinement under 34-A M.R.S. § 3036-A; and safe, constitutional living conditions during confinement; and medical care and rehabilitative services to prepare for reentry after release. 42 U.S.C. § 12131(2); 28 C.F.R. § 35.104; 28 C.F.R. § Pt. 35, App. B ("[T]itle II applies to anything a public entity does").

84. The Maine Department of Corrections is a "public entity" for purposes of the ADA, and is bound to comply with Title II. 42 U.S.C. § 12131(B) ("public entity" includes "any department, agency, special purpose district, or other instrumentality of a State or States or local government"); *see also Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998). The Maine DOC also receives federal funds for purposes of the Rehabilitation Act.

    **2.    Under the ADA and Section 504, DOC has an Affirmative Obligation to Ensure Equal and Equally Safe Access to Programs, Services, and Activities and to Avoid Disability Discrimination Against Disabled Class Members.**

85. In order to avoid disability discrimination, public entities have an affirmative obligation to ensure that people with disabilities can participate in all of the entity's programs, benefits, and services on an equal and equally safe basis as people without disabilities. 28 C.F.R. §§ 35.102(a), 35.130(a)-(b); *Pierce v. D.C.*, 128 F. Supp. 3d 250, 266 (D.D.C. 2015) ("[B]ecause Congress was concerned that '[d]iscrimination against [people with disabilities] was . . . most often the product, not of invidious animus, but rather of thoughtlessness and indifference – of benign neglect[,]' the express prohibitions against

---

function . . . epilepsy . . . substantially limits neurological function . . . HIV infection substantially limits immune function."

disability-based discrimination in Section 504 and Title II include *an affirmative obligation* to make benefits, services, and programs accessible to disabled people"); *id.* at 269 ("[N]othing in the disability discrimination statutes even remotely suggests that covered entities have the option of being passive in their approach to disabled individuals as far as the provision of accommodations is concerned."). Public entities must avoid policies, practices, criteria, or methods of administration that have the purpose or effect of excluding or discriminating against persons with disabilities. 28 C.F.R. § 35.130(b)(3), (8).

86. These affirmative obligations include a requirement that public entities make reasonable modifications to their policies, practices, or procedures where necessary to avoid disability discrimination. 28 C.F.R. § 35.130(b)(7)(i). The ADA also prohibits public entities from "utiliz[ing] criteria or methods of administration . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability" or "[t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3)(i)-(ii).

### 3. Reasonable modifications, including release of the Disability Subclass, are required under the ADA and Section 504.

87. DOC discriminates against the Disability Subclass by refusing to "affirmatively accommodate" their disabilities as necessary to provide "meaningful access to a public service." *Nunes v. Mass. Dep't of Correction*, 766 F.3d 136, 145 (1st Cir. 2014) (citation omitted). The Disability Subclasses are entitled to full constitutional protections, as well as reasonable modifications under disability rights laws to ensure they can participate equally and with equal safety in Defendants' programs, services, and activities. Defendants' programs, services, and activities include provision of necessary medical treatment,

40

including medical furlough when necessary, 34-A M.R.S. § 3035(C)(2); rehabilitative programs such as home confinement under 34-A M.R.S. § 3036-A; and safe, constitutional living conditions during confinement to prepare the person for a safe return to society at the end of their sentence. Disability Subclass members cannot access these services equally if they are severely ill, unconscious, or dead. Because of their high risk of these catastrophic outcomes—which will inevitably result in exclusion from the jail's programs—the jail must release them as a reasonable modification, and to avoid unlawful discriminatory methods of administration.

88. DOC has also excluded members of the Disability Subclass from available medical services and rehabilitative programs—namely, medical furlough and home confinement. Release to the community is a reasonable and necessary accommodation for many members of the Disability Subclass, who require space to physically distance and protect themselves from the virus. By categorically making medical furlough unavailable during the pandemic, DOC discriminates against members of the Disability Subclass who require life-saving preventive care (physical distancing) that is only available outside of the prison. And by applying stricter-than-usual standards for home confinement during the pandemic and by failing to process applications in a reasonable timeframe, DOC discriminates against Subclass Members with disabilities who are at heightened risk from the pandemic. In short, by categorically refusing to provide access to medical furlough and by denying reasonable access to home confinement, DOC has denied access to necessary treatments and programs in violation of disability rights laws.

