## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| JOSEPH A. DENBOW and SEAN R. RAGSDALE, *on their own and on behalf of a class of similarly situated persons*, <br><br>      *Petitioners*, <br><br>     v. <br><br> MAINE DEPARTMENT OF CORRECTIONS and RANDALL A. LIBERTY, Commissioner of Maine Department of Corrections *in his official capacity*, <br><br>      *Respondents* | Case No. 20-cv-00175-JAW <br><br> **CLASS MOTION FOR TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION, WITH INCORPORATED MEMORANDUM OF LAW** |

### INTRODUCTION

Petitioners Joseph Denbow and Sean Ragsdale are prisoners incarcerated by the Maine Department of Corrections ("DOC") who, as a result of age and underlying medical issues, and disabilities, are at high risk of serious illness or death from COVID-19. If there were a vaccine or medical treatment for COVID-19, the constitution and federal disability law would require Respondents DOC and Commissioner Randall A. Liberty ("Respondents") to provide it to prisoners, even if providing such care was expensive or inconvenient. *See, e.g.*, *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); *Smith v. Aroostook Cty.*, 376 F. Supp. 3d 146, 159-60 (D. Me. 2019).

But there is no vaccine or effective treatment for the coronavirus. Parrish Decl. ¶ 16, ECF No. 1-9. That makes prevention of the disease of paramount importance, especially for medically vulnerable individuals. *Id.* Physical distancing is the cornerstone for preventing infection with COVID-19. Goldenson Decl. ¶ 27, ECF No. 1-11. Yet it is impossible for prisoners to physically distance in DOC facilities. *See, e.g.*, Denbow Decl. ¶ 22, ECF No. 1-1; Ragsdale Decl. ¶¶ 12-14, ECF No. 1-3; Sideris Decl., Att. A at 2, ECF No. 1-7. Nor does DOC take other necessary measures

to prevent the spread of COVID-19, such as providing alcohol-based hand sanitizer or providing widespread testing for detection and control of any outbreak. Denbow Decl. ¶¶ 15-26; Ragsdale Decl. ¶¶ 12-22. Under such circumstances, providing adequate preventive care for medically vulnerable prisoners requires release to locations where they can physically distance and perform proper preventative hygiene. *See, e.g.*, Goldenson Decl. ¶¶ 43-44; Parrish Decl. ¶ 35. As another court recently explained, "without social distancing measures" in prison, "transfer to home confinement (or compassionate release . . .) [is] the only viable measure by which the safety of highly vulnerable inmates can be reasonably assured." *Martinez-Brooks v. Easter*, No. 3:20-CV-00569 (MPS), 2020 WL 2405350, at *23 (D. Conn. May 12, 2020).

Yet although it has authority to grant release through medical furloughs and home confinement, 34-A M.R.S. §§ 3035(2)(C), 3036-A, DOC has generally refused to release medically vulnerable prisoners during the COVID-19 pandemic. According to its Classification Director, DOC "is not utilizing the medical furlough to release clients during the COVID19 pandemic." Sideris Decl., Att. B. Similarly, despite the claimed availability of its home confinement program, DOC's approval process all but ensures that the program is unavailable for those who need it most. As one DOC staff member stated, "there's nobody being released because of medical conditions, so you can just get that idea right out of your head." Denbow Decl. ¶ 13.

On Friday, May 15, 2002, Petitioners Mr. Denbow and Mr. Ragsdale filed a Class Habeas Petition under 28 U.S.C. § 2241, on behalf of themselves and a putative class of other medically vulnerable prisoners. Given the emergency harms facing all Class Members, Petitioners respectfully request that the Court issue a temporary restraining order or preliminary injunction:

(1)  provisionally certifying the class[1] and ordering Respondents to provide a list of all

---

[1] This Court need not formally certify a class in order to issue the requested emergency relief. *See, e.g.*, Newberg on Class Actions § 24:83 (4th ed. 2002) ("The absence of formal

2

medically vulnerable prisoners in their custody ("Class Members"), specifically identifying those who will be released in the next year (the "Imminent Release Subclass"), those who are classified as minimum or community security (the "Minimum Security Subclass"), and those who are medically vulnerable because of a federally protected disability (the "Disability Subclass");

(2) ordering Respondents to evaluate each Class Member for home confinement, furlough, or another accommodation, or, in the alternative, appointing a Rule 706 expert to complete such evaluations, *see, e.g.*, *Wilson v. Williams*, No. 4:20-CV-00794, 2020 WL 1940882, at *10–11 (N.D. Ohio Apr. 22, 2020);

(3) granting enlargement to Class Members to safely physically distance in the community or another appropriate setting, *see e.g.,* Resnik Decl. ¶¶ 27-29; *Savino v. Souza*, No. CV 20-10617-WGY, 2020 WL 1703844, at *8 (D. Mass. Apr. 8, 2020) (citing *Woodcock v. Donnelly*, 470 F.2d 93, 94 (1st Cir. 1972) (per curiam)) (discussing release authority in habeas actions); and

(4) for any Class Members who remain incarcerated, mandating compliance with U.S. Centers for Disease Control and Prevention (CDC) guidance including adequate physical distancing and necessary hygiene, *see* 28 U.S.C. § 2243 (authorizing courts in habeas actions to "dispose of the matter as law and justice require"); *Savino v. Souza*, No. CV 20-10617-WGY, 2020 WL 2404923, at *3 & n.6 (D. Mass. May 12, 2020) (exercising necessary equitable authority "to balance the equities as the litigation moves forward" (quoting *Trump v. International Refugee Assistance Project (IRAP)*, 137 S. Ct. 2080, 2087 (2017)).

