UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| JOSEPH A. DENBOW et al.,<br><br>               Petitioners,<br><br>      v.<br><br>MAINE DEPARTMENT OF<br>CORRECTIONS et al.,<br><br>               Respondents. | Docket No. 1:20-cv-00175-JAW |

**OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER
AND INCORPORATED MEMORANDUM OF LAW**

**Introduction**

Respondents Maine Department of Corrections ("MDOC") and Commissioner Randall Liberty have taken dramatic and rapid action to reduce the risk of COVID-19 to inmates and staff by stopping all non-essential movement into the prisons, taking precautions to reduce the spread of germs among inmates, responding vigorously to the four positive tests, and evaluating inmates for potential community confinement. MDOC's aggressive actions have dramatically limited the spread of COVID-19 in its facilities. Maine has found only four confirmed cases of COVID-19, all at one facility and all arising in the last 10 days. MDOC's actions reflect a high level of concern for inmates in MDOC's prisons and do not show that Petitioners are "in custody in violation of the Constitution or laws" of the United States, as required for habeas relief.

Despite MDOC's actions, Petitioners ask the Court to order six wide-ranging categories of injunctive relief, including dictating MDOC's COVID-19 testing protocols (with no input from the Maine CDC) and "enlargement" (release) of inmates into the community while this case is pending. However, Petitioners have not shown they are entitled to the extraordinary and drastic

1

remedy of mandatory injunctive relief. They are unlikely to succeed on the merits, because the facts demonstrate MDOC's robust response to COVID-19 and because Petitioners' claims are barred by the exhaustion statute. Nor, given MDOC's aggressive policies and the small number of COVID-19 cases in the prisons, have Petitioners shown a likelihood—as opposed to a mere possibility—of irreparable harm. Similarly, the relief Petitioners seek (releasing hundreds of inmates, including those convicted of murder and other violent crimes) is counter to the public interest, and the balance of equities tips heavily in favor of MDOC. Because MDOC's efforts to combat COVID-19 do not support injunctive relief against it, the Court should deny Petitioners' motion for a temporary restraining order.[1]

## Facts

### I.     MDOC's Aggressive Response to COVID-19

MDOC is currently engaged in extraordinary efforts to combat COVID-19, a respiratory ailment caused by the novel coronavirus that has spread throughout Maine[2] and globally. The U.S. CDC's "current best estimate" is that approximately 65% of individuals who contract COVID-19 will develop symptoms; 3.4% of those symptomatic COVID-19 cases will require hospitalization and 0.4% of symptomatic cases will result in death. *See* U.S. CDC, *COVID-19 Pandemic Planning Scenarios*, at 4-5 ("Scenario Five: Current Best Estimate"), at https://www.cdc.gov/coronavirus/

---

[1] Per the Court's directive at the May 21, 2020 status conference, this expedited filing is directed at Petitioners' request for an immediate temporary restraining order, which the Court has indicated it intends to rule upon separately from Petitioners' motion for preliminary injunction. As directed by the Court, this submission is focused primarily on MDOC's policies and practices to respond to the challenges of the COVID-19 pandemic in Maine's correctional facilities. Respondents reserve their right to present additional factual material and legal arguments in opposing Petitioners' motion for a preliminary injunction.

[2] As of May 27, 2020, there have been 1,914 confirmed cases of COVID-19 in Maine. Penobscot County, where Petitioners are incarcerated, has had 99 cases. Cumberland County, where the Maine Correctional Center is located, has had 1,065 cases. Knox County, where Maine State Prison and the Bolduc Correctional Facility are located, has had 20 cases. *See* Maine Center for Disease Control, "Novel Coronavirus 2019 (COVID-19)," https://www.maine.gov/dhhs/mecdc/infectious-disease/epi/airborne/coronavirus.shtml (last viewed May 27, 2020).

2019-ncov/hcp/planning-scenarios-h.pdf (last reviewed May 20, 2020).

In early March 2020, MDOC developed a three-phase approach to combating COVID-19, in consultation with the Maine CDC. Affidavit of Dr. Ryan Thornell, filed concurrently, ¶ 7. Each successive phase of MDOC's response plan contains escalating protective measures against the spread of COVID-19. *Id.* Phase 1 (Preparation and Prevention) occurred immediately. *Id.* MDOC moved to Phase 2 when there was a confirmed case in the Maine community, and Phase 3 began at MCC on May 19, when MDOC found the first confirmed inmate case of COVID-19. *Id.* Immediately after that first positive test, the entire population (inmates, staff, and medical) at MCC was tested within four days. *Id.* ¶ 55. Remarkably, only four positive cases were found. *Id.* In response to those positives, MDOC has already begun universal re-testing at MCC, in consultation with the Maine CDC, and expects it to conclude by June 1. *Id.* ¶ 57. Overall, MDOC has tested over 750 inmates and staff since the start of the pandemic. *Id.* ¶ 18.

The most important and effective parts of MDOC's wide-ranging response plan have been its efforts to stop movement into the prisons, prompt and vigorous responses to positive tests, evaluation of inmates with medical conditions for potential community confinement, and collaboration with Wellpath (MDOC's medical contractor) and the Maine CDC to prevent the spread of COVID-19.