89. Release of the Disability Subclasses is a reasonable modification and is not a fundamental alteration. *Cf. Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882, 1003 (E.D. Cal. 2009);

*Inmates of Allegheny Cnty. Jail v. Peirce*, 487 F. Supp. 638, 644 (W.D. Pa. 1980); *cf.*
*Henrietta D. v. Bloomberg*, 331 F.3d 261, 281 (2d Cir. 2003) ("[t]he reasonableness of the
modifications that plaintiffs seek . . . is evidenced by the fact that virtually all are
modifications that defendants have long purported … to provide") (quoting *Henrietta D.
v. Giuliani*, 119 F. Supp. 2d 181, 208 n.17 (E.D.N.Y. 2000)). Release on medical furlough,
home confinement, or another accommodation is the most effective and reasonable
modification to ensure Disability Subclass members are not subject to disability
discrimination.

**C.      28 U.S.C. § 2241 is an Appropriate Vehicle to Remedy these Violations**

90. Section 2241(c)(3) allows this court to order the release of inmates like Petitioners who are
held "in violation of the Constitution or laws . . . of the United States." 28 U.S.C.
2241(c)(3); *Peyton v. Rowe*, 391 U.S. 54, 67 (1968) (Section 2241(c)(3) can afford
immediate release for claims other than those challenging the sentence itself). This circuit
has confirmed that Section 2241 is available for so-called "conditions of confinement"
challenges. *Miller v. U.S.*, 564 F.2d 103, 105 (1st Cir. 1977) ("Section 2241 provides a
remedy for a federal prisoner who contests the conditions of his confinement.").[129]

---

[129] *See Miller v. U.S.*, 564 F.2d 103, 105 (1st Cir. 1977) ("Section 2241 provides a remedy for a
federal prisoner who contests the conditions of his confinement."); *see also Thompson v.
Choinski*, 525 F.3d 205, 209 (2d Cir. 2008) ("This court has long interpreted § 2241 as applying
to challenges to the execution of a federal sentence, 'including such matters as the administration
of parole, . . . prison disciplinary actions, prison transfers, type of detention and prison
conditions.'"); *Aamer v. Obama*, 742 F.3d 1023, 1032 (D.C. Cir. 2014) ("Our precedent
establishes that one in custody may challenge the conditions of his confinement in a petition for
habeas corpus.").

91. Habeas corpus is the appropriate remedy when a petitioner challenges "the fact or duration of his confinement" or seeks a "quantum change" to a less restrictive form of custody. *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 873 (1st Cir. 2010) (citing, *e.g.*, *Wilkinson v. Dotson*, 544 U.S. 74, 78 (2005)); *Dickerson v. Walsh*, 750 F.2d 150, 152 (1st Cir. 1984). In this case, Petitioners and Class Members challenge the fact of their confinement, which, they allege, has "become unconstitutional because of the COVID-19 pandemic risk." *McPherson v. Lamont*, No. 3:20CV534, 2020 WL 2198279, at *4 (D. Conn. May 6, 2020) (exercising jurisdiction over a section 2241 habeas petition challenging unlawful confinement during the COVID-19 pandemic) (citing cases).

**D.    Exhaustion of State Remedies in the Face of COVID-19 Spread Would Be Futile**

92. Federal courts apply a judge-made exhaustion doctrine in § 2241 cases. *See Braden v. 30th Judicial Circuit Court of Kentucky*, 410 U.S. 484, 490 (1973).[130] Unlike the statutory exhaustion requirement in § 2254, the judge-made exhaustion requirement for § 2241 petitions is prudential, flexible, and non-jurisdictional. *See, e.g. Santiago-Lugo v. Warden*, 785 F.3d 467, 474 (11th Cir. 2015). The Supreme Court has described the exhaustion doctrine in § 2241 cases as a "judicially crafted instrument which reflects a careful balance between important interests of federalism and the need to preserve the writ of habeas corpus as a 'swift and imperative remedy in all cases of illegal restraint or