Given the exponential infection rates of COVID-19 and the risk of its rapid, undetected spread in closed, congregate settings, time is of the essence.

## FACTUAL BACKGROUND

## I.   Physical Distancing Is Necessary to Control the Deadly Coronavirus

In the past several months, every aspect of our society has changed in response to the novel coronavirus, SARS-CoV-2, a contagious and deadly virus first identified in Wuhan City, China, and that rapidly spread across the globe. *See* Declaration of Dr. Nirav Shah ¶¶ 9, 11, *Cavalry Chapel of Bangor v. Mills*, Docket No. 20-cv-156-NT, ECF No. 20 (May 8, 2020) (hereafter Shah

---

certification is no barrier to classwide preliminary injunctive relief."); Moore's Federal Practice § 23.50, at 23-396, 23-397 (2d ed.1990) ("Prior to the Court's determination whether plaintiffs can maintain a class action, the Court should treat the action as a class suit."); *Gomes v. Acting Sec'y, DHS*, No. 20-CV-453-LM, 2020 WL 2113642, at *1 (D.N.H. May 4, 2020) ("provisionally certify[ing] the class for the purpose of holding expedited bail hearings").

Decl.). The virus is especially dangerous and deadly for medically vulnerable individuals who are older or who have underlying medical conditions such as diabetes, lung disease, or heart disease. Parrish Decl. ¶¶ 7-9. Early reports estimate that the mortality rate is 13.2% for those with cardiovascular disease, 9.2% for those with diabetes, 8.4% for those with hypertension, 8.0% for those with chronic respiratory disease, and 7.6% for those with cancer. *Id.* ¶ 9.

Because there is no vaccine or effective treatment for the virus, prevention is paramount, especially for those who are medically vulnerable. Shah Decl.¶¶ 18-20, 31. The "most effective" preventive measure is physical distancing. *Id.* ¶ 19. Both the federal and Maine Centers for Disease Control and Prevention have determined that effective physical distancing "requires a *minimum* separation of six feet between individuals and avoiding gatherings of people." *Id.* ¶ 20 (emphasis added). Indeed, since Governor Mills declared a state of emergency in Maine on March 15, 2020, the State has issued multiple directives encouraging or requiring physical distancing, all of which are designed to slow the spread of the virus, limit the burden on local hospitals, and reduce serious illness and death. *Cavalry Chapel of Bangor v. Mills*, No. 1:20-CV-00156-NT, 2020 WL 2310913, at *2-*4 (D. Me. May 9, 2020) (listing state-imposed restrictions and stay-at-home mandates).

Physical distancing is critical not only to slow the spread of the virus on a population-wide basis, but also as a means of protecting medically vulnerable persons on an individual basis. Parrish Decl. ¶ 30. Stated differently, physical distancing is like a vaccine that "work[s] on both an individual basis, by preventing or attenuating clinical disease in a person exposed to the pathogen, and also on a population basis, by affecting herd immunity." *Id.* (citation omitted). Indeed, according to the Director of the Maine CDC, "[p]hysical distancing is the best vaccine that we have." Maine CDC briefing: April 1, 2020 (available at https://www.youtube.com/watch?v=nX4ljxGU4VI). "Social distancing is especially important for people who are at higher risk of

4

getting very sick." Parrish Decl. ¶ 19 (citation omitted).

## II.   Physical Distancing Is Impossible In Maine Department of Corrections Facilities

For the more than 900 medically vulnerable Mainers under DOC's sole custody and control, physical distancing is impossible, and the inability to physically distance may be deadly. Sideris Decl. Att. B at 1 (DOC Classification Director stating that there are approximately 925 prisoners with preexisting conditions and risks). Prisoners are housed in dorms with fifty or more people, with whom they come into close contact each day and share communal showers. *See, e.g.*, Denbow Decl. ¶¶ 15-16; Ragsdale Decl. ¶¶ 12-13. Most prisoners sleep two to four in a cell. *See, e.g.*, Denbow Decl. ¶ 17; Ragsdale Decl. ¶ 14. Although some prisoners have sinks and toilets in their cells, others are housed in "dry cells" and are required to share sinks, toilets, and showers with the dozens of other prisoners. *See* Denbow Decl. ¶ 16; Ragsdale Decl. ¶ 13. Prisoners spend much of the day in small and crowded dayrooms where physical distancing is impossible. Denbow Decl. ¶ 22; Ragsdale Decl. ¶ 19 Those who require medication must wait in line where they are bunched together. *Id.* When traveling throughout the facility, prisoners are bunched together and cannot physically distance. *Id.*

Class Members are frequently exposed to other prisoners throughout the facility, and to prison staff who circulate to and from the community each day. Although DOC has taken some steps to limit exposure to prisoners from other dorms, prisoners from different dorms still mix when transitioning to and from the meal hall and when outside in the smoking area. Denbow Decl. ¶ 22; Ragsdale Decl. ¶ 19. Officers from all different dorms congregate in staff common rooms, without masks, and then travel to each of their respective posts in the facilities. Denbow Decl. ¶ 26; Ragsdale Decl. ¶ 22. With the progressive reopening of the economy, moreover, there are ever more opportunities for prison staff to contract the virus in the community and to carry it back

into the prison, increasing the risk of COVID-19 spreading among the prison population. Parrish Decl. ¶ 28. Prisoners with medical needs are even more exposed. Those who receive medical care come into close contact with medical staff, who sometimes do not wear gloves. *See* Ragsdale Decl. ¶ 19(k). Likewise, corrections officers shine flashlights directly into the mouths of prisoners who receive medication for addiction treatment ("MAT"), in close quarters. Denbow Decl. ¶ 22(d).