## II.   MDOC's Early Halt to Movement Into Prisons

Key to delaying COVID-19 infiltrating MDOC facilities was that, as of April 13, MDOC and the county jails agreed to stop the transfer of inmates to MDOC. *Id.* ¶ 50. Now, by the Governor's Executive Order, there will be no intakes from county jails until the emergency declaration ends. *Id.* Even prior to intakes stopping, MDOC ordered that any inmates arriving from county jail would go only to MCC (with a very limited exception for intensive mental health treatment) and had all such intakes met upon arrival by staff in full PPE (n95 masks, face shields,

gowns, and gloves) and undergo medical assessments. *Id.* ¶ 38. Transferees were also quarantined for fourteen days. Affidavit of Dr. John Newby, filed concurrently, ¶ 36. MDOC also suspended work release programs, so that inmates would not be exposed in the community or bring the virus back. Thornell Aff. ¶ 32. In March, MDOC suspended all non-professional visits at the facilities.[3] *Id.* ¶ 26. These limitations contributed to MDOC's success in staving off the first COVID-19 cases in MDOC facilities until late May, while correctional systems in other states have had much larger case numbers. *Id.* ¶ 71.

Further, MDOC implemented strict screening requirements for everyone entering the prisons, which MDOC developed in consultation with the Maine CDC. *Id.* ¶ 31. Those entering have their temperatures taken and are questioned about possible exposure and symptoms. *Id.* In March, MDOC also limited staff to working in a single facility and limited movement of behavioral health staff between the facilities. *Id.* ¶¶ 24, 30; *see also* Newby Aff. ¶ 38 (limiting all non-essential travel between facilities by Wellpath's medical providers).

### III.    MDOC's Vigorous Response to the Positive Tests

After the positive test at MCC on May 19, MDOC began immediate universal testing there, and all inmates and staff at MCC were tested within four days, save for the handful of inmates who refused, resulting in four positive inmate tests and no positive staff tests. Thornell Aff. ¶ 55. The second positive inmate case was confirmed on May 22 and two additional cases were confirmed on May 23. *Id.* All four inmates who tested positive were housed at MCC and have been placed in isolation there, where nursing staff attend to them multiple times per day. *Id.*; Newby Aff. ¶ 47. None have required hospitalization. Thornell Aff. ¶ 55. Three are under age 50, and the

---

[3] MDOC has provided inmates with additional calls, messages, and Zoom visits to address the lack of in-person visits. Thornell Aff. ¶¶ 27, 39.

fourth is in his late 60s (and has been in prison since 1998). *Id.* MDOC will continue to isolate these inmates (and any future positives), as recommended by the Maine CDC, for at least fourteen days from the date of their positive test, and they will not be reintegrated until they are symptom-free and have had two confirmed negative tests. *Id.* ¶ 56.

Given the four total positive tests, on May 24, 2020, MDOC obtained approval from the Maine CDC for universal retesting at MCC. *Id.* ¶ 57. Retesting began today, May 27, and is expected to be completed June 1. *Id.* MDOC also follows the Maine CDC's recommendation that testing at other MDOC facilities occur when there is a reason to believe inmates or staff in those facilities have been exposed or are suspected of having COVID-19. *Id.* ¶¶ 57-58. There is very little risk that the cases found at MCC will be the source of infection at other MDOC facilities. *Id.* ¶ 53. The only recent inmate transfers from MCC were three inmates transferred to MSP (two had urgent mental-health needs and one required restrictive housing unavailable at MCC). *Id.* All three were tested for COVID-19 following the positive test on May 19. *Id.* ¶¶ 53-54.

Due to the positive tests, MCC is currently locked down, with inmate movement restricted to reduce the potential spread of COVID-19. *Id.* ¶¶ 52, 61. Inmates at MCC are receiving meals and medication in their housing units, and inmate "sick calls" (medical requests) are being triaged in the housing unit when possible, instead of the prison's clinic, to limit potential transmission. *Id.* ¶ 52; *see also* Newby Aff. ¶ 32. On May 23, MCC's Warden declared an emergency in order to obtain authorization from the Governor to divert staff to MCC to address the emergency and assist with universal re-testing. Thornell Aff. ¶ 61.

**IV.   MDOC Evaluated At-Risk Inmates For Supervised Community Confinement.**

In March of 2020, as part of Phase 1, MDOC and Wellpath compiled a list of over 900 inmates with conditions considered by the U.S. CDC to place them at higher risk of illness from COVID-19, including asthma, hypertension, chronic lung disease, and other conditions. *Id.* ¶ 62.

5

MDOC and Wellpath also created a list of inmates whose medical conditions made them a priority for consideration for the Supervised Community Confinement Program (SCCP).[4] *Id.* MDOC's Classification Department then evaluated every inmate on these lists (starting with those identified as most at risk) for potential placement on SCCP. *Id.* ¶¶ 62-63. MDOC continues to update this list and evaluate inmates for SCCP. *Id.* ¶ 62.