---

[130] *Cf. Deere v. Superior Court of Cal.*, No. 07-56109, 2009 WL 2386677, at *1 (9th Cir. Aug. 5, 2009) (declining to decide the question of whether a § 2241 petitioner must first exhaust his state remedies "to the extent this question has not been decided."); *U.S. v. Castor*, 937 F.2d 293, 296-297 (7th Cir. 1991) ("While these applicants [defendants awaiting trial] are not subject to the statutory requirement of exhaustion remedies, 28 U.S.C. § 2254(b)(1988) … federal courts nevertheless may require, as a matter of comity, that such detainees exhaust all avenues….").

confinement.'" *Braden*, 410 U.S. at 490 (citation omitted). Courts, accordingly, apply it with those dual purposes in mind. *See, e.g.*, *Park v. Thompson*, 356 F. Supp. 783, 788 (D. Haw. 1973) ("It is the legal issues that are to be exhausted, not the petitioner.").

93. Courts have also recognized that exhaustion is excused where it would be futile. "Although the exhaustion rule is important, it is not immutable: exhaustion of remedies is not a jurisdictional prerequisite to a habeas petition, but, rather, a gatekeeping provision rooted in concepts of federalism and comity." *Allen v. Attorney Gen. of State of Me.*, 80 F.3d 569, 573 (1st Cir. 1996); *Schandelmeier v. Cunningham*, 819 F.2d 52, 53 (3d Cir. 1986) (applying futility doctrine to state prisoner seeking Section 2241 habeas relief). *McPherson v. Lamont*, No. 3:20CV534 (JBA), 2020 WL 2198279, at *4 (D. Conn. May 6, 2020)2012) (quoting *Beharry v. Aschcroft,* 329 F.3d 51, 62 (2d Cir. 2003). A state corrective process may be futile when it "is so clearly deficient as to render futile any effort to obtain relief." *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981).

94. Efforts to obtain relief for Petitioners demonstrate that it would be not only futile, but dangerous to force Petitioners and Class Members to exhaust state remedies when their risk of COVID-19 contraction is increasing by the minute. "[U]ndue delay, if it in fact results in catastrophic health consequences, could make exhaustion futile." *McPherson v. Lamont*, No. 3:20CV534 (JBA), 2020 WL 2198279, at *6 (D. Conn. May 6, 2020) (citing *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019)). It would be futile to seek such relief in state court, where Mr. Denbow's individual petition for post-conviction review has languished without a hearing for nearly five weeks (since April 13, 2020), Denbow

Decl., ¶ 27, and where Maine criminal procedure requires singular treatment of post-conviction review, and does not authorize class treatment. *See* M.R. Crim. P. 67(b).[131]

95. In light of the unprecedented crisis presented by the COVID-19 pandemic, class relief is essential to promote efficiency, consistency, and fairness, and to improve access to legal and expert assistance by parties with limited resources.[132] Class relief is essential because proceeding on a case-by-case basis is too cumbersome in the face of the unprecedented COVID-19 pandemic—as illustrated by outbreaks across the country.[133] As such, exhaustion is futile for proposed Class Members, because requiring each member to individually petition the state court would burden the limited judicial resources during this

---

[131] *See also* M. R. Crim. P. 67(b) (requiring that a single petition may attack only a single proceeding); M.R. Civ. P. 23 (applying only in civil actions, not criminal actions like post-conviction reviews).

[132] *Monk v. Shulkin*, 855 F.3d 1312, 1320–21 (Fed. Cir. 2017) (referencing inherent authority to aggregate cases when it "promot[es] efficiency, consistency, and fairness, and improving access to legal and expert assistance by parties with limited resources"); Stephen C. Robin, *Healing Medicare*, 95 N.C. L. Rev. 1293, 1303 (2017) (citing *Barr*, 930 F.2d at 74; *Air Line Pilots Ass'n, Int'l v. Civil Aeronautics Bd.*, 750 F.2d 81 (D.C. Cir. 1984)) (suggesting a preference for suits brought on behalf of a class or association, where the court can "shift[ ] its focus from one claimant to the whole system" and "simply address[ ] the unreasonable delays felt by all of the potential parties with claims under the Act in question"); *Harshaw v. Farrell*, 55 Ohio App. 2d 246, 247, 380 N.E.2d 749, 750–51 (Ohio Ct. App. 1977) (holding that "a class action in habeas corpus may be the swiftest, fairest, and most effective way to obtain common relief for a large group of persons who are confined unlawfully under similar or identical circumstances").