DOC's current precautionary measures are no substitute for physical distancing. For example, despite concerns with asymptomatic and pre-symptomatic transmission of the virus, *see, e.g.*, Shah Decl., ¶ 16, DOC has performed only limited testing of prisoners with symptoms of COVID-19. Because COVID-19 spreads rapidly through asymptomatic carriers, testing of symptomatic patients alone is ineffective at preventing, or even slowing, the spread of the disease. *See* Parrish Decl. ¶ 27. The focus on symptoms is particularly concerning in prison because some prisoners are so afraid of being forced into segregation or isolation that they have said they will not self-report any symptoms of COVID-19. Denbow Decl. ¶ 23; Ragsdale Decl. ¶ 21. Nonetheless, DOC does not test prisoners or staff who are exposed to another positive case unless they become symptomatic, Parrish Decl. ¶ 34 & n.69 (citing sources), and as of May 14, 2020, DOC had tested only 26 prisoners, or 1.3 percent of incarcerated adults. Daily Dashboard, https://bit.ly/2Z1Ay3r (last visited May 14, 2020).

Similarly, another element of prevention, hand hygiene, is lacking for prisoners in DOC custody. Contrary to CDC guidelines, the hand sanitizer provided to prisoners contains no alcohol and is thus ineffective to help reduce the spread of COVID-19. Parrish Decl. ¶ 25; Goldenson Decl. ¶ 25. Petitioners are able to wash their hands only in a communal bathroom shared with approximately fifty other prisoners. Denbow Decl. ¶ 20(b); Ragsdale Decl. ¶ 17. Although DOC provides prisoners with gloves and spray bottles to clean the dormitories and bathrooms, no bleach-

based materials are provided, and there is minimal supervision to ensure consistent or thorough cleaning. Denbow Decl. ¶ 19; Ragsdale Decl. ¶ 16.

DOC provides prisoners with access to two masks, but most staff and prisoners do not wear them most of the time. Denbow Decl. ¶ 21 (describing additional concerns with the masks); Ragsdale Decl. ¶ 18 (same). In any event, masks offer only limited utility to someone trying to avoid catching the infection, especially when they are in close contact with others who are not wearing masks. Parrish Decl. ¶ 26. It is well established that "[m]asks are no substitute for necessary preventive measures like physical distancing." *Id.*

In sum, crowded settings, poor hygiene, and the absence of adequate testing are a recipe for the rapid spreading of COVID-19, and the disease may well be spreading undetected throughout the prisons at this very moment. *See* Parrish Decl. ¶ 34. Outbreaks in correctional facilities around the country illustrate the substantial risks posed to prisoners, prison staff, and the entire community. *See, e.g.*, Goldenson Decl. ¶ 37 (citing outbreaks in prisons).

## III. DOC Has Categorically Refused to Take Necessary Measures within Its Authority to Enable Medically Vulnerable Prisoners to Physically Distance

Despite the impossibility of physical distancing in DOC facilities, DOC has categorically refused to allow medical furlough and has applied home confinement in such a limited way as to be effectively unavailable for those who need it most. *See* Sideris Decl. Att. B; Denbow Decl. ¶¶ 9-14; Ragsdale Decl. ¶¶ 8-11. According to the DOC website, there are only 64 prisoners currently on home confinement, out of a total 1934 prisoners. Daily Dashboard (May 14, 2020), https://bit.ly/3fRsJmQ.

Petitioners' experiences illustrate the point. Mr. Denbow is 54 years old and has asthma, COPD, and is in remission from cancer. *Id.* ¶¶ 4-8. He is incarcerated for driving without a license and aggravated forgery (*i.e.*, for initially giving his brother's name, instead of his own, to a traffic

officer). *Id.* ¶ 2. He is classified as "minimum" security and his earliest release date is August 30, 2020, approximately three months away. *Id.* ¶¶ 2, 9. Before the COVID-19 restrictions, Mr. Denbow frequently worked in the community during the day and returned to the facility at night. *Id.* ¶ 9. Mr. Denbow applied for release to the community. Yet, DOC did not even consider him for medical furlough because it has categorically refused to allow that service during the COVID-19 pandemic. *See* Sideris Decl. Att. B. DOC also denied him home confinement.[2] The State has never reconsidered that decision, even after Mr. Denbow filed an action for post-conviction review challenging his ongoing incarceration. *See* Appendix of Filings in *Denbow v. State*, ECF No. 1-2. Instead, the State argued that Mr. Denbow should not even receive a hearing on his motion for post-conviction bail. *See id.* at 38-41. Five weeks after Mr. Denbow originally filed the motion for post-conviction review, he still has not received a hearing. *See generally id.*