Some of these 900+ inmates with pre-existing medical conditions are incarcerated for violent crimes, and some are currently housed in segregated housing units because they pose a danger to staff and other inmates. *Id.* ¶ 68. Releasing such inmates on unsupervised medical furlough or SCCP would pose a danger to the victims of these offenders and to the community at large. *Id.* Their release would also violate the SCCP statute, which makes the program only available to minimum custody inmates and sets specific terms for their housing and monitoring. *Id.*; 34-A M.R.S. § 3036-A(2)-(3). The Classification Department determined which of the 900+ inmates qualified for SCCP under the relevant statute and rules, based on their sentence and security level. Thornell Aff. ¶ 62. The Classification Department then reviewed each eligible inmate's case for potential SCCP placement. *Id.* ¶ 63. For inmates meeting certain criteria, aspects of the complex SCCP investigations that are typically required (which include inspecting the proposed residence and contacting victims) were modified to fast-track releases to SCCP. *Id.* Inmates not meeting the criteria for a fast-track placement were also considered for SCCP. *Id.* ¶ 64. Since March 1, 2020, 95 inmates have been released to SCCP. *Id.* ¶ 63. Five have since returned

---

[4] The Supervised Community Confinement Program (SCCP) is governed by 34-A M.R.S. § 3036-A and 03-201 C.M.R. ch. 10 (attached as Ex. H to the Thornell Declaration and also available at https://www.maine.gov/sos/cec/rules/03/chaps03.htm) and allows the Commissioner to consider inmates for release to approved residences in the community with supervision by probation. The statute limits which inmates qualify and sets strict requirements. For example, inmates are not eligible for SCCP if they have a security classification level higher than minimum, or until they have served a certain portion of their sentence, and their proposed residence must be approved by MDOC. Thornell Aff. ¶ 62; 34-A M.R.S. § 3036-A(2)(B)-(D), (3)(B).

to custody from SCCP for substance abuse, among other issues. *Id.* ¶ 63.

The statute and rules specify that an inmate must have a proposed residence that is approved by MDOC. *Id.* ¶ 66; 34-A M.R.S. § 3036-A(3)(B). It is especially important during a pandemic that inmates who are released have an appropriate residence. Thornell Aff. ¶ 67. Homeless shelters are not appropriate, because of documented outbreaks of COVID-19 in homeless shelters and because of the impossibility of determining if homeless shelters also house crime victims or other offenders, which the SCCP Policy does not allow. *Id.*

During the process of evaluating inmates for SCCP, MDOC Commissioner Liberty and others met several times with representatives of the Maine ACLU and provided them with the number of inmates with medical conditions associated with an increased risk from COVID-19. *Id.* ¶ 69. The ACLU requested that all 900+ inmates be released on medical furlough. *Id.* However, medical furlough is controlled by 34-A M.R.S. § 3035(2)(C),[5] and is used when medical treatment or a medical procedure is necessary and cannot be done within MDOC. *Id.* ¶ 70. There is no monitoring of inmates on medical furlough. *Id.* MDOC is not presently using medical furlough to release inmates with hypertension, for example, simply because of the risk of COVID-19, because such inmates do not meet the statutory requirements and would potentially endanger the community. *Id.* ¶¶ 68, 70.

V. **MDOC Has an Aggressive Response Plan And Has Been Extremely Transparent.**

On March 23, 2020, the U.S. CDC issued guidance specific to correctional facilities, which MDOC follows to the extent feasible given the physical parameters of the prisons. Thornell Aff. ¶ 33. Even before that guidance was issued, MDOC took widespread action to prevent COVID-

---

[5] 34-A M.R.S. § 3035(2)(C) states that a "furlough may be granted *for the obtaining of medical services* for a period longer than 10 days *if medically required*." (Emphasis added.)

19. In early March 2020, MDOC instituted aggressive cleaning protocols at the facilities. *Id.* ¶¶ 8-9, 21. MDOC also issued directives encouraging social distancing practices, directing modified medication administration procedures to occur within housing units, and limiting group activities. *Id.* ¶¶ 12, 21-22, 42-44. Inmates were educated about COVID-19 and its prevention. *Id.* ¶¶ 9, 21, 25; Newby Aff. ¶ 18-20. MDOC ensured adequate supplies of PPE and other crucial supplies. Thornell Aff. ¶¶ 9, 14; Newby Aff. ¶ 14-15. MDOC also ensured that each facility identified a location for isolating suspected COVID-19 cases and that each facility had a plan for potential staff shortages. Thornell Aff. ¶ 15. MDOC and Wellpath also altered the delivery of healthcare services in response to COVID-19, including the use of PPE by providers and patients during examinations, the cleaning and disinfecting of equipment and medical areas between patient visits, and the use of telehealth visits where possible. Newby Aff. ¶¶ 22-35.

MDOC has worked closely with the Maine CDC to prevent and respond to COVID-19, meeting daily with the Maine CDC Director and following their protocols on testing. Thornell Aff. ¶¶ 6, 7, 57-58. Immediately after the positive staff test at Bolduc Correctional Facility, MDOC issued a directive to all facilities regarding positive case reporting and "contact tracing[,]" as advised by the Maine CDC. *Id.* ¶ 37.