[133] Recent news includes outbreaks in jails and prisons in Tennessee, Massachusetts, and Michigan. *See, e.g.*, COVID-19 outbreak infecting over 500 prisoners may have come from staff: Medical director (Apr. 28, 2020), https://abcnews.go.com/US/covid-19-outbreak-infecting-500-prisoners-staff-medical/story?id=70382322; Mass. Prisons And Jails Among Hardest Hit By Coronavirus In U.S. (Apr. 28, 2020), https://www.wbur.org/investigations/2020/04/28/coronavirus-prisons-jails-massachusetts-deaths-cases; Lakeland has the most positive COVID-19 cases of all M.D.O.C facilities (87 percent of tested prisoners were positive for the coronavirus) (Apr. 22, 2020), https://wtvbam.com/news/articles/2020/apr/22/lakeland-has-the-most-positive-covid-19-cases-of-all-mdoc-facilities/1009979/.

emergency and cause further delay. The risk of irreparable harm to Petitioners and Class

Members is simply too high to require exhaustion in this circumstance.

## V.     CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**Unconstitutional Punishment in Violation of the Eighth Amendment to the U.S.
Constitution**
28 U.S.C. § 2241

96. Under the Eighth Amendment, persons in carceral custody have a right to be free from
cruel and unusual punishment. As part of the right, the government must provide
incarcerated persons with reasonable safety and address serious medical needs that arise in
jail. *See, e.g., Estelle*, 429 U.S. at 104; *DeShaney*, 489 U.S. at 200. Deliberate indifference
to the serious risk COVID-19 poses to Class Members infringes on the protection from
cruel and unusual punishment. Respondents violate this right by subjecting Class Members
to conditions of confinement that do not ensure their safety and health.

97. The Prison has neither the capacity nor the ability to comply with public health guidelines
to prevent an outbreak of COVID-19 and cannot provide for the safety of the Post-
Conviction Class.

98. Respondents' actions and inactions result in the confinement of members of the Post-
Conviction Class in a jail where they do not have the capacity to test for, treat, or prevent
COVID-19 outbreaks, which violates Petitioners's rights to treatment and adequate
medical care.

99. By operating prison without the capacity to test for, treat, or prevent a COVID-19 outbreak,
Respondents, as supervisors, direct participants, and policy makers for the Maine
Department of Corrections have violated the rights of Class Members under the Eighth
Amendment.

**<u>SECOND CLAIM FOR RELIEF</u>**

**Discrimination on the Basis of Disability in Violation of Title II of the ADA**

**42 U.S.C. § 12131 *et seq.* / 28 U.S.C. § 2241**

**Disability Subclass versus all Respondents**

100. Petitioners incorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

101. Title II of the ADA requires that public entities refrain from discriminating against qualified individuals on the basis of disability. 42 U.S.C. § 12132. The regulations implementing Title II of the ADA require that public entities avoid unnecessary policies, practices, criteria or methods of administration that have the effect of excluding or discriminating against persons with disabilities in the entity's programs, services, or activities. 28 C.F.R. § 35.130(a), (b)(3), (b)(8). Further, a public entity must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).

102. Petitioners Ragsdale and Denbow are individuals with disabilities for purposes of the ADA. 42 U.S.C. § 12102. As people held in the Maine Department of Corrections, they are "qualified" for the programs, services, and activities being challenged herein. 42 U.S.C. § 12131(2).

103. Defendants are violating Title II of the ADA by failing to make the reasonable modifications necessary to ensure equal access to adjudication, jail services, and release for people with disabilities who face high risk of complications or death in the event of

47

COVID-19 infection. Defendants are further violating the ADA by employing methods of administration (including a policy of non-release even in the face of COVID-19) that tend to discriminate against people with disabilities by placing them at heightened risk of severe illness and death.