Similarly, Mr. Ragsdale has been effectively denied home confinement and medical furlough, through excessive delay. Ragsdale Decl. ¶¶ 8-11. Mr. Ragsdale is 56 years old and has a long-term chest infection, diabetes, Hepatitis C, and MRSA. *Id.* ¶¶ 4-7. He is classified as "community" level supervision, which means he is allowed to work in the community. *Id.* ¶ 8. He is nearly done with a four-year sentence for drug trafficking, with a release date in approximately two months, on July 17, 2020. *Id.* ¶ 1. Mr. Ragsdale first completed the application for home confinement more than a month ago, but received no response for weeks on end. *Id.* ¶¶ 9-10. The

---

[2] Specifically, DOC denied home confinement for Mr. Denbow because, almost seven years ago, Mr. Denbow was found noncompliant with conditions for a prior home confinement, during which he was supposed to attend school. Denbow Decl. ¶ 11. Mr. Denbow attempted to explain that he had a doctor's note for leaving school (including for symptoms that would later be diagnosed as cancer). In any event, even in normal times, a prior unsuccessful attempt at home confinement is not an automatically disqualifying factor, *see* DOC Policy 27.02(VI)(D)(10), and these are far from normal times. DOC provided no reason for believing that 2013 incident outweighed the mortal threat to Mr. Denbow from continued incarceration.

person responsible for reviewing the requests was out sick for two weeks and nobody else was assigned to review the requests. Only after his attorney sent a demand letter did anyone complete preliminary processing of Mr. Ragsdale's request. Even then, the request remained under review, and DOC warned that "[t]here is no guarantee that [this] application will be processed immediately" and that "[a]t this time very limited home investigations are being done." *Id.* ¶ 10. According to DOC, "If [the application] is not [processed] now, it will be done when normal operations resume." *Id.* To state the obvious, delaying Mr. Ragsdale's request until "normal operations resume" would defeat the purpose of a request based on the COVID-19 pandemic.

## ARGUMENT

### I. This Action is Properly Brought Pursuant to Section 2241

As a threshold matter, Section 2241 authorizes courts to grant habeas corpus relief where a person is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(b)(3). Habeas corpus is the appropriate remedy when a petitioner challenges "the fact or duration of his confinement" or seeks a "quantum change" to a less restrictive form of custody. *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 873 (1st Cir. 2010) (citing, *e.g.*, *Wilkinson v. Dotson*, 544 U.S. 74, 78 (2005)); *Dickerson v. Walsh*, 750 F.2d 150, 152 (1st Cir. 1984)). In this case, Petitioners and Class Members challenge the fact of their confinement, which, they allege, has "become unconstitutional because of the COVID-19 pandemic risk." *McPherson v. Lamont*, No. 3:20CV534, 2020 WL 2198279, at *4 (D. Conn. May 6, 2020) (exercising jurisdiction over a section 2241 habeas petition challenging unlawful confinement during the COVID-19 pandemic) (citing cases). In such cases, the habeas remedy applies even if the alleged violation arises from unlawful conditions of confinement. *See Brennan v. Cunningham*, 813 F.2d 1, 4 (1st Cir. 1987) (allowing habeas petition from a state prisoner seeking reinstatement in a work release program,

even accepting that the petition challenged conditions of confinement); *see also United States v. Orton*, No. 1:12-CR-00117-JAW, 2020 WL 1672782, at *5 (D. Me. Apr. 6, 2020) (stating that a section 2241 petition "provides a remedy in the custodial court for federal prisoners challenging the execution of their sentences, such as administration of parole, prison disciplinary proceedings, or conditions of confinement") (internal citation and quotation marks omitted).

Although section 2241 incorporates a prudential exhaustion requirement, that requirement does not apply when, as here, the state remedy would be futile and the petitioner is likely to suffer an irreparable injury without immediate judicial relief. *Beharry v. Ashcroft*, 329 F.3d 51, 62 (2d Cir. 2003), *as amended* (July 24, 2003). "[E]xhaustion of remedies is not a jurisdictional prerequisite to a habeas petition, but, rather, a gatekeeping provision rooted in concepts of federalism and comity." *Allen v. Attorney Gen. of State of Me.*, 80 F.3d 569, 573 (1st Cir. 1996).[3] In light of the unprecedented crisis presented by the COVID-19 pandemic, emergency class relief is essential to rectify ongoing constitutional and statutory violations and to "promot[e] efficiency, consistency, and fairness, and improv[e] access to legal and expert assistance by parties with limited resources." *See, e.g.*, *Monk v. Shulkin*, 855 F.3d 1312, 1320–21 (Fed. Cir. 2017) (articulating benefits of the class procedure). It would be futile to seek such emergency relief in state court, where Mr. Denbow's individual petition for post-conviction review has languished without a hearing for *five weeks*, ECF No. 1-2; and where Maine criminal procedure requires singular treatment of post-conviction review (PCR) cases, and does not authorize class treatment. *See* M.R. Crim. P. 67(b) (requiring that a single petition may attack only a single proceeding);

---

[3] Consistent with this principle, "[t]he law . . . should not require litigants to engage in empty gestures or to perform obviously futile acts." *Allen*, 80 F.3d at 573. A state corrective process may be futile when it "is so clearly deficient as to render futile any effort to obtain relief." *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981).