MDOC has also put in place protocols to maximize mask wearing, social distancing and other CDC-endorsed practices. Following new CDC guidance on masks in April, MDOC distributed cloth masks to all inmates. *Id.* ¶ 40. MDOC further changed its policy from encouraging to *requiring* social distancing where feasible, and further required inmates and staff to wear masks in all facility areas when and where social distancing is not available. *Id.* ¶¶ 42–43. And, contrary to Petitioners' allegations (PI Mot. 6, Petition 20), in every MDOC facility, inmates have access to hand sanitizer with a 70% alcohol content (Thornell Aff. ¶¶ 49, Ex. D). The U.S. CDC

recommends handwashing over hand sanitizer, but at Mountain View, as at other facilities, inmates have access to hand sanitizer, dispensed by officers due to the potential for misuse. *Id.* ¶ 49.

Because of the protective steps it has taken against COVID-19, MDOC facilities have been able to continue to provide chronic care visits and other necessary medical treatments to inmates suffering from chronic conditions, including the 900+ inmates described above. Newby Aff. ¶¶ 18-19. Protocols for distributing medication have been altered to minimize the potential for virus transmission. Thornell Aff. ¶¶ 12, 22, 52; Newby Aff. ¶ 23-24. In addition, to encourage inmates to seek treatment for any COVID-19 symptoms, MDOC has waived co-pays for sick calls for inmates with COVID-19 symptoms. Newby Aff. ¶ 30.

MDOC has also taken extensive measures to inform inmates, staff, and the public of best practices and important events related to COVID-19. Thornell Aff. ¶¶ 10, 35-36, 59-60. On March 31, 2020, MDOC began publishing daily information regarding COVID-19 in MDOC facilities on the web via the "Daily COVID-19 Dashboard," available at www.maine.gov/corrections. *Id.* ¶ 35. The information posted includes the number of inmates tested, the number of pending tests, the number of positive and negative results, the number of inmates refusing the tests, as well as population data and data on the SCCP Program. *Id.* As of today, May 27, 2020, the Dashboard reflects that 494 inmates have been tested, that 3 have refused, and that only 4 have tested positive. *Id.* These numbers include all inmates and staff at MCC. *Id.* MDOC has also kept inmates and staff constantly updated on new developments, guidance, and protocols relating to COVID-19. *E.g., id.* ¶¶ 8, 21, 36-37, 40.

Within hours of learning of the five total staff and inmate positive tests, MDOC notified its staff and the public of the results and the steps taken to reduce the spread of the virus. *Id.* ¶¶ 36, 59-60. In short, MDOC's rapid and thorough response, in collaboration with the Maine CDC, has

been remarkably effective in limiting the spread of COVID-19 in Maine's prisons. *Id.* ¶¶ 55, 72.

## Legal Standard

A temporary restraining order, like a preliminary injunction, is "an extraordinary and drastic remedy that is never awarded as of right." *Monga v. Nat'l Endowment for Arts*, 323 F. Supp. 3d 75, 82 (D. Me. 2018) (Woodcock, J.). The movant must establish that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord W Holding Co., Inc. v. AIG Ins. Co.-Puerto Rico*, 748 F.3d 377, 383 (1st Cir. 2014). "The *sine qua non* of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm. Wireless Servs. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002). Petitioners must show "'more than mere possibility' of success—rather, they must establish a 'strong likelihood' that they will ultimately prevail." *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012).

Petitioners' burden is especially high here because the injunctive relief they seek would alter, rather than preserve, the status quo. Such injunctions are disfavored and "normally should be granted only in those circumstances when the exigencies of the situation demand such relief." *Mass. Coal. of Citizens with Disab. v. Civil Def. Agency & Office of Emergency Preparedness of Mass.*, 649 F.2d 71, 76 n.7 (1st Cir. 1981); *United Steelworkers of Am., AFL-CIO v. Textron, Inc.*, 836 F.2d 6, 10 (1st Cir. 1987) (noting that First Circuit authority suggests that "courts disfavor injunctions that disturb, rather than preserve, the status quo").[6]

---

[6] Habeas is an appropriate vehicle where an inmate seeks "what can be fairly described as a quantum change in the level of custody[,]" not vague and wide-ranging changes to MDOC's practices. *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 873 (1st Cir. 2010) (quotation omitted). Even if some of the relief Petitioners seek could be understood as seeking "quantum" change in custody level, much of the relief requested does not. For example, Petitioners ask the