### THIRD CLAIM FOR RELIEF

**Discrimination on the Basis of Disability in Violation of Section 504 of the Rehabilitation Act**

**29 U.S.C. § 794 *et seq.* / 28 U.S.C. § 2241**

**Disability Subclass versus all Respondents**

104. Section 504 of the Rehabilitation Act states that "no otherwise qualified individual with disability in the United States . . . shall, solely by reason of [] disability, be excluded from the participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The regulations implementing Section 504 of the Rehabilitation Act require that entities receiving federal financial assistance avoid unnecessary policies, practices criteria or methods of administration that have the effect of discriminating against persons with disabilities. 28 C.F.R. § 41.51(b)(3)(i).

105. 134. Defendants receive "Federal financial assistance" within the meaning of 28 U.S.C. § 794(a).

106. Petitioners Ragsdale and Denbow are individuals with disabilities for purposes of the Rehabilitation Act, 42 U.S.C. § 12012, 29 U.S.C. § 705(20)(B). As people held in the Maine Department of Corrections, they are "qualified" for the programs, services, and activities being challenged herein.

107. Defendants are violating section 504 of the Rehabilitation Act by failing to make the reasonable modifications necessary to ensure equal access to adjudication, jail services, and release for people with disabilities who face high risk of complications or death in the event of COVID-19 infection. Defendants are further violating the ADA by employing methods of administration (including a policy of non-release even in the face of COVID-19) that tend to discriminate against people with disabilities by placing them at heightened risk of severe illness and death.

## VI.        REQUEST FOR RELIEF

108. Petitioners and Class Members respectfully request that the Court order the following:

1. Certification of this Petition as a Class Action;

2. A temporary restraining order, preliminary injunction, permanent injunction, order of enlargement, and/or writ of habeas corpus

   a. declaring that it is unconstitutional and unlawful for DOC to categorically deny access to medical furlough during the pandemic;

   b. ordering DOC to identify members of the medically vulnerable class, the imminent release subclass, the minimum-or-community custody subclass, and the disability subclass, within two days;

   c. order DOC to evaluate, under standards that comply with the Eighth Amendment and federal disability laws, each class member's eligibility for medical furlough, home confinement, or another accommodation to enable social distancing, or, in the alternative, appoint a Rule 706 expert to complete such evaluation; and

    d. order enlargement for Class Members to safely physically distance in the community or another appropriate setting;

3. A declaration that DOC's policies and practices violate the Eighth Amendment right against cruel and unusual punishment;

4. A declaration that DOC's policies and practices violate the ADA and Rehabilitation Act's prohibition of discrimination on the basis of disability;

5. All further action required to release Class and Subclass Members to ensure that all remaining persons are incarcerated in DOC facilities under conditions consistent with CDC guidance to prevent the spread of COVID-19, including requiring that all persons be able to maintain six feet or more of space between them;

6. Any further relief this Court deems appropriate.

Dated: May 15, 2020                                  Respectfully Submitted,

                                                     /s/ Emma E. Bond
                                                     Emma E. Bond, Esq.
                                                     Zachary L. Heiden, Eq.
                                                     American Civil Liberties Union of Maine
                                                     Foundation
                                                     121 Middle Street, Suite 200
                                                     Portland, ME 04103
                                                     (207) 619-8687
                                                     *ebond@aclumaine.org*
                                                     (207) 619-6224
                                                     *heiden@aclumaine.org*

                                                     Moe Keshavarzi*
                                                     Robert Sturgeon*
                                                     Alex Kuljis*
                                                     Sheppard Mullin Richter & Hampton LLP
                                                     333 South Hope Street, 43rd Floor
                                                     Los Angeles, CA 90071-1422
                                                     213.617.5544
                                                     *MKeshavarzi@sheppardmullin.com*
                                                     213-617-5435
                                                     *RSturgeon@sheppardmullin.com*
                                                     213-617-4239
                                                     *AKuljis@sheppardmullin.com*

                                                     Jodi Nofsinger
                                                     Miriam Johnson
                                                     Taylor Asen
                                                     Berman and Simmons
                                                     129 Lisbon Street
                                                     Lewiston, Maine 04240
                                                     *jnofsinger@bermansimmons.com*
                                                     (207) 784-7699
                                                     *mjohnson@bermansimmons.com*
                                                     (207) 784-3576
                                                     *tasen@bermansimmons.com*

                                                     Attorneys for Petitioners and Proposed Class

                                                      * pro hac vice application forthcoming