M.R. Civ. P. 23 (providing for class actions in civil actions, not criminal actions like PCRs).

## II.   Injunctive Relief Is Necessary to Protect Putative Class Members from Risk of Serious Illness or Death

All injunctive factors weigh in favor of granting the requested class relief. *See Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008). As discussed below, Petitioners and others like them will face irreparable harm absent court intervention, and are likely to succeed on the merits of their statutory and constitutional claims. The balance of hardships, as well as the public interest, strongly favor the issuance of injunctive relief.

### A.   Petitioners and Others Like Them Face Irreparable Harm from Continued Incarceration in DOC Facilities

Irreparable injury is harm that "cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). An increased risk of serious illness and death constitutes irreparable injury. *See, e.g.*, *Smith*, 376 F. Supp. 3d at 161, *aff'd*, 922 F.3d 41 (1st Cir. 2019).[4] Absent injunctive relief, Class Members face an increased risk of infection, serious illness, and death from COVID-19. Years ago, Mr. Denbow's three-month-old daughter died from a respiratory virus after he unsuccessfully sought care at a local hospital; as a result, he knows all too well how deadly respiratory viruses can be. Denbow Decl. ¶ 13. With each day that passes, Petitioners and Class Members remain susceptible to infection by one of the hundreds of prison staff who move in and out of DOC facilities on a

---

[4] Numerous federal courts have found the specific threats posed by the COVID-19 pandemic to detained persons constitute irreparable injury. *See, e.g., Castillo v. Barr*, No. CV 20-00605, at *5-6 (C.D. Cal. Mar. 27, 2020) (finding detained petitioners established irreparable harm stemming from risk of exposure to COVID-19); *Coronel v. Decker*, 20-cv-2472, 2020 WL 1487274, at *3 (S.D.N.Y. Mar. 27, 2020) (finding that petitioners with "serious underlying medical conditions . . . face a risk of severe, irreparable harm if they contract COVID-19"); *Basank v. Decker*, No. 20 Civ. 2518, 2020 WL 1481503, at *4 (S.D.N.Y. Mar. 26, 2020) (same).

daily basis. Once the virus infiltrates the prisons, Petitioners and Class Members face a high risk of infection, serious illness, and death due to impossibility of physical distancing and the absence of other protective measures. No amount of money could make Petitioners or Class Members whole if they suffer illness or die a preventable death while in custody.

### B.    Petitioners and Class Members Are Likely to Succeed on the Merits of their Claims

Petitioners and Class Members are likely to prevail on their arguments that DOC's policies and practices violate the Eighth Amendment to the U.S. Constitution and federal disability rights laws. *See* U.S. Const. Amend. VIII; 42 U.S.C. §12132 (Americans with Disabilities Act (ADA)); 29 U.S.C. § 794 (Rehabilitation Act). Physical distancing is medically necessary preventive care for Class Members—who face elevated risks of serious illness or death from COVID-19—yet Respondents do not allow physical distancing in the facility, and have refused readily available prison services (such as medical furlough or community release) that would enable Class Members to safely distance in the community. By refusing to ensure physical distancing for vulnerable Class Members, Respondents have acted with deliberate indifference to the medical needs of people in their custody, in violation of the Eighth Amendment. And by categorically excluding Class Members with disabilities from necessary and reasonable accommodations, Respondents have also discriminated by reason of disability in violation of the ADA and Rehabilitation Act.

### 1.    The Class Members Are Likely to Succeed on their Claim that Respondents Have Violated the Eighth Amendment

Petitioners and Class Members are likely to succeed on the merits of their Eighth Amendment claim that DOC's refusal to allow physical distancing for medically vulnerable persons violates the Eighth Amendment. Under the Eighth Amendment, the Government has an affirmative duty to provide for the "basic human needs" of those in its custody—including

"medical care . . . and reasonable safety." *DeShaney v. Winnebago Cty. Dep't Soc. Servs.*, 489 U.S. 189, 199-200 (1989) (citing *Estelle v. Gamble,* 429 U.S. 97, 103–104 (1976); *Youngberg v. Romeo,* 457 U.S. 307, 315-16 (1982)). "[T]o prove an Eighth Amendment violation, a prisoner must satisfy two prongs: (1) an objective prong that requires proof of a serious medical need, and (2) a subjective prong that mandates a showing of prison administrators' deliberate indifference to that need." *Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir. 2014).

Under the objective prong, the risk of infection with COVID-19 represents a serious medical need for all prisoners, but especially for Petitioners and Class Members who are medically vulnerable to serious illness or death from the virus. As another court recently explained, "[f]or infected inmates, the virus can lead to pneumonia," and "[i]n the worse pneumonia cases, COVID-19 victims suffer diminishing oxygen absorption, with resulting organ failure," and victims "chok[ing] to death." *Wilson v. Williams*, No. 4:20-CV-00794, 2020 WL 1940882, at *8 (N.D. Ohio Apr. 22, 2020). "While not every inmate who contracts the virus will die, [medically vulnerable prisoners] are at a much greater risk of doing so." *Id.* "They have a very serious medical need to be protected from the virus." *Id.*; *see also* Parrish Decl. ¶¶ 8-9; Goldenson Decl. ¶¶ 27, 39.[5]