**Argument**

I.   **Petitioners Are Unlikely to Succeed on the Merits**

   A.   **Petitioners' Eighth Amendment Claim Is Unlikely to Succeed on the Merits.**

"[A] prison official cannot be found liable under the Eighth amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety[.]" *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The state of mind required for deliberate indifference is "akin to criminal recklessness." *Kosilek v. Spencer*, 774 F.3d 63, 83 (1st Cir. 2014); *Farmer*, 511 U.S. at 837-38. A reasonable response to a known risk negates deliberate indifference, even if harm is not averted,[7] and even a negligent response to a known risk "that was colorable and taken in good faith might still be enough to negate deliberate indifference." *Burrell v. Hampshire Cty.*, 307 F.3d 1, 8 (1st Cir. 2002). Petitioners claim that MDOC does not adequately protect them from COVID-19, but MDOC's early and expansive response to the virus shows an extraordinarily careful and active approach to trying to protect inmates and staff. *E.g.*, Thornell Aff. ¶¶ 33, 37-38, 50, 42-44. MDOC's actions and collaboration with the Maine CDC reflect best practices, not reckless disregard of an excessive risk, and do not violate the Eighth Amendment. *Id.* ¶¶ 7, 12, 57-58.

Even assuming that Petitioners can show a sufficiently grave risk of harm from COVID-19,[8] they cannot show that MDOC officials were deliberately indifferent to that risk. MDOC

---

Court to "mandat[e] compliance with [U.S.CDC] guidance" inside MDOC facilities. Mot. at 3. This request is not for "a quantum change in the level of custody," and is beyond the scope of what is available in habeas.

[7] Here, harm has thus far been largely averted, as the four inmates who have tested positive have not required hospitalization. Thornell Aff. ¶ 55.

[8] MDOC does not dispute that the COVID-19 is a highly contagious virus that puts everyone at risk, but compared to the community, where literally thousands more cases of COVID-19 have been identified (*see* Maine CDC, "Novel Coronavirus 2019 (COVID-19)," https://www.maine.gov/dhhs/mecdc/infectious-disease/epi/airborne/coronavirus.shtml (last viewed May 23, 2020)), the conditions in MDOC's facilities do not reflect a level of risk

officials are aware of the risks of COVID-19, but they are not deliberately indifferent unless they recklessly disregard an excessive risk to inmate health or safety. *Farmer*, 511 U.S. at 839. The inquiry must "incorporate[ ] due regard for [the] unenviable task of keeping dangerous men in safe custody under humane conditions.'" *Burrell*, 307 F.3d at 8 (quoting *Farmer*, 511 U.S. at 845).

    Petitioners cannot show that MDOC's response to COVID-19 and the measures MDOC has put in place to protect inmates and staff were reckless. MDOC's prevention efforts have been vast and were accomplished early. MDOC halted outside visitation and work release programs and screened all those entering the prisons, including the Wardens, in March, stopped all intakes from county jails to MDOC's facilities on April 6, and ceased movement of staff and behavioral workers between prisons in April. Thornell Aff. ¶¶ 24, 30, 31, 50. MDOC made substantial efforts to educate staff and inmates by reinforcing good hygiene, intensifying cleaning and disinfecting practices, and implementing social distancing and masking strategies. Newby Aff. ¶¶ 17-18; Thornell Aff. ¶¶ 21, 42-43. These proactive and serious steps show a robust response, not deliberate indifference.

    MDOC has found only four confirmed inmate cases, all at one facility, despite MDOC immediately testing that entire facility within four days of the first positive result.[9] Thornell Aff. ¶ 55. MDOC did not stop there. MDOC traced the only two inmates who had recently transferred out of MCC, and tested and isolated them. *Id.* ¶¶ 53-54. These actions do not evidence reckless disregard of an excessive risk for any inmate. *Farmer*, 511 U.S. at 839.[10]

---

actionable under the Eighth Amendment. *See Kosilek*, 774 F.3d at 82 (the objective prong of *Farmer* "does not impose upon prison administrators a duty to provide care that is ideal, or of the prisoner's choosing").

[9] This massive testing effort stands in stark contrast to the "shockingly limited" 75 total tests found to be available to the federal facility at issue in *Wilson v. Williams*, No. 4:20-cv-00794, 2020 WL 1940882, at *2 (N.D. Ohio Apr. 22, 2020), relied upon by Petitioners. Mot. at 14.

[10] Petitioners demand in the joint status report that MDOC immediately test inmates at other facilities (ECF No. 13 p. 3), but the Maine CDC's own guidance on testing in correctional facilities does not call for testing at other

12

Even before any positive cases, MDOC took extensive actions to protect inmates and staff, including increased cleaning of facilities and shared items, giving inmates and staff information on COVID-19 and its prevention, ensuring adequate supplies of medication and other essentials, creating isolation units, and planning for staff shortages. Thornell Aff. ¶¶ 9, 14-15, 21, 25. Early on, inmates were encouraged to seek medical care when ill and not to share personal items with others. *Id.* ¶ 21. MDOC worked with Wellpath to test suspected COVID-19 cases and developed protocols to encourage social distancing where feasible. *Id.* ¶¶ 17, 22; Newby Aff. ¶¶ 17, 20, 42.