Under the second prong, DOC and Commissioner Liberty are deliberately indifferent to the "'obvious'" threat posed by COVID-19 to "elderly individuals [and] those with certain preexisting medical conditions." *See Martinez-Brooks*, 2020 WL 2405350, at *21 (quoting *Farmer*, 511 U.S. at 842). In one recent case, the court held that a prison exhibited deliberate

---

[5] That Petitioners and Class Members are not yet infected with the virus does not lessen the objectively serious nature of their medical needs. A prisoner "does not have to await the consummation of a threatened injury" or "await a tragic event" to obtain injunctive relief. *Farmer*, 511 U.S. at 845 (citations and internal quotation marks omitted).

indifference to the risk of infection and potential death from COVID-19 by performing insufficient testing and failing to keep prisoners "at least six feet apart despite clear CDC guidance." *Wilson*, 2020 WL 1940882 at \*8. Likewise here, Respondents have refused to implement adequate physical distancing, provide alcohol-based hand sanitizer, or ensure meaningful testing despite knowing that all are critical to protecting Class Members' health and preventing the spread of disease. *See supra* pp. 3-7.

Further compounding the constitutional harm, DOC has refused to transfer Class Members to a location where physical distancing is possible. In *Martinez-Brooks*, the Court held that a prison likely violated the Eighth Amendment for refusing "to transfer medically vulnerable prisoners . . . to home confinement 'in any meaningful numbers,'" despite having the authority to do so and knowing that such transfer was necessary to protect medically vulnerable prisoners. *Martinez-Brooks*, 2020 WL 2405350, at \*22-\*23. The court determined that the Bureau of Prison officials were deliberately indifferent by implementing their release authority in a "slow and inflexible" fashion that "evidence[d] a disregard for the seriousness of the health risk faced by vulnerable inmates." *Id.*

Likewise here, the impossibility of physical distancing in DOC facilities means that transfer to the community is "the only viable measure by which the safety of highly vulnerable inmates can be reasonably assured." *Martinez-Brooks*, 2020 WL 2405350, at \*23. Yet DOC has refused to use its authority to transfer medically vulnerable prisoners to the community through medical furlough. 34-A M.R.S. § 3035(2)(C). Specifically, DOC may grant furlough "for the obtaining of medical services for a period longer than 10 days if medically required." 34-A M.R.S. § 3035(2)(C). By policy, medical furlough is available to prisoners in community custody "to obtain necessary medical services," and for other prisoners when necessary for life-

14

saving care. DOC Policy 27.04(VI)(H). Yet DOC has outright refused to provide medical furlough during the deadly COVID-19 pandemic. According to the Director of Classification, "[t]he department is not utilizing the medical furlough to release clients during the COVID-19 pandemic." Sideris Decl., Exh. B.

Similarly, DOC's slow and inflexible implementation of its home confinement authority is deliberately indifferent to the rights of Class Members. Community release is a rehabilitative service offered to prisoners to facilitate safe and healthy return to the community. *See* 34-A M.R.S. § 3036-A (providing for the Supervised Community Confinement Program). This service is particularly necessary for medically vulnerable Class Members who, absent the ability to physically distance in the community, are exposed to a heightened risk of serious illness or death and the risk that they will never be released at all. *See* Goldenson Decl.¶¶ 43-44; Parrish Decl.¶¶ 35-36. Yet DOC has applied stricter-than-usual criteria for home confinement during COVID-19—adding many new technical requirements on top of the statutory criteria.[6] As in *Martinez-Brooks*, these criteria are "unrelated to medical vulnerability and, at best, only tangentially related to public safety." 2020 WL 2405350, at *22. Even worse, there is reason to believe that having a medical condition is being treated as a "minus" factor for home confinement consideration, with DOC (wrongly) insisting that medically vulnerable prisoners would face heightened risk outside the prison setting. *See, e.g.*, DOC Resp. Denbow at A40, ECF No. 1-2; DOC Resp. Ragsdale at 2, ECF No. 1-5; *see also* Denbow Decl. ¶¶ 9-14 (describing challenges in

---

[6] Additional non-statutory criteria include having a release date in less than one year (even though the statute allows for default of 18 months) and classification as community custody (even though this is not a statutory requirement). *See* Daily Dashboard, *available at* https://bit.ly/3fRsJmQ; *see also* Megan Gray, *Maine prisons pressured to release more inmates, and information, during pandemic*, Portland Press Herald (May 3, 2020), https://bit.ly/2WYPeNT (stating "the department has prioritized cases by using an *even stricter set of criteria* than usual") (emphasis added).

accessing home confinement); Ragsdale Decl. ¶¶ 8-11 (same). As one prison case worker recently explained to Mr. Denbow, "there's nobody being released because of medical conditions, so you can get that idea right out of your head." Denbow Decl. ¶ 13.

Considering these actions together, it is evident that DOC has the tools that it needs to enable physical distancing for medically vulnerable individuals, yet has refused to do so, thereby exposing Class Members to a heightened risk of serious illness or death. "[B]y failing to make meaningful use of [release] authority, [DOC] has failed to implement what appears to be the sole measure capable of adequately protecting vulnerable inmates . . . in favor of measures that, even if they were fully and painstakingly implemented, would still leave vulnerable inmates subject to a grave risk to their health." *See Martinez-Brooks*, 2020 WL 2405350, at *23. That is textbook deliberate indifference in violation of the Eighth Amendment.