Petitioners argue that MDOC is deliberately indifferent because, like the federal facility that was enjoined in *Martinez-Brooks v. Easter*, No. 3:20-CV-00569 (MPS), 2020 WL 2405350, at *22 (D. Conn. May 12, 2020), MDOC has allegedly been "slow and inflexible" in considering inmates for SCCP. Mot. at 14. But the record does not support Petitioner's claim. MDOC has considered for SCCP all of the eligible 900+ inmates in its custody with a medical condition that increases their susceptibility to COVID-19—nearly half of all inmates—making 95 placements so far. Thornell Aff. ¶¶ 62-63. In *Martinez-Brooks*, in contrast, the defendant officials considered only 159 of roughly 1,000 inmates for home confinement, approved only 21, and ignored Department of Justice guidance directing them to take COVID-19 risk factors into consideration. *Id.* at **22–23. Moreover, MDOC has far less flexibility with regard to home confinement than did the defendants in *Martinez-Brooks*. While the federal Bureau of Prisons is authorized under the federal emergency pandemic law to place *any* inmate in home confinement, *id.* at *22, MDOC

---

facilities until there is a reason to believe someone there has been exposed or is suspected of having COVID-19. Thornell Aff. ¶ 58. Petitioners' disagreement with MDOC's decision to follow the Maine CDC's guidance does not show deliberate indifference. *See Sires v. Berman*, 834 F.2d 9, 13 (1st Cir. 1987) (citations omitted) ("where the dispute . . . evidences mere disagreement with considered medical judgment, we will not second guess the doctors."); *see also Estelle v. Gamble,* 429 U.S. 97, 107 (1976).

13

can only place inmates in SCCP if they meet the statutory eligibility requirements.[11]

Because MDOC did not recklessly disregard an excessive risk to inmates, Petitioners' Eighth Amendment claim is unlikely to succeed on the merits.

### B. Petitioners' ADA Claim Is Unlikely to Succeed on the Merits.

Petitioners claim that MDOC's response to the COVID-19 pandemic violates Title II of the Americans with Disabilities Act by discriminating against prisoners with certain conditions that are risk factors of the disease. But to make a Title II claim, the Petitioner must establish: (1) that he is a qualified individual with a disability; (2) that he was excluded from participating in, or denied the benefits of a public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of his disability." *Kiman v. N.H. Dep't of Corr.*, 451 F.3d 274, 283 (1st Cir. 2006) (quoting *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 5 (1st Cir. 2000)). Discrimination can be established in three ways: (1) disparate treatment, (2) disparate impact—that a government policy neutral on its face "falls more harshly on one group than another and cannot be justified by business necessity," or (3) failure to accommodate. *Nunes v. Mass. Dep't of Corr.*, 766 F.3d 136, 145 (1st Cir. 2014) (internal citations and quotations omitted). The first and third theory of discrimination require little discussion. There is no evidence that MDOC's COVID-19 policies and practices treat inmates with disabilities less favorably than the non-disabled. In fact, MDOC created a list of inmates with certain medical conditions at particular risk of COVID-19, shared those numbers with Petitioners' counsel in several meetings, and evaluated those inmates for potential expedited release on SCCP. Thornell Aff. ¶¶ 62-63, 69. Moreover, Petitioners' demand for the "reasonable

---

[11] As described in Dr. Thornell's affidavit, Petitioners' claim that MDOC is applying "stricter-than-usual" criteria to SCCP, Mot. at 15, is false. Rather, those criteria are for *expedited* placement through SCCP. Inmates not meeting those criteria continue to be considered for SCCP if they are eligible. Thornell Aff. ¶ 64.

14

accommodation" of granting all subclass members SCCP or medical furlough, regardless of eligibility, Mot. at 19, misconstrues MDOC's obligation under the ADA, which is to ensure that disabled inmates receive accommodations needed to allow them access those programs to the same extent as non-disabled inmates. There is no evidence that subclass members are being denied such accommodations.

That leaves only a disparate impact theory—that MDOC's neutral policies on medical furlough and home confinement nonetheless disproportionately impact individuals with disabilities and cannot otherwise be justified. While Petitioners cite the increased vulnerability to COVID-19 of individuals with certain medical conditions, that increased vulnerability is not caused by any act of MDOC, or its policies. *See Money v. Pritzker,* No. 20-cv-2093, 2020 WL 1820660, at *19 n.14 (N.D. Ill. Apr. 10, 2020) (rejecting claim that increased susceptibility of disabled inmates to COVID-19 established that prison's medical furlough and home confinement policies had a disparate impact on those inmates); *see also generally Frazier v. Kelley*, No. 4:20-cv-00434, 2020 WL 2561956, at *35 (E.D. Ark. May 19, 2020) (rejecting claim that prison officials' COVID-19 policies discriminated against disabled inmates). Instead, MDOC took action to identify inmates with medical conditions that make COVID-19 particularly risky, including a list of priority inmates from MDOC's medical provider, and evaluated them for SCCP confinement in March. Thornell Aff. ¶¶ 62-63. Petitioners have not shown that MDOC's policies "fall[] more harshly" on the disabled and "cannot be justified by business necessity." *Nunes,* 766 F.3d at 145. Not only is there no disparate impact, but MDOC's policies and actions are "justified by business necessity" for the same reasons that MDOC's robust response to COVID-19 satisfies the Eighth Amendment. *Id*. MDOC is tasked by statute with housing and caring for inmates for the duration of their sentences, and MDOC has taken innumerable actions that are within MDOC's power to

try to protect them from COVID-19. *See, e.g.*, Thornell Aff. ¶ 9-12, 21-24, 43, 52. Their actions are justified and do not discriminate against disabled inmates.[12]