> ### 2. Members of the Subclass with Disabilities Are Likely to Succeed on the Merits of their Claims under Federal Disability Rights Laws

Petitioners also seek to represent a subclass of prisoners who are medically vulnerable because of disabilities that are protected under federal law (the "Disability Subclass"). Petitioners and members of the Disability Subclass are likely to succeed in showing that DOC is engaging in unlawful discrimination under the ADA and Rehabilitation Act by refusing to provide reasonable accommodation—specifically, medical furlough, home confinement, or similar relief—to protect them against the elevated risk of serious illness or death from COVID-19.

The ADA and Rehabilitation Act prohibit a "public entity" from discriminating against a qualified individual with a disability on the basis of that disability. 42 U.S.C. § 12132; 29 U.S.C. § 794(a). As an instrumentality of state government, Maine's prisons qualify as a "public entit[y]." 42 U.S.C. § 12131(1)(B); *Pa. Dep't of Corrections v. Yeskey*, 524 U.S. 206, 210 (1998). To state a claim against a public entity under these laws, a person must allege: "(1) that he is a qualified

16

individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability." *Buchanan v. Maine*, 469 F.3d 158, 170–71 (1st Cir. 2006) (quoting *Parker v. Universidad de P.R.,* 225 F.3d 1, 5 (1st Cir. 2000)). Each of those elements is satisfied here.

### a. Petitioners and Members of the Subclass Are Qualified Individuals with Disabilities

Members of the Disability Subclass have medical conditions that place them at heightened risk of serious illness or death from COVID-19. "Disability" is defined broadly, to include, *inter alia*, a "physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). "Major life activities" is itself broadly defined, and includes "the operation of a major bodily function," such as "functions of the immune system, normal cell growth . . . neurological, brain, respiratory, circulatory, [or] endocrine" systems. 42 U.S.C. § 12102(2)(B).

Members in the Disability Subclass have pre-existing medical conditions that increase risk for COVID-19 complications or death—including lung conditions, asthma, heart conditions, diabetes, kidney disease, liver disease, HIV, immune dysfunction, autoimmune disorders, cancer treatment, and history of organ or bone marrow transplantation—all of which are disabilities under federal disability rights laws.[7] Individuals with these conditions remain "qualified" to participate in DOC programs and services, including provision of medical care, rehabilitative programs, and

---

[7] Several conditions within the disability subclasses are expressly identified in regulations as presumptively covered disabilities. *See, e.g.*, 28 C.F.R. § 35.108(d)(2)(iii). Regulations promulgated under the ADA must be given "controlling weight" unless they are arbitrary, capricious, or plainly contrary to the statute. *See Kiman v. New Hampshire Dep't of Corr.*, 451 F.3d 274, 283 n.8 (1st Cir. 2006) (internal citations omitted).

other services during confinement to prepare for a safe return to society at the end of their sentence. *See* 42 U.S.C. § 12131(2); 28 C.F.R. § 35.104; 28 C.F.R. § Pt. 35, App. B ("[T]itle II applies to anything a public entity does").

> **b.   Subclass Members Are Excluded or Denied the Benefits of DOC's Programs and Services by reason of their Disabilities**

By refusing to allow Disability Subclass Members to perform physical distancing—in the prison, the community, or elsewhere—DOC excludes them from necessary medical care, rehabilitative programs, and other programs and services "by reason of" their disabilities. To avoid disability discrimination, public entities have an affirmative obligation to ensure that people with disabilities can participate in all of the entity's programs, benefits, and services on an equal and equally safe basis as people without disabilities. 28 C.F.R. §§ 35.102(a), 35.130(a)-(b). This affirmative obligation stems from Congress's concern that "'[d]iscrimination against [people with disabilities] was . . . most often the product, not of invidious animus, but rather of thoughtlessness and indifference – of benign neglect[.]'" *Pierce v. D.C.*, 128 F. Supp. 3d 250, 266 (D.D.C. 2015) (quoting *Alexander v. Choate*, 469 U.S. 287, 295 (1985)) (internal quotation marks omitted). Refusing to provide such affirmative accommodations qualifies as discrimination on the basis of disability. *Nunes v. Mass. Dep't of Correction*, 766 F.3d 136, 145 (1st Cir. 2014) (citation omitted); *see also* 28 C.F.R. § 35.130(b)(3)(I) (prohibiting public entities from adopting policies that "have the effect" of discriminating against qualified individuals with disabilities).

 One of the services that DOC provides to prisoners is necessary medical care. *See, e.g.*, *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Helling v. McKinney*, 509 U.S. 25, 31-32 (1993); 34-A M.R.S.A. §3031(2) (articulating the right to adequate professional medical and mental health care). If there were a vaccine or pharmaceutical treatment for COVID-19, DOC would be required to provide it to prisoners—even if it was costly to do so. *See, e.g.*, *Allah v. Thomas*, 679 Fed. Appx.