### C.     Petitioners' Claims Are Barred for Failure to Exhaust.

Petitioners are also unlikely to succeed on the merits because they failed to exhaust remedies available in Maine courts. 28 U.S.C. § 2254 requires petitioners to have "exhausted the remedies available in the courts of the State" and further decrees that the petitioner "shall not be deemed to have exhausted . . . if he has the right under the law of the State to raise, by any available procedure, the question presented." *Id.* at § 2254(b)–(c). Petitioner Denbow is currently petitioning the Maine Superior Court for early release in a post-conviction review proceeding and thus has the right to raise the question presented in the State court. *See* ECF No. 13-2, 13-3. Petitioner Ragsdale has not even attempted to invoke state judicial processes to challenge his confinement. Because neither Petitioner has exhausted, their petitions are barred by § 2254.

Petitioners argue that § 2554 is inapplicable and that they must only overcome the more flexible non-statutory exhaustion requirement applicable to petitions under 28 U.S.C. § 2241. But the First Circuit has expressly rejected this minority view of § 2241, and instead takes the "majority view" that "prisoners in state custody are required to comply with all the requirements laid out in § 2254 whenever they wish to challenge their custodial status, *no matter what statutory label the prisoner uses*." *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 875 n.9 (1st Cir. 2010) (emphasis added); *see also In re Wright*, 826 F.3d 774, 778 (4th Cir. 2016) ("the majority view is that § 2241

---

[12] Petitioners frame their disability discrimination claim in part as an alleged failure of MDOC to provide appropriate medical care to inmates with certain medical conditions. Mot. at 18. The First Circuit has made clear that allegations of inadequate medical care, standing alone, are insufficient to state a claim under Title II. Rather, such a claim must be "framed within some larger theory of disability discrimination," such as evidence that alleged inadequate care was "pretext for some discriminatory motive, such as animus, fear, or apathetic attitudes" or evidence that the care was "discriminatory on its face, because it rested on stereotypes of the disabled rather than an individualized inquiry[.]" *Kiman*, 451 F.3d at 285 (quoting *Lesley v. Chie,* 250 F.3d 47, 55 (1st Cir. 2001)). Petitioners have not alleged pretext or facially discriminatory animus.

habeas petitions from convicted state prisoners challenging the execution of a sentence are governed by § 2254"). Nor can Petitioners avoid exhaustion by showing circumstances "that render [state] process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(2)(ii). The Superior Court is moving forward with Petitioner Denbow's PRC petition. (ECF No. 13 p. 2.) Other putative class members are free to file similar petitions. Petitioners cite no authority for their novel argument that the lack of a class-action mechanism dispenses with the exhaustion requirement.[13] Petitioner's proposed class-action exception would erase § 2254's exhaustion requirement. Because state processes are pending and available, § 2254 bars this petition and renders Petitioners unlikely to succeed on the merits.

## II. Petitioners Have Not Demonstrated Likely Irreparable Injury.

In addition to failing to demonstrate likelihood of success on the merits, Petitioners also cannot demonstrate that they are likely to suffer irreparable injury to justify a temporary restraining order or preliminary injunction. It is not enough for a party seeking injunctive relief to demonstrate a "possibility" of irreparable harm; rather, the movant must demonstrate that irreparable harm is "likely." *Winter*, 555 U.S. at 20. Basing preliminary injunctive relief "only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22.

Petitioners have not shown they are likely to suffer irreparable injury without an injunction. To date, there have only been four cases of COVID-19 in a single MDOC facility that is

---

[13]Courts have dismissed § 2254 petitions for failure to exhaust despite the petitions being styled as class actions. *See, e.g.*, *Mays v. Dart*, No. 20-C-2134, 2020 WL 1812381, at *6 (N.D. Ill. Apr. 9, 2020) (dismissing class-action habeas petition over COVID-19 response where named petitioners failed to exhaust); *Pace v. Chino Inst. for Men*, No. EDCV 09-00841CBM, 2009 WL 2189885, at *2 (C.D. Cal. July 21, 2009) (finding "no need to consider" whether a § 2254 petition may be brought as a class action where named petitioners failed to exhaust); *Robinson v. Leahy*, 401 F. Supp. 1027, 1032 (N.D. Ill. 1975) (dismissing class action for failure to exhaust under § 2254).