216 (3rd Cir. Feb. 13, 2017) (cost alone cannot justify prison's refusal to provide allegedly "cost-prohibitive" Hepatitis C medication). Although physical distancing does not come in a vial or a pill box, it is no less medically necessary for members of the Disability Subclass—especially due to the absence of a vaccine or any effective treatment for the virus. Because physical distancing is necessary preventive care that DOC has made unavailable to members, members of the Disability Subclass are denied the benefits of basic DOC programs and services.

Not only are they denied necessary preventive care (namely, physical distancing), but this deprivation also denies Disability Subclass Members the ability to participate on an equal basis in other prison programming and services. Even traveling to get medical care (whether MAT or insulin treatment) exposes members of the Disability Subclass to the risk of particularly close contact with others, and a resulting heightened risk of serious illness or death. Denbow Decl. ¶ 22(d); Ragsdale Decl. ¶ 19(h), (k). Forcing members of the Disability Subclass to choose between obtaining medical treatment and staying alone in their cell is no choice at all.

Finally, DOC has also excluded members of the Disability Subclass from available medical services and rehabilitative programs—namely, medical furlough and home confinement. Release to the community is a reasonable and necessary accommodation for many members of the Disability Subclass, who require space to physically distance and protect themselves from the virus. *Supra* p. 14. By categorically making medical furlough unavailable during the pandemic, DOC discriminates against members of the Disability Subclass who require life-saving preventive care (physical distancing) that is only available outside of the prison. And by applying stricter-than-usual standards for home confinement during the pandemic and by failing to process applications in a reasonable timeframe, DOC discriminates against Subclass Members with

disabilities who are at heightened risk from the pandemic. *See supra* p. 15 & n.6. In short, DOC has denied access to necessary treatments and programs in violation of disability rights laws.

### C.    The Equities and Public Interest Weigh in Favor of Granting Injunctive Relief

The remaining equitable factors also require injunctive relief. The balancing of the equities favors Petitioners and Class Members, who face a heightened risk of serious and potentially permanent illness or death without injunctive relief. Respondents, by contrast, are simply being asked to ensure necessary care that they are constitutionally and statutorily obligated to provide.

Refusing injunctive relief, moreover, would risk greater community spread of COVID-19—among prisoners, prison staff, and the broader community—a result the State has taken other extraordinary steps to avoid. *See generally* Langhauser Decl., *Cavalry Chapel of Bangor v. Mills*, Docket No. 20-156-NT, ECF No. 21 (May 8, 2020) (emphasizing that risks of "community spread" from in-person religious gatherings of more than 10 people "threatens unnecessarily the health and lives of Maine citizens and, if not contained, the stability of the State's first-responder and health care systems"). The same risks are even more prevalent in prisons, in which people are held in closed and crowded settings and in which prison staff travel to and from the facility each day, as potential vectors of the disease. *See also Cavalry Chapel of Bangor v. Mills*, 2020 WL 2310913, at *10 (weighing the harm of community spread).

### CONCLUSION

For these reasons, Petitioners and Class Members respectfully request that the Court grant expedited relief as detailed above, *supra* pp. 2–3, to protect Class Members and to enable physical distancing during the pandemic.

Dated May 18, 2020                                 Respectfully Submitted,

                                                   /s/ Emma E. Bond
                                                   Emma E. Bond, Esq.
                                                   Zachary L. Heiden, Eq.
                                                   American Civil Liberties Union of Maine
                                                   Foundation
                                                   P.O. Box 7860
                                                   Portland, Maine 04112
                                                   (207) 619-8687
                                                   *ebond@aclumaine.org*
                                                   (207) 619-6224
                                                   *heiden@aclumaine.org*

                                                   Moe Keshavarzi*
                                                   Robert Sturgeon*
                                                   Alex Kuljis*
                                                   Sheppard Mullin Richter & Hampton LLP
                                                   333 South Hope Street, 43rd Floor
                                                   Los Angeles, CA 90071-1422
                                                   213.617.5544
                                                   *MKeshavarzi@sheppardmullin.com*
                                                   213-617-5435
                                                   *RSturgeon@sheppardmullin.com*
                                                   213-617-4239
                                                   *AKuljis@sheppardmullin.com*

                                                   Jodi Nofsinger
                                                   Miriam Johnson
                                                   Taylor Asen
                                                   Berman and Simmons
                                                   129 Lisbon Street
                                                   Lewiston, Maine 04240
                                                   *jnofsinger@bermansimmons.com*
                                                   (207) 784-7699
                                                   *mjohnson@bermansimmons.com*
                                                   (207) 784-3576
                                                   *tasen@bermansimmons.com*

                                                   Attorneys for Petitioners and Proposed Class

                                                   * pro hac vice application pending

## **CERTIFICATE OF SERVICE**

The undersigned certifies that she has electronically filed this date the foregoing CLASS

MOTION FOR TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION,

WITH INCORPORATED MEMORANDUM OF LAW with the Clerk of the Court using the

CM/ECF system, and by sending a copy via electronic mail to Jill O'Brien, Assistant Attorney

General, Jill.Obrien@maine.gov. This filing is available for viewing and downloading from the

ECF system.


Dated:  May 18, 2020                         /s/ Emma E. Bond
                                             Emma E. Bond
                                             American Civil Liberties Union of Maine
                                             Foundation
                                             P.O. Box 7860
                                             Portland, Maine 04112
                                             (207) 619-8687
                                             *ebond@aclumaine.org*

                                             Counsel for Petitioners