17

considerably less remote than the facility housing Petitioners. *See Dawson v. Asher*, No. C20-0409JLR-MAT, 2020 WL 1304557, at *3 (W.D. Wash. Mar. 19, 2020) (finding no irreparable harm to an inmate from COVID-19 where there was "no evidence of an outbreak at the detention center or that Defendants' precautionary measures are inadequate to contain such an outbreak or properly provide medical care should it occur"). MDOC's impressive track record in keeping COVID-19 out of the prisons stands in stark contrast to other correctional systems that have been subject to injunctive relief in other states. *See, e.g. Robenson v. Decker*, No. 20-5141, 2020 WL 2611544, at 7 (D.N.J. May 22, 2020) (identifying "large number of cases" at correctional facility as key factor in TRO analysis); *Martinez-Brooks v. Easter*, No. 3:20-CV-00569 (MPS), 2020 WL 2405350, at *27 (D. Conn. May 12, 2020) (finding irreparable harm where prison was suffering "one of the worst [COVID-19 outbreaks] in the federal prison system").

Here, Petitioners are not likely to suffer irreparable harm if the Court fails to award them the six categories of injunctive relief they seek, ranging from directing MDOC's COVID-19 testing protocols (with no input from the Maine CDC), release of inmates into the community while their petition is pending, and "mandating compliance with" CDC "guidance including adequate physical distancing and necessary hygiene." ECF No. 5 pp. 2-3; ECF No. 13 p. 3. Petitioners ask the Court to ignore U.S. Supreme Court precedent mandating deference to State prison officials in managing its prisons[14] and instead issue an injunction consisting of widely varying types of relief that are unmoored from the status quo. The named Petitioners remaining at Mountain View, in rural Maine, until the end of their sentences (both this summer) does not show

---

[14] *See Preiser v. Rodriguez*, 411 U.S. 475, 491-92 (1973) ("It is difficult to imagine an activity in which a State has a stronger interest . . . than the administration of its prisons"); *Bell v. Wolfish*, 441 US. 520, 562 (1979) (warning courts against becoming "enmeshed in the minutiae of prison operations.").

a likelihood of irreparable injury. Similarly, given that MDOC provides medical care on site (often in the housing unit), requires social distancing and cloth masks except where infeasible, and has implemented near constant cleaning, Petitioners have not shown that remaining in place creates a likelihood of irreparable injury. Petitioners have not shown an "imminent—rather than speculative—possibility" that they will suffer irreparable harm from COVID-19 if not released from custody[,]" and their request for injunctive relief should be denied. *Engelund v. Doll*, No. 4:20-CV-00604, 2020 WL 1974389, at *12 (M.D. Pa. Apr. 24, 2020).

**III.   The Balance of Equities and the Public Interest Favors MDOC.**

When the government is the opposing party, the balance of equities and the public interest merge into a single factor. *See Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Here, MDOC and the State of Maine as a whole have a compelling interest in having inmates serve the sentence imposed by the judicial system and completing the attendant rehabilitative programs. *See United States v. Salerno*, 481 U.S. 739, 750 (1987) (stating in the face of a challenge to pretrial detention that the "Government's general interest in preventing crime is compelling").

Certain putative class members are convicted of serious and violent crimes, and others are segregated from the general prison population because they pose a safety risk. Thornell Aff. ¶ 68. Indiscriminately releasing these inmates into the community—particularly on unmonitored medical furloughs, as Petitioners propose—would significantly threaten public safety. *Id.* MDOC already evaluated inmates with certain medical conditions for potential release through SCCP. *Id.* ¶¶ 62-63. That program's requirement that an inmate have a low security classification ensures that the community is protected from higher-risk inmates. 34-A M.R.S. § 3036-A(2)(D). The statutory requirement that the inmate have a residence approved by the Commissioner, *id.* § 3036-A(3)(B), ensures that inmates are not released into unsafe or unstable living situations. The record

shows that MDOC is in fact using the SCCP for inmates susceptible to COVID-19 complications and that MDOC has reviewed every such inmate, in order to determine if they are eligible for SCCP, and, if so, if that program is appropriate. Thornell Aff. ¶¶ 62-63. Ninety-five individuals have been released to SCCP since the start of the pandemic. *Id.* ¶¶ 11, 63. The remaining inmates are either categorically ineligible, or MDOC determined that SCCP was otherwise inappropriate based on the specific factual circumstances for that inmate. *Id.* ¶¶ 62-63. The public interest supports keeping the program's statutory safeguards in place, rather releasing inmates who are either potentially dangerous or who do not have a safe, appropriate place to live.

## Conclusion

The evidence shows that MDOC took early, immense, and successful steps to protect inmates from the threat of COVID-19, and that these actions do not violate the ADA or the Eighth Amendment. Because Petitioners are unlikely to succeed on the merits, are unlikely to suffer irreparable harm given MDOC's response to the virus, and because the balance of equities and the public interest weigh strongly in MDOC's favor, this Court should deny Petitioners' motion.

Dated: May 27, 2020                                    AARON M. FREY
                                                       Attorney General

                                                       /s/ Jillian R. O'Brien
                                                       Jillian R. O'Brien
                                                       jill.obrien@maine.gov
                                                       Jonathan R. Bolton
                                                       jonathan.bolton@maine.gov
                                                       Alisa Ross
                                                       alisa.ross@maine.gov
                                                       Assistant Attorney General
                                                       Office of the Attorney General
                                                       6 State House Station
                                                       Augusta, ME 04333-0006
                                                       Tel. (207) 626-8800