UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

JOSEPH A. DENBOW et al.,     )
     )
     Petitioners,     )
     )
     v.     )     No. 1:20-cv-00175-JAW
     )
MAINE DEPARTMENT OF     )
CORRECTIONS et al.,     )
     )
     Respondents.     )

**ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER**

Two individuals incarcerated in facilities operated by the Maine Department of Corrections filed a habeas action seeking a temporary restraining order on behalf of themselves and others similarly situated against the Department and its commissioner, claiming Eighth Amendment violations and violations of the Americans with Disabilities Act and the Rehabilitation Act. The order these individuals seek would fundamentally alter central details of the Department's COVID-19 response. Because the Court believes that significant unresolved factual disputes preclude a finding that the incarcerated individuals have established a likelihood of success on the merits for their claims or that they have established a likelihood of irreparable harm in the absence of injunctive relief, the Court denies temporary injunctive relief. The Court plans on moving ahead quickly with the individuals' request for a preliminary injunction.

# I.     BACKGROUND

## A.     Procedural Background

On May 15, 2020, Joseph A. Denbow and Sean R. Ragsdale (Petitioners) filed a petition for habeas corpus and complaint against the Maine Department of Corrections (MDOC) and Randall A. Liberty, the commissioner of the MDOC (Respondents), on behalf of themselves and a putative class of those similarly situated. *Pet. for Writ of Habeas Corpus and Compl. for Injunctive and Declaratory Relief* (ECF No. 1) (*Pet.*).  On May 18, 2020, Petitioners filed a motion for a temporary restraining order or preliminary injunction. *Class Mot. for TRO or Preliminary Inj.* (ECF No. 5) (*Pet'rs' Mot.*).  Also on May 18, 2020, the Court held a conference of counsel with counsel for Petitioners and Respondents at which the Court ordered a joint status report by May 20, 2020, and set the case for a second conference of counsel on May 21, 2020. *Min. Entry* (ECF No. 10); *Notice of Hr'g* (ECF No. 11).

On May 19, 2020, Petitioners informed the Court that the MDOC had reported the first case of COVID-19 of a person in Maine custody. *Notice of First Confirmed COVID-19 Case in Maine Department of Corrections Custody* (ECF No. 12).  On May 20, 2020, the parties filed a joint status report, as ordered by the Court. *Joint Status Report and Proposed Briefing Schedule* (ECF No. 13) (*Status Rep.*).  In the status report, the parties informed the Court of updates in the MDOC's COVID-19 response based on the first positive test result, Mr. Denbow's state post-conviction review proceeding, the parties' agreement on waiver of service, and Petitioners' requested relief.  *Id.* at 1-6.  The parties also proposed opposing briefing schedules, including

2

Respondents' request to bifurcate procedural challenges from consideration of the merits; opposing views of the scope of possible discovery; and opposing views of class certification.  *Id.* at 6-13.

On May 21, 2020, Petitioners filed a motion to seal certain exhibits filed with their complaint, along with redacted versions of those exhibits.  *Mot. to Seal Exs.* (ECF No. 14); *Redacted Docs.* (ECF No. 15).  Later that day, Petitioners filed a notice informing the Court of supplemental authority.  *Notice of Suppl. Authority* (ECF No. 16).  Also on May 21, 2020, the Court held a conference of counsel at which the Court set a briefing schedule for response to Petitioners' motion for temporary restraining order and informed counsel for Petitioners that the Court expected Petitioners to address the need for sealing in this case in light of *United States v. Kravetz*, 706 F.3d 47 (1st Cir. 2013).  *Min. Entry* (ECF No. 17).

On May 27, 2020, Respondents filed a response to the motion for temporary restraining order along with two affidavits.  *Opp'n to Mot. for TRO* (ECF No. 19) (*Resp'ts' Opp'n*); *Aff. of Dr. Ryan Thornell, Ph.D., in Opp'n to Mot. for TRO* (ECF No. 20) (*Thornell Aff.*); *Aff. of Dr. John Newby, D.P.M., in Opp'n to Mot. for TRO* (ECF No. 21) (*Newby Aff.*).  Petitioners filed a reply on May 29, 2020.  *Reply in Supp. of TRO* (ECF No. 22) (*Pet'rs' Reply*).  On June 1, 2020, Petitioners filed a motion withdrawing their motion to seal exhibits.  *Withdrawal of Mot. to Seal* (ECF No. 23). The Court held oral argument by Zoom hearing on June 2, 2020.  *Min. Entry* (ECF No. 24).

### B.     Factual Background

The Court takes this factual background from the Petition and the affidavits and declarations submitted by Petitioners and Respondents.

### 1.     The Parties

The two Petitioners are currently serving terms of incarceration at Maine Department of Corrections (MDOC) facilities.  *Pet.* ¶ 7.  They bring this habeas petition on behalf of themselves and a putative class of all current and future individuals incarcerated at MDOC facilities who, by reason of age or medical condition, are particularly vulnerable to injury or death if they were to contract COVID-19 (the Class).  *Id.* ¶ 62.  Within this class, Petitioners define three subclasses.   The Imminent Release Subclass are members of the Class (Class Members) who are set to be released within one year.  *Id.* ¶ 67.  The Minimum Security Subclass consists of Class Members classified by MDOC as minimum or community security.  *Id.*  The Disabilities Subclass is made up of those who are medically vulnerable to COVID-19 because of disabilities protected by federal disability rights law.  *Id.*

Petitioner Sean R. Ragsdale, a fifty-six-year-old man, is incarcerated in Mountain View Correctional Facility.  *Id.* ¶ 13.  Mr. Ragsdale is at high risk for serious illness or death if he contracts COVID-19 due to a long-term chest infection, diabetes, and Hepatitis C, which has caused him liver damage.  *Id.*  Because of these conditions, Mr. Ragsdale regularly uses an inhaler, takes insulin twice a day, and— due to his diabetes—has been given work restrictions by doctors to not stand on his

4

feet for prolonged periods of time or engage in strenuous activity.  *Id.*  While medication to treat his Hepatitis C and prevent further liver disease is medically indicated, the MDOC has not provided that medication.  *Id.*  Though payments have been suspended while he is in prison, Mr. Ragsdale receives Social Security income for his disabilities.  *Id.*  Mr. Ragsdale was convicted of two counts of aggravated trafficking of drugs and has completed the majority of his sentence of imprisonment, with a planned release date of July 17, 2020.  *Id.*  Mr. Ragsdale is currently classified as "community" custody, meaning that, but for the current COVID-19 restrictions, he would be approved to work in the community during the day.  *Id.*

Petitioner Joseph A. Denbow (together with Mr. Ragsdale, Petitioners) is a fifty-four-year-old man also incarcerated in Mountain View Correctional Facility.  *Id.* ¶ 14.  Due to his asthma, chronic obstructive pulmonary disease, and the fact that he is in remission from colorectal cancer, he is at high risk for developing serious illness or death from COVID-19.  *Id.*  Mr. Denbow is incarcerated for driving without a license and aggravated forgery, and has completed most of his two-year prison sentence, with an earliest release date of August 30, 2020.  *Id.*  He is currently classified as "minimum" security, and before the current COVID-19 restrictions went into effect he worked in the community during the day doing odd jobs.  *Id.*

The MDOC is a Maine state agency "responsible for the direction and general administrative supervision, guidance and planning of adult and juvenile correctional facilities and programs within the State."  *Id.* ¶ 16 (quoting 34-A M.R.S. § 1202).  Randall A. Liberty is Commissioner of the MDOC, and in that role, he has "general

supervision, management and control of the research and planning, grounds, buildings, property, officers, employees and clients of any correctional facility, detention facility or correctional program." *Id.* ¶ 15 (quoting 34-A M.R.S. § 1402(1)).

## 2. The COVID-19 Pandemic

The novel coronavirus that causes COVID-19 has led to a global pandemic, with millions of cases throughout the world and many cases throughout the United States and Maine. *Id.* ¶ 17. Official reports of the incidence of COVID-19 are likely underestimates due to a lack of widely available testing. *Id.* The virus is known to spread from person to person through respiratory droplets, close personal contact, and contact with contaminated surfaces and objects. *Id.* ¶ 19. There is no vaccine against COVID-19 or any known medication effective at preventing or treating it. *Id.* Social distancing—i.e. deliberately keeping at least six feet of space between individuals—and a vigilant hygiene regimen, including hand hygiene, are critical for protecting against the virus' transmission. *Id.* These measures are important because COVID-19 spreads aggressively, and even those who are asymptomatic can spread it. *Id.* ¶ 20. The only assured way to curb the spread of COVID-19 is to dramatically reduce interpersonal contact, and institutions across the United States have been exhorted to reduce the number of people in close quarters, if not empty entirely, as well as to undertake aggressive sanitation measures, such as cleaning and disinfecting surfaces with products that contain a particular percentage of alcohol and closing off areas used by sick persons. *Id.*

Once contracted, COVID-19 can cause severe damage to lung tissue, including permanent loss of respiratory capacity, and can damage tissues in other vital organs such as the heart and liver. *Id.* ¶ 21. People over the age of fifty face a greater risk of serious illness or death from COVID-19, with estimates suggesting age groups above fifty face progressively higher mortality rates. *Id.* ¶ 22. Additionally, people of any age who suffer from certain underlying medical conditions—including lung disease, heart disease, chronic liver or kidney disease (including hepatitis and dialysis patients), diabetes, epilepsy, hypertension, compromised immune systems (such as from cancer, HIV, or autoimmune disease), blood disorders (including sickle cell disease), inherited metabolic disorders, stroke, developmental delay, and asthma—also have an elevated risk, including higher rates of mortality for certain conditions. *Id.* ¶ 23.

In many people, COVID-19 causes fever, cough, and shortness of breath; however, many people in higher risk categories who develop serious illness will need advanced support, such as ventilators and care providers. *Id.* ¶ 24. In serious cases, COVID-19 causes acute respiratory disease syndrome, which is life-threatening; even where this is not the case, the virus can cause severe and in some cases permanent lung damage, cardiac complications including heart failure, and damage to other organs. *Id.* ¶ 25. These complications can manifest and cause serious harm very quickly—in as few as five days after exposure. *Id.* ¶ 26. Recent estimates suggest the fatality rate of people infected with COVID-19 is approximately ten times higher than a severe seasonal influenza, and patients who do not die from serious cases may

7

still face prolonged recovery periods. *Id.* ¶ 27. The United States Centers for Disease Control and Prevention's (CDC) best estimate as of May 20, 2020, was that approximately sixty-five percent of individuals who contract COVID-19 will develop symptoms, 3.4 percent of those symptomatic cases will require hospitalization, and 0.4 percent of symptomatic cases will result in death. *Resp'ts' Opp'n* at 2 (citing U.S. CDC, COVID-19 PANDEMIC PLANNING SCENARIOS at 4-5, https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios-h.pdf). The United States currently leads the world in confirmed cases of COVID-19 cases, and as of May 14, 2020, Maine has had 1,565 confirmed cases, 207 hospitalizations, and sixty-nine deaths. *Pet.* ¶ 28. Many of these deaths occurred in congregate care nursing facilities. *Id.* There is no way to know when the number of daily cases will abate. *Id.*

### 3. COVID-19 in Prisons

People who live or work in prisons face a particularly acute threat of illness, permanent injury, and death, beyond that faced by the general public, and dramatic outbreaks of COVID-19 have occurred in Chicago, New York City, and Ohio. *Id.* ¶¶ 29-30. In fact, eight of the ten largest known infection sources in the United States are associated with jails or prisons. *Id.* ¶ 30. People in congregate environments—places where people live, eat, and sleep in close proximity—face increased danger of contracting COVID-19; it is virtually impossible for people in prisons to engage in the necessary social distancing and hygiene required to mitigate transmission risks due to high numbers of shared contact surfaces, limited access to medical care, and high

numbers of people with chronic, often untreated, illnesses living in close proximity. *Id.* ¶ 31. Correctional facilities house large groups of people together and move people in groups to eat, recreate, and obtain medical care, which is often insufficient for the population. *Id.* ¶ 32. The incarcerated population is generally responsible for cleaning the facilities with minimal supervision, and outbreaks of the seasonal flu regularly occur in jails and prisons—including one such outbreak in two facilities in Maine in 2011. *Id.* ¶¶ 32-33. Many public health experts have warned that those held in correctional settings are likely to face serious harm due to COVID-19. *Id.* ¶ 34. Because most of the people who enter correctional facilities typically leave those facilities in short order—particularly correctional and medical staff—failing to prevent and mitigate the spread of COVID-19 endangers not only those within the facility, but the entire community. *Id.* ¶ 35.

### 4. COVID-19 in Maine and MDOC Facilities

Many public health experts have recommended that correctional facilities rapidly release those most vulnerable to COVID-19, which has the dual benefit (in those experts' view) of protecting those vulnerable individuals while simultaneously facilitating risk mitigation among those who remain in the correctional facility and reducing the burden on regional health care infrastructure. *Id.* ¶ 42. Jail administrators across the country have concluded that widespread jail release is a necessary and appropriate public health intervention, and as of May 8, 2020, county jails in Maine had reduced their populations by more than forty percent since January 2020. *Id.* ¶ 43.

There have been confirmed cases of COVID-19 in every county in Maine. *Id.* ¶ 37. Penobscot County, where Mountain View Correctional Facility is located, has had ninety-one confirmed cases as of May 14, 2020, and has experienced spreading of the virus through community transmission. *Id.* Cumberland County, where Maine Correctional Center (MCC) and Southern Maine Women's Reentry Center are located, had 778 cases as of May 14, 2020, and also has confirmed community transmission of the virus. *Id.*

In early March 2020, the MDOC—in consultation with the Maine Center for Disease Control and Prevention (MCDC)—developed a three-phase approach to combating COVID-19, containing escalating protective measures. *Thornell Aff.* ¶ 7; *Pet.* ¶ 44. MDOC immediately entered into phase one, aimed at preparation and prevention. *Thornell Aff.* ¶ 7. The MDOC moved to phase two of that plan on March 13, 2020, when there was a confirmed case in the community, *id.* ¶¶ 7, 22; phase two includes the following measures:

(1)     suspending visitation, work release, and other community-related activities;

(2)     implementing screening measures for staff;

(3)     providing for increased cleaning and provision of cleaning supplies;

(4)     posting signage about hand washing and general fact sheets about COVID-19;

(5)     using personal protective equipment (PPE) for certain categories of staff;

(6)     providing the influenza vaccine to those who want it but have not received it;

10

(7)     providing daily briefings at all facilities;

(8)     suspending self-serve dining;

(9)     pre-planning with local hospitals; and

(10)    designating isolation areas at each facility and limiting the number of staff working at multiple facilities.

*See Pet.* ¶ 44. The MDOC has also provided two cloth masks to each incarcerated individual and, in some facilities, created alternative systems for providing meals. *Id.* ¶ 45. The MDOC stated that it would enter phase three when there is a suspected or confirmed case within an MDOC facility but did not do so after the confirmed positive case of a corrections worker at the MDOC facility in Bolduc, Maine. *Id.*

On March 23, 2020, the CDC issued guidance specific to correctional facilities, which the MDOC follows to the extent feasible within the physical parameters of its facilities. *Thornell Aff.* ¶ 33. In early March 2020, the MDOC instituted changed cleaning protocols at its facilities, as well as issuing directives encouraging social distancing practices, modifying medication administration procedures to occur within housing units, and limiting group activities. *Id.* ¶¶ 8-9, 12, 21-22. The MDOC also educated incarcerated individuals about COVID-19 and its prevention, ensured it had what it believed to be adequate supplies of PPE and other crucial supplies available, and ensured that each facility had a plan for isolating suspected COVID-19 cases and for potential staff shortages. *Id.* ¶¶ 9, 14-15, 21, 25; *Newby Aff.* ¶¶ 14-15, 18-20. The MDOC and Wellpath (the MDOC's medical contractor) also altered the delivery of healthcare services in response to COVID-19, including the use of PPE by providers

and patients during examination, cleaning and disinfecting of equipment and medical areas between patient visits, and use of telehealth visits where possible. *Newby Aff.* ¶¶ 22-35; *Thornell Aff.* ¶¶ 12, 22, 52. The MDOC has waived co-pays for sick calls for inmates with COVID-19-like symptoms to encourage inmates to seek treatment. *Newby Aff.* ¶ 30. Because of these and other protective steps, MDOC facilities have been able to continue to provide chronic care visits and other necessary medical treatments to inmates suffering from chronic conditions. *Id.* ¶¶ 34-35.

The MDOC has worked closely with the MCDC to prevent and respond to COVID-19, meeting daily with the MCDC director and following the MCDC's protocols on testing. *Thornell Aff.* ¶ 6-7, 57-58. Immediately after the positive test at Bolduc Correctional Facility, the MDOC issued a directive to all facilities regarding positive case reporting and contact tracing, as advised by the MCDC. *Id.* ¶ 37.

The MDOC has taken measures to inform inmates, staff, and the public of best practices and important events related to COVID-19. *Id.* ¶¶ 10, 35-36, 59-60. On March 31, 2020, the MDOC began publishing daily information regarding COVID-19 in MDOC facilities on the web via a daily dashboard. *Id.* ¶ 35. The posted information includes the number of inmates tested, the number of pending tests, the number of positive and negative results, and the number of individuals refusing tests, as well as population data and data on the Supervised Community Confinement Program (SCCP). *Id.* The MDOC has also kept inmates and staff updated on new developments, guidance, and protocols relating to COVID-19. *Id.* ¶¶ 8, 21, 36-37, 40.

The MDOC initiated phase three on May 19, 2020, at MCC due to the first positive test there. *Id.* ¶ 52. Phase three involves notifying state agencies and the medical community according to state protocol, increasing use of PPE (including n95 masks for staff), suspending programming as necessary, isolating intakes in cohorts, instituting alternative methods for medical distribution and food service as necessary, and triaging sick calls. *Pet.* ¶ 46; *Thornell Aff.* ¶ 52. The other MDOC facilities continue to take phase two precautions as of May 27, 2020. *Thornell Aff.* ¶ 53.

Once phase three began, the MDOC tested the entire population of MCC within four days, including incarcerated individuals, staff, and medical personnel.[1] *Id.* ¶ 55. These tests discovered three additional positive cases of COVID-19. *Id.* Within hours of learning of these positive results, the MDOC notified its staff and the public of the results and the steps taken to reduce the spread of the virus. *Id.* ¶¶ 36, 59-60. The MDOC also isolated and tested two individuals who had recently been transferred from MCC to other facilities; these tests came back negative. *Id.* ¶¶ 53-54. All the individuals who tested positive for COVID-19 are located at MCC, where they have been isolated and are receiving medical care; none has required hospitalization. *Id.* ¶¶ 55-56. In consultation with the MCDC, the MDOC began conducting universal re-testing at MCC, which had an expected conclusion date of June 1, 2020. *Id.* ¶ 57. On May 23, 2020, the warden of MCC declared an emergency to obtain authorization from Maine Governor Janet Mills to divert staff to MCC to address the emergency

---

[1] A small handful of individuals refused testing. *Id.* ¶ 55.

and assist with universal re-testing. *Id.* ¶ 61. Overall, the MDOC has performed over 750 COVID-19 tests on inmates and staff since the beginning of the pandemic. *Id.* ¶ 18.

As of April 13, 2020, the MDOC and county jails agreed to stop the transfer of inmates to MDOC facilities, and after Governor Mills' May 15, 2020, executive order, there will be no admissions from county jails to MDOC facilities until Maine's emergency declaration ends. *Id.* ¶ 50. Prior to this, the MDOC ordered that any incarcerated individuals arriving from county jail would only go to MCC, and they would all be met by staff in full PPE, undergo medical assessments, and quarantine for fourteen days after transfer. *Id.* ¶¶ 30, 38; *Newby Aff.* ¶ 36. In March, MDOC suspended work release programs and all non-professional visits at its facilities. *Thornell Aff.* ¶¶ 26, 32. The MDOC has also implemented screening requirements for everyone entering the prisons, developed in consultation with the MCDC. *Id.* ¶ 31.

Though MDOC policy has changed from encouraging social distancing to requiring it where feasible, prisoners in MDOC facilities cannot perform basic physical distancing beyond what is feasible within the physical parameters of the MDOC facilities. *Pet.* ¶¶ 38, 47; *Thornell Aff.* ¶¶ 33, 42; *Pet'rs' Reply*, Attach. 3, *Decl. of Brandon Gross* ¶¶ 13-16, 19, 23 (*Gross Decl.*); *Pet'rs' Reply*, Attach. 4, *Decl. of Dale Sukeforth* ¶¶ 5-6, 9-10 (*Sukeforth Decl.*); *Pet'rs' Reply*, Attach. 7, *Decl. of Arthur Gray* ¶¶ 9-10, 15 (*Gray Decl.*). Prisoners typically sleep in cells containing two to four individuals, share showers with thirty to eighty other inmates, and spend much of

14

the day in small and crowded rooms. *Pet.* ¶ 47. Additionally, when traveling throughout the facility to go to the meal hall or elsewhere, prisoners are bunched together and cannot physically distance due to lack of space. *Id.* Petitioners, as an example, live in dorms with approximately fifty other individuals with whom they share common rooms, sinks, showers, and toilets, and sleep in small rooms with three other people. *Id.* ¶ 38.

MDOC policy requires inmates and staff to wear masks in all facility areas when and where social distancing is not available. *Thornell Aff.* ¶ 43. In practice, the MDOC does not enforce the requirement to wear masks in the common rooms or dorms, and corrections officers often do not wear masks while standing within six feet of colleagues. *Pet.* ¶ 39; *Sukeforth Decl.* ¶ 10; *Gross Decl.* ¶¶ 20, 22, 25; *Pet'rs' Reply*, Attach. 5, *Suppl. Decl. of Sean Ragsdale* ¶ 4 (*Suppl. Ragsdale Decl.*); *Pet'rs' Reply*, Attach. 6, *Suppl. Decl. of Joseph Denbow* ¶ 4 (*Suppl. Denbow Decl.*); *Gray Decl.* ¶¶ 14-15. Although following new April 2020 CDC guidance on masks, incarcerated individuals were given two cloth masks made from the same material as prison-issue boxer briefs, prisoners are sometimes unable to sanitize them between uses and the material quickly breaks down when washed. *Pet.* ¶ 39; *Gross Decl.* ¶ 22. Furthermore, masks offer only limited benefits to the mask-wearer when others in the vicinity are not wearing masks. *Pet.* ¶ 40. As with staff, prisoners often do not wear masks. *Id.* ¶ 47.

Although the MDOC provides prisoners with gloves and spray bottles of non-bleach-based cleaning products to clean the dormitories and bathrooms, there is

15

minimal supervision to ensure consistent or thorough cleaning. *Id.* ¶ 47; *Suppl. Ragsdale Decl.* ¶ 5. For hand hygiene, Petitioners have access to a bathroom sink which they share with approximately fifty other prisoners, as well as alcohol-free hand sanitizer, even though the MCDC recommends that people use hand sanitizer with an alcohol content of sixty to ninety-five percent. *Pet.* ¶ 41. Incarcerated individuals at all MDOC facilities have access to hand sanitizer with an alcohol content of seventy percent; however, due to the potential for abuse, it must be dispensed by officers. *Thornell Aff.* ¶ 49. Petitioners did not know that this alcohol-based hand sanitizer existed until recently; it is kept behind closed doors in the officers' area and Petitioners have not received any notice that they are entitled to its use. *Suppl. Ragsdale Decl.* ¶ 2; *Suppl. Denbow Decl.* ¶ 2.

As of May 14, 2020, the MDOC had tested only twenty-six inmates, or 1.3 percent of the incarcerated population. *Pet.* ¶ 47. Outside of MCC, the MDOC does not test individuals who are exposed to someone who has tested positive unless they are symptomatic. *Id.* Because some prisoners are afraid of being forced into segregation or isolation if they test positive for COVID-19, such individuals have expressed that they will not report and will even try to hide symptoms if they begin to experience them. *Id.*

### 5.  MDOC's Use of Medical Furlough and Supervised Community Confinement

Unlike other correctional facilities in Maine, the MDOC has not engaged in widespread or systematic release of people who are medically vulnerable, near the end of their sentence, or otherwise eligible for home confinement. *Id.* ¶ 50. Pursuant

16

to 34-A M.R.S. § 3035(2), Commissioner Liberty has authority to grant individuals medical furlough to obtain medically-required medical services. *Id.* ¶ 51. Under 34-A M.R.S. § 3036-A(2), Commissioner Liberty may also transfer any incarcerated individual in MDOC custody to SCCP transfer, subject to certain statutory restrictions. *Id.* The MDOC retains custody and oversight over individuals on both medical furlough and SCCP transfer, though there is no monitoring of inmates on medical furlough. *Id.*; *Thornell Aff.* ¶ 70.

In mid-March 2020, as part of phase one, the MDOC and Wellpath compiled a list of over 900 incarcerated individuals with conditions considered by the CDC to place them at a higher risk of illness from COVID-19, including asthma, hypertension, chronic lung disease, and other conditions. *Thornell Aff.* ¶ 62. Some of these more than 900 individuals are incarcerated for violent crimes, and some are currently housed in segregated housing units because they pose a danger to staff and other inmates; release of such individuals would violate the provisions of the SCCP statute which make the program available only to minimum custody inmates. *Id.* ¶ 68. The MDOC and Wellpath also created a list of inmates whose medical conditions made them a priority for consideration for SCCP transfer. *Id.* ¶ 62. MDOC's Classification Department then evaluated every incarcerated individual on these lists—starting with those identified as most at risk—for potential placement SCCP placement. *Id.* ¶¶ 62-63. Since March 1, 2020, ninety-five individuals have been released via the SCCP, with five returning to MDOC custody for substance

abuse or other issues. *Id.* ¶ 63. The MDOC continues to update this list and evaluate inmates for SCCP transfer. *Id.* ¶ 62.

Despite urging from advocates, the MDOC has not expanded eligibility for home confinement to additional groups of incarcerated individuals since the beginning of the COVID-19 pandemic. *Pet.* ¶¶ 52-53. The MDOC is using certain criteria beyond the statutory requirements for SCCP transfer to determine which reviews should be expedited:

(1)    individual's scheduled release date must be within one year, despite statutory default of eighteen months;

(2)    individual is not serving a sentence for a crime committed against a person, although this is not a typical statutory or policy requirement;

(3)    individual may not have a criminal history that includes a crime against a person, being a fugitive from justice, or several prior revocations, although these are not typical statutory or policy requirements;

(4)    individual must be approved as community custody by MDOC's classification instrument, though the statute requires only minimum-security classification; and

(5)    individual's placement plan must include stable housing, medical services as needed, and treatment or programming services as appropriate, despite the fact that many prisoners get medical care through MaineCare, which is suspended during periods of incarceration.[2]

*See Pet.* ¶ 53. MDOC also provides several other factors—such as the individual's medical history and current medical conditions, history on probation and SCCP,

---

[2]    Petitioners assert that these criteria are being used to determine who is eligible to be released, and that they are stricter than normal. *Id.* ¶ 53. Respondents assert that this is not an accurate characterization, and these additional parameters are merely being used to determine which reviews should be expedited. *Thornell Aff.* ¶ 64. For the purposes of this motion for a temporary restraining order, in which Petitioners have the burden of proof, the Court resolves this conflict in favor of Respondents.

treatment and programming process, and disciplinary record while incarcerated—that are relevant to the determination whether an individual should be placed via the SCCP. *Id.* ¶ 54. It is especially important during a pandemic that individuals who are released have an appropriate residence. *Thornell Aff.* ¶ 67. Homeless shelters are not appropriate because of documented outbreaks of COVID-19 in homeless shelters and because of the impossibility of determining if homeless shelters also house crime victims or other offenders, which the SCCP policy would not allow. *Id.*

During the process of evaluating inmates for the SCCP, Commissioner Liberty met several times with representatives of the Maine American Civil Liberties Union (ACLU) and provided them with the number of inmates with medical conditions associated with an increased risk from COVID-19. *Id.* ¶ 69. The Maine ACLU requested that all the more than 900 inmates listed be released on medical furlough. *Id.*

Petitioners' experiences suggest that the MDOC may treat the presence of underlying medical conditions as a reason not to release otherwise eligible prisoners. Mr. Denbow's case worker allegedly told him that "there's nobody being released because of medical conditions, so you can get that idea right out of your head," and in opposing his state court habeas petition seeking release from incarceration, as a reason to oppose Mr. Denbow's petition, the Maine Attorney General's office cited the fact that while incarcerated, he receives multiple prescription medicines that he would have to find access to if released. *Id.* ¶¶ 55-56. The Attorney General's office made the same point about Mr. Ragsdale. *Id.* ¶ 56.

The MDOC has also refused to grant expedited review or processing for people who are medically vulnerable.  Mr. Ragsdale applied for home confinement over a month ago but did not receive a response until his attorney sent a demand letter.  *Id.* ¶ 57.  Mr. Ragsdale then received more paperwork to complete, as well as a notice that there was no guarantee his application would be processed immediately and that limited home investigations were being done at the time.  *Id.*  The MDOC has also categorically prohibited using medical furlough to enable medically vulnerable prisoners to physically distance during the COVID-19 pandemic.  *Id.* ¶ 58.  The MDOC Director of Classification has stated that MDOC is not using medical furlough to release incarcerated individuals during the COVID-19 pandemic.  *Id.*

## II.   THE PARTIES' POSITIONS

### A.   Petitioners' Motion for Temporary Restraining Order

#### 1.   28 U.S.C. § 2241 is the Proper Procedural Vehicle for Petitioners' Claims

Petitioners seek a temporary restraining order with four elements:

(1)   provisional certification of the Class and an order that Respondents "provide a list of all medically vulnerable prisoners in their custody," "specifically identifying those who will be released in the next year (the 'Imminent Release Subclass'), those who are classified as minimum or community security (the 'Minimum Security Subclass'), and those who are medically vulnerable because of a federally protected disability (the 'Disability Subclass');"

(2)     requirement that Respondents "evaluate each Class Member for home confinement, furlough, or another accommodation, or, in the alternative, appointing a Rule 706 expert to complete such evaluations;"

(3)     a grant of "enlargement to Class Members to safely physically distance in the community or another appropriate setting;" and

(4)     "for any Class Members who remain incarcerated," a mandate of "compliance with [CDC] guidance including adequate physical distancing and necessary hygiene . . .."

*Pet'rs' Mot.* at 2-3.[3]

Petitioners assert that "Section 2241 authorizes courts to grant habeas corpus relief where a person is 'in custody in violation of the Constitution or laws or treaties of the United States.'" *Id.* at 9 (quoting 28 U.S.C. § 2241(b)(3)).  In Petitioners' view, "[h]abeas corpus is the appropriate remedy when a petitioner challenges 'the fact or duration of his confinement' or seeks a 'quantum change' to a less restrictive form of custody." *Id.* (quoting *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 873 (1st Cir. 2010)). Because "Petitioners and Class Members challenge the fact of their confinement, which, they allege, has 'become unconstitutional because of the COVID-19 pandemic risk,'" *id.* (quoting *McPherson v. Lamont*, No. 3:20cv534 (JBA), 2020 WL 2198279, at *5 (D. Conn. May 6, 2020)), "the habeas remedy applies even if the alleged violation

---

[3]     In the Joint Status Report, Petitioners expand their request for relief, seeking, in addition, "universal testing in the Maine Correctional Center and spot testing of asymptomatic prisoners" at other facilities, "accommodations to ensure counsel's access to discuss conditions with members of the putative class," and "immediate disclosure of infection control policies implemented by [the M]DOC and any positive tests of putative class members." *Status Rep.* at 3.

arises from unlawful conditions of confinement." *Id.* Petitioners point out that the exhaustion requirement of Section 2241 is prudential and "does not apply when, as here, the state remedy would be futile and the petitioner is likely to suffer an irreparable injury without immediate judicial relief." *Id.* at 10.

### 2. Injunctive Relief Is Necessary to Protect from Risk of Illness or Death

Petitioners discuss each of the four injunctive relief factors.

#### a. Irreparable Harm

Petitioners assert that "[a]n increased risk of serious illness and death constitutes irreparable injury," and "[a]bsent injunctive relief, Class Members face an increased risk of infection, serious illness, and death from COVID-19. . . . due to impossibility of physical distancing and the absence of other protective measures." *Id.* at 11-12. Petitioners assert that "[n]o amount of money could make [them] whole if they suffer illness or die a preventable death while in custody." *Id.* at 12.

#### b. Likelihood of Success on the Merits

Petitioners split their evaluation of their likelihood of success on the merits into two sections dealing first with their Eighth Amendment claim and second with their Americans with Disabilities Act (ADA) and Rehabilitation Act claims. *Id.* at 12.

#### i. Eighth Amendment Claim

Petitioners begin by laying out the "deliberate indifference to serious medical needs" standard for Eighth Amendment claims adopted in *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). *Pet'rs' Mot.* at 12-13. Under the objective "serious medical needs" prong, Petitioners assert that "the risk of infection with COVID-19 represents a

serious medical need for all prisoners, but especially for Petitioners and Class Members who are medically vulnerable to serious illness or death from the virus." *Id.* at 13.  With regard to the subjective "deliberate indifference" prong, Petitioners assert that Respondents "have refused to implement adequate physical distancing, provide alcohol-based hand sanitizer, or ensure meaningful testing despite knowing that all are critical to protecting Class Members' health and preventing the spread of disease." *Id.* at 13-14.  Additionally, Petitioners state that the MDOC "has refused to transfer Class Members to a location where physical distancing is possible," and "the impossibility of physical distancing in [M]DOC facilities means that transfer to the community is 'the only viable measure by which the safety of highly vulnerable inmates can be reasonably assured.'"  *Id.* at 14 (quoting *Martinez-Brooks v. Easter*, No. 3:20-cv-00569 (MPS), 2020 WL 2405350, at *23 (D. Conn. May 12, 2020)). Specifically, Petitioners assert that the MDOC is refusing to utilize its authority to grant medical furlough to reduce the risks posed by COVID-19 and is implementing its home confinement authority "slow[ly] and inflexibl[y]," applying "stricter-than-usual criteria for home confinement during COVID-19 . . .." *Id.* at 14-15.  Petitioners conclude this argument by stating that the MDOC "has the tools that it needs to enable physical distancing for medically vulnerable individuals, yet has refused to do so," constituting "textbook deliberate indifference in violation of the Eighth Amendment."  *Id.* at 16.

ii.   **Americans with Disabilities Act and Rehabilitation Act Claims**

Petitioners assert that they and members of the Disabilities Subclass "are likely to succeed in showing that [the M]DOC is engaging in unlawful discrimination under the ADA and Rehabilitation Act by refusing to provide reasonable accommodation—specifically, medical furlough, home confinement, or similar relief—to protect them against the elevated risk of serious illness or death from COVID-19." *Id.* at 16.   Petitioners state that Maine's prisons qualify as "public entit[ies]" within the meaning of 42 U.S.C. § 12132, and thus are prohibited from "discriminating against a qualified individual with a disability on the basis of that disability."   *Id.* Petitioners lay out the standard for claims under the ADA and Rehabilitation Act, *id.* at 16-17 (quoting *Buchanan v. Maine*, 469 F.3d 158, 170-71 (1st Cir. 2006)), and then address the elements of that standard.

Petitioners assert that members of the Disability Subclass "have medical conditions that place them at heightened risk of serious illness or death from COVID-19" because they have "pre-existing medical conditions that increase risk for COVID-19 complications or death . . . all of which are disabilities under federal disability rights laws."   *Id.* at 17.   Next, Petitioners contend that "[b]y refusing to allow Disability Subclass Members to perform physical distancing . . . [the M]DOC excludes them from necessary medical care, rehabilitative programs, and other programs and services 'by reason of' their disabilities."   *Id.* at 18.   Petitioners state that "[b]ecause physical distancing is necessary preventive care that [the M]DOC has made unavailable to members, members of the Disability Subclass are denied the benefits

24

of basic [M]DOC programs and services," as well as "the ability to participate on an equal basis in other prison programming and services." *Id.* at 19. Finally, Petitioners argue that "[r]elease to the community is a reasonable and necessary accommodation for many members of the Disability Subclass, who require space to physically distance and protect themselves from the virus," and "by applying stricter-than-usual standards for home confinement during the pandemic and by failing to process applications in a reasonable timeframe, [the M]DOC discriminates against Subclass Members with disabilities who are at heightened risk from the pandemic." *Id.* at 19-20.

### c.      Balance of the Equities and the Public Interest

Petitioners assert that "[t]he balancing of the equities favors Petitioners and Class Members, who face a heightened risk of serious and potentially permanent illness or death without injunctive relief," as opposed to Respondents, who "are simply being asked to ensure necessary care that they are constitutionally and statutorily obligated to provide." *Id.* at 20. Additionally, "[r]efusing injunctive relief . . . would risk greater community spread of COVID-19—among prisoners, prison staff, and the broader community—a result the State has taken other extraordinary steps to avoid." *Id.*

### B.      Respondents' Opposition

Respondents begin by stating that "[a] temporary restraining order, like a preliminary injunction, is 'an extraordinary and drastic remedy that is never awarded as of right,'" particularly so in this case because "the injunctive relief [Petitioners]

seek would alter, rather than preserve, the status quo." *Resp'ts' Opp'n* at 10 (quoting *Monga v. Nat'l Endowment for Arts*, 323 F. Supp. 3d 75, 82 (D. Me. 2018)). Respondents then discuss each of the four injunctive relief factors.

### 1.   Likelihood of Success on the Merits

Respondents first discuss the Eighth Amendment, ADA, and Rehabilitation Act claims brought by Petitioners before discussing the prudential exhaustion requirement of 28 U.S.C. § 2241.

### a.   Eighth Amendment Claim

Respondents state that "[a] reasonable response to a known risk negates deliberate indifference, even if harm is not averted, and even a negligent response to a known risk 'that was colorable and taken in good faith might still be enough to negate deliberate indifference.'" *Id.* at 11 (footnote omitted) (quoting *Burrell v. Hampshire Cty.*, 307 F.3d 1, 8 (1st Cir. 2002)). Respondents state that, in contrast to Petitioners' view, "[the] MDOC's early and expansive response to the virus shows an extraordinarily careful and active approach to trying to protect inmates and staff" and "reflect[s] best practices, not reckless disregard of an excessive risk . . .." *Id.* Respondents further argue that, "[e]ven assuming that Petitioners can show a sufficiently grave risk of harm from COVID-19, they cannot show that MDOC officials were deliberately indifferent to that risk" because those officials "are not deliberately indifferent unless they recklessly disregard an excessive risk to inmate health or safety." *Id.* at 11-12 (footnote omitted) (citing *Farmer v. Brennan*, 511 U.S. 825, 839 (1970)). Respondents suggest Petitioners cannot show recklessness here because

26

"[the] MDOC's prevention efforts have been vast and were accomplished early." *Id.* at 12.

Respondents attempt to counter Petitioners' argument that "[the] MDOC has . . . been 'slow and inflexible' in considering inmates for SCCP" by differentiating *Martinez-Brooks*, arguing that unlike in that case, "[the] MDOC has considered for SCCP all of the eligible 900+ inmates in its custody with a medical condition that increases their susceptibility to COVID-19—nearly half of all inmates—making 95 placements so far." *Id.* at 13.  Additionally, Respondents point out that "[the] MDOC has far less flexibility with regard to home confinement than did the defendants in *Martinez-Brooks*." *Id.*

**b.    Americans with Disabilities Act Claim**

Respondents assert that under the ADA, "[d]iscrimination can be established in three ways: (1) disparate treatment, (2) disparate impact—that a government policy neutral on its face 'falls more harshly on one group than another and cannot be justified by business necessity,' or (3) failure to accommodate." *Id.* at 14 (quoting *Nunes v. Mass. Dep't of Corr.*, 766 F.3d 136, 145 (1st Cir. 2014)).  Respondents claim that "[t]he first and third theory of discrimination require little discussion" as "[t]here is no evidence that [the] MDOC's COVID-19 policies and practices treat inmates with disabilities less favorably than the non-disabled" and "Petitioners' demand for 'reasonable accommodation' of granting all subclass members SCCP or medical furlough, regardless of eligibility, misconstrues MDOC's obligation under the ADA, which is to ensure that disabled inmates receive accommodations needed to allow

them access [to] those programs to the same extent as non-disabled inmates." *Id.* at 14-15 (internal citation omitted). With regard to a disparate impact theory, "[w]hile Petitioners cite the increased vulnerability to COVID-19 of individuals with certain medical conditions, that increased vulnerability is not caused by any act of [the] MDOC, or its policies," and "[i]nstead, [the] MDOC took action to identify inmates with medical conditions that make COVID-19 particularly risky . . .." *Id.* at 15. Respondents assert that [the] MDOC's "actions are justified and do not discriminate against disabled inmates." *Id.* at 16.

### c.   Exhaustion

Respondents assert that Petitioners must comply with the statutory exhaustion requirement of 28 U.S.C. § 2254, rather than the judicially-created exhaustion requirement applicable to 28 U.S.C. § 2241, and argue that they have not done so. *Id.* at 16-17.

### 2.   Irreparable Injury

Respondents contend that "[i]t is not enough for a party seeking injunctive relief to demonstrate a 'possibility' of irreparable harm; rather, the movant must demonstrate that irreparable harm is 'likely.'" *Id.* at 17 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). They point out that "[t]o date, there have only been four cases of COVID-19 in a single MDOC facility that is considerably less remote than the facility housing Petitioners," and assert that the MDOC has an "impressive track record in keeping COVID-19 out of the prisons . . .." *Id.* at 17-18. Respondents state that "Petitioners ask the Court to ignore U.S. Supreme Court

precedent mandating deference to State prison officials in managing its prisons and instead issue an injunction consisting of widely varying types of relief that are unmoored from the status quo." *Id.* at 18 (footnote omitted). Additionally, Respondents point out that both named petitioners are currently incarcerated in rural Maine with release dates of this summer; Respondents assert that maintaining this status quo "does not show a likelihood of irreparable injury." *Id.* at 18-19. Respondents further state that because of the steps the MDOC is taking to prevent spread of COVID-19, Petitioners have not shown likelihood of irreparable harm beyond the speculative. *Id.* at 19.

### 3.    Balance of Equities and Public Interest

Respondents argue that "[w]hen the government is the opposing party, the balance of equities and the public interest merge into a single factor." *Id.* In Respondents' view, "[the] MDOC and the State of Maine as a whole have a compelling interest in having inmates serve the sentence imposed by the judicial system and completing the attendant rehabilitative programs." *Id.* Respondents contend that "[i]ndiscriminately releasing [certain] inmates into the community—particularly on unmonitored medical furloughs, as Petitioners propose—would significantly threaten public safety." *Id.* Respondents point to the MDOC's use of the SCCP throughout the pandemic, and argue that "[t]he public interest supports keeping the [SCCP's] statutory safeguards in place, rather [than] releasing inmates who are either potentially dangerous or who do not have a safe, appropriate place to live." *Id.* at 19-20.

29

### C.     Petitioners' Reply

Addressing Respondents' arguments about irreparable harm, Petitioners argue that "even a relatively low risk of death may qualify as 'irreparable,' given that 'practitioners consider even a very low absolute risk of death to be medically unacceptable.'"  *Pet'rs' Reply* at 3 (quoting *Smith v. Aroostook Cty.*, 376 F. Supp. 3d 146, 162 & n.23 (D. Me. 2019)).  Petitioners point out that it is unsurprising there have been no confirmed positive COVID-19 cases at the facility where the named petitioners are housed because "only two prisoners there have been tested to date." *Id.*

With regard to their Eighth Amendment claim, Petitioners contend that "this case is on all fours with other examples in which courts have ordered emergency injunctive relief to require release from prison in 'meaningful numbers' during the COVID-19 pandemic." *Id.* Petitioners state that many of the precautionary measures Respondents point to are "unavailable in practice," and further state that "providing only 'some treatment' is no defense when the 'serious need for greater or more immediate medical attention' was obvious and nonetheless refused by the prison." *Id.* (quoting *Perry v. Roy*, 782 F.3d 73, 77, 81 (1st Cir. 2015)).  Petitioners assert that despite Respondents' knowledge of the need to maintain social distance, the MDOC "has refused to meaningfully exercise its release authority and instead has pursued an approach that is incomplete in inception and flawed in execution." *Id.* at 4. Petitioners further argue that the statutory limitations of home confinement provide no excuse for the MDOC's refusal to authorize medical furloughs. *Id.* at 5. Petitioners

state that "mandating the general availability of medical furlough would not prevent [the M]DOC from weighing specific safety concerns for a particular person." *Id.* at 5 n.2.

In response to Respondents' arguments about Petitioners' ADA claim, Petitioners contend that Respondents' focus on eligibility for home confinement or medical furlough is a "red herring," as "[m]embers of the Disabilities Subclass are eligible for lifesaving medical care (physical distancing) available through medical furlough, absent a specific reason that such an accommodation would not be safe for a specific individual." *Id.* at 5. Petitioners argue that "to the extent [the M]DOC has adopted policies narrowing eligibility for medical furlough or home confinement or refusing accommodations to ensure those programs are available for prisoners with disabilities, such policies violate the ADA." *Id.* at 6. Petitioners also disagree with Respondents' position that the fact the MDOC "considered medically vulnerable prisoners for home confinement . . . foreclose[es] any claim of disability discrimination," as in doing so, the MDOC "funnel[ed] all release claims through" a more onerous process, which had a disparate impact on the Disabilities Subclass. *Id.*

Petitioners state that Respondents' argument about public safety "grossly mischaracterizes Petitioners' request to protect medically vulnerable prisoners using tools within existing [M]DOC authority—and with prisoners remaining subject to M[DOC] oversight and control . . .." *Id.* Lastly, Petitioners assert that Respondents "have not rebutted Petitioners' showing that it would be futile to exhaust state court procedures in seeking emergency relief for members of the proposed class." *Id.* at 7.

31

### III.   LEGAL STANDARD

"[Injunctive relief] is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2012) (quoting *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011)).  A judge should use his or her authority to grant such injunctive relief "sparingly." *Mass. Coal. of Citizens with Disabilities v. Civil Def. Agency & Office of Emergency Preparedness*, 649 F.2d 71, 76 n.7 (1st Cir. 1981); *see also Augusta News Co. v. News Am. Publ'g, Inc.*, 750 F. Supp. 28, 31 (D. Me. 1990) ("Preliminary injunctions must be used sparingly and only in cases where the need for extraordinary equitable relief is clear and plain").

To determine whether to issue a temporary restraining order, the Court applies the same four-factor analysis used to evaluate a motion for a preliminary injunction.  *See Alcom, LLC v. Temple*, No. 1:20-cv-00152-JAW, 2020 WL 2202443, at *5 (D. Me. May 6, 2020) (citing cases).  The four factors are:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of the relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

*Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 17-18 (1st Cir. 2006) (alteration in original) (quoting *Bl(a)ck Tea Soc'y v. City of Bos.*, 378 F.3d 8, 11 (1st Cir. 2004)).

"The party seeking [an injunction] bears the burden of establishing that these four factors weigh in its favor."  *Id.* at 18.  The same is true with respect to a temporary restraining order.  *Martin*, 665 F. Supp. 2d at 22.  Ultimately, "trial courts

have wide discretion in making judgments regarding the appropriateness of such relief." *Francisco Sánchez v. Esso Standard Oil Co.*, 572 F.3d 1, 14 (1st Cir. 2009).

## IV.   DISCUSSION

The task before the Court on this motion for a temporary restraining order is narrow: to determine whether, at this early stage, Petitioners are entitled to temporary injunctive relief to prevent irreparable harm and serve the public interest.[4]   The Court analyzes the four factors Petitioners must establish in turn.

### A.   Likelihood of Success on the Merits

"The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002); *see also Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 7 (1st Cir. 2012) (confirming that this factor is the "most important part of the preliminary injunction assessment" (quoting *Jean v. Mass. State Police*, 492 F.3d 24, 27 (1st Cir. 2007))).   The Court first discusses exhaustion of state court remedies before analyzing the merits of Petitioners' Eighth Amendment and ADA and Rehabilitation Act claims.

### 1.   Exhaustion of State Court Remedies

One consequence of the COVID-19 pandemic has been considerable litigation to test the status quo in light of marked and rapid change.   The dangerous impact of

---

[4]   To rule on the motion for TRO, the Court put aside the potentially difficult question of class certification, but assuming the Court reaches the merits of the motion for preliminary injunction, the Court will be required to address this issue.

the novel coronavirus on the nation's prison system has proven to be fertile ground for such challenges.  In this case, the Plaintiffs elected to file their petition under two theories: (1) a habeas corpus theory under 28 U.S.C. § 2241 and (2) a disability discrimination action under the ADA, 42 U.S.C. § 12132, and Rehabilitation Act, 29 U.S.C. § 794.  The Court first addresses the exhaustion issue in the context of the habeas corpus theory of relief.[5]

This area of federal law is complicated and nuanced.  To begin, the Court turns to recent decisions from the Second Circuit.  In *Cook v. New York Division of Parole*, 321 F.3d 274 (2d Cir. 2003), the Second Circuit "explained that while a person in federal custody may challenge the execution of his sentence pursuant to § 2241, the same is not true of a person in state custody . . .."  *Dafoe v. Wolcott*, No. 20-CV-6269 EAW, 2020 U.S. Dist. LEXIS 91626, at *2 (W.D.N.Y. May 26, 2020).  The *Cook* Court wrote:

> [S]ection 2255, which is the vehicle by which persons in federal custody may assert that their sentence violates the federal Constitution or federal law, is critically narrower than [§] 2254, by which persons in state custody may challenge that custody: A claim [under § 2254] that [a state prisoner] is "in custody" in violation of federal laws is broader than a claim that the imposition of one's sentence is illegal.  A federal due process challenge claiming state incarceration beyond that authorized by a judgment and sentence would fall within this broader category of claims. The plain language of the pertinent statutes indicates, therefore, that a federal prisoner may challenge the imposition, but not the execution, of a sentence under § 2255, while a

---

[5]      The Plaintiffs have not filed under 42 U.S.C. § 1983 and, therefore, the Court is not called upon to address whether a § 1983 theory would be a better fit.  The Court assumes that in requesting to be furloughed or placed on home confinement, the Plaintiffs' claimed relief represents a "quantum change in the level of custody."  *Gonzalez-Fuentes*, 607 F.3d at 873 (1st Cir. 2010); *see also Inman v. Austin*, No. 2:15-cv-00267-JAW, 2015 U.S. Dist. LEXIS 117982, at *4 (D. Me. Sept. 3, 2015) ("Plaintiff's request for community confinement likely would entail a 'quantum change in the level of custody,' meaning such relief would only be appropriate in the context of a habeas petition, not a civil rights action") (quoting *Gonzalez-Fuentes,* 607 F.3d at 873), *aff'd* 2015 U.S. Dist. LEXIS 161199 (D. Me. Dec. 2, 2015).

> state prisoner may challenge either the imposition or the execution of a
> sentence under [§] 2254.   Because a *federal* prisoner cannot challenge
> the *execution* of his or her sentence by a motion under [§] 2255, he or she
> must resort to a [§] 2241 petition to do so.   A state prisoner such as [the
> petitioner], by contrast, not only may, but according to the terms of [§]
> 2254 must, bring a challenge to the execution of his or her sentence . . .
> under [§] 2254. A petition under [§] 2241 is therefore unavailable to him.

321 F.3d at 278 (citation omitted).

Consistent with *Cook*, the district courts in the Second Circuit have dismissed

state prisoner lawsuits brought in federal court unless the plaintiffs have complied

with the hurdles in § 2254.   *Dafoe*, 2020 U.S. Dist. LEXIS 91626; *Cobb v. Wolcott*, No.

20-CV-496 (JLS), 2020 U.S. Dist. LEXIS 94444 (W.D.N.Y. May 29, 2020) (granting

motion to convert § 2241 to a § 2254 petition); *Diaz v. Rollins*, No. 3:20-CV-00653

(KAD), 2020 U.S. Dist. LEXIS 94036 (D. Conn. May 29, 2020) (converting § 2241 to a

§ 2254 petition); *Llewellyn v. Wolcott*, No. 20-CV-498 (JLS), 2020 WL 2525770, at *3

n.6 (W.D.N.Y. May 18, 2020); *but see McPherson*, 2020 WL 2198279, at *5 (D. Conn.

May 6, 2020).   If *Cook* is the law in the First Circuit, the Petitioners, who are state

inmates incarcerated pursuant to a judgment of a state court, must bring their claim

not under § 2241 but under § 2254.   As the Court will explain, if § 2254 applies, the

difference between these statutes effects a significant difference for purposes of

exhaustion.

The Court turns to whether the First Circuit has adopted the Second Circuit's

analysis of the availability of habeas relief in federal court to a state prisoner.   In

*Brennan v. Wall*, 100 Fed. App'x 4 (1st Cir. 2004), the First Circuit addressed whether

a district court erred by treating a petition for writ of habeas corpus filed by a state

prisoner under 28 U.S.C. § 2241 as a petition under § 2254 and dismissing it as "nonconforming, successive and untimely," which were proper grounds for dismissal under § 2254.  *Id.* at 4.

The *Brennan* Court wrote that a "state habeas petitioner in custody pursuant to the judgment of a state court may not evade the 'second or successive' restrictions of § 2244 by bringing his petition under § 2241 rather than § 2254."  *Id.*  The First Circuit quoted the Third Circuit: "'[B]oth §§ 2241 and 2254 authorize [petitioner's] challenge to the legality of his continued state custody,' but allowing him to file his 'petition in federal court pursuant to § 2241 without reliance on § 2254 would. . . thwart Congressional intent.'"  *Id.* (quoting *Coady v. Vaughn.* 251 F.3d 480, 484-85 (3d Cir. 2001)).  Thus, the First Circuit explained, "a state prisoner in custody pursuant to the judgment of a state court may file a habeas corpus petition, as authorized by § 2241, but he is limited by § 2254."  *Id.*  The *Brennan* Court concluded that "the district court properly treated Brennan's petition as having been brought under § 2254, despite Brennan's attempt to classify his petition as a § 2241 . . . action." *Id.* at 5.

During oral argument, the Plaintiffs observed that the *Brennan* opinion was an unpublished First Circuit decision and therefore not binding on this Court.  First Circuit Local Rule 36(c) provides:

> While an unpublished opinion of this court may be cited to this court in accordance with Fed. R. App. P. 32.1 and Local Rule 32.1.0, a panel's decision to issue an unpublished opinion means that the panel sees no precedential value in that opinion.

36

F<small>IRST</small> C<small>IR</small>. L<small>OC</small>. R. 36(c).  First Circuit Local Rule 32.1.0, however, allows counsel to cite an unpublished opinion and provides that the First Circuit "will consider such dispositions for their persuasive value but not as binding precedent."  Thus, although the Plaintiffs are correct about the binding impact of *Brennan*, the Court acknowledges *Brennan* as the considered judgment of a panel of the Court of Appeals for the First Circuit.

Unlike *Brennan*, the First Circuit's next opinion on this issue, *Gonzalez-Fuentes*, is a published opinion and binding on this Court.  In *Gonzalez-Fuentes*, the plaintiffs, who were inmates in the commonwealth of Puerto Rico, filed a federal habeas corpus petition under 28 U.S.C. § 2241; the First Circuit observed that "§ 2254 ultimately governs the relief that they seek."  607 F.3d at 875 n.9.  The *Gonzalez-Fuentes* Court wrote:

> Section 2241, which does not contain many of the hurdles that § 2254 places before habeas petitioners, may be used to attack the manner in which a sentence is executed, as opposed to the sentence itself.  Yet even if the substance of the challenge here could theoretically support jurisdiction under § 2241, the majority view is that prisoners in state custody are required to comply with all the requirements laid out in § 2254 whenever they wish to challenge their custodial status, no matter what statutory label the prisoner uses.  To do otherwise would thwart Congress's intent in passing AEDPA.

*Id.* (citations omitted).  The First Circuit discussed *Brennan*, noting that "We previously adopted the majority position in an unpublished decision and we see no reason to abandon it here."  *Id.* (citing *Brennan*, 100 Fed. App'x at 4-5).

Finally, when addressing the same issue, district courts within the First Circuit have accepted both *Gonzalez-Fuentes* and *Brennan* as authoritative.  *Cruz-*

*Rivera v. O'Brien*, Civil No. 16-1429 (ADC), 2019 U.S. Dist. LEXIS 20983, at *3-4 (D.P.R. Feb. 5, 2019); *Mercer v. Joyce*, No. 2:14-cv-00531-JDL, 2015 U.S. Dist. LEXIS 5826, *1 (D. Me. Jan. 16, 2015), *aff'd* 2015 U.S. Dist. LEXIS 21293 (D. Me. Feb. 20, 2015) (citing only *Gonzalez-Fuentes*); *Murray v. Bledsoe*, Civil Action Nos. 10-11019-GAO, 11-10905-GAO, 2012 U.S. Dist. LEXIS 128591, at *4-5 (D. Mass. Sept. 11, 2012); *Dionne v. Suffolk Cty. Sheriff Dep't*, Civil Action No. 12-11319, 2012 U.S. Dist. LEXIS 114200, at *4 n.2 (D. Mass. Aug. 14, 2012).

At oral argument, the Plaintiffs maintained that they had a right to proceed under § 2241, not § 2254.[6] But be that as it may, once the Court applies the statutory requirements of § 2254 to Petitioners' § 2241 claims, the difference is in number only. One hurdle imposed by § 2254 is that relief is not available unless "the applicant has exhausted the remedies available in the courts of the State." *Cruz-Rivera*, 2019 U.S. Dist. LEXIS 20983, at *4 (quoting 28 U.S.C. § 2254(b)(1)); *see also Higgins v. State of*

---

[6]    Also at oral argument, Petitioners discussed the possibility the Court might proceed under the All Writs Act, 28 U.S.C. § 1651. Once again, *Brennan* suggests that such a path is not available. The First Circuit quoted the Supreme Court's statement in *Carlisle v. United States*, 517 U.S. 416 (1996) that "[t]he All Writs Act is a residual source of authority to issue writs that are not otherwise covered by statute. Where a statute specifically addresses the particular issue at hand, it is that authority, and not the All Writs Act, that is controlling." *Brennan*, 100 Fed. App'x at 5 (quoting *Carlisle*, 517 U.S. at 429). The *Brennan* Court went on to say that "because Brennan is in custody pursuant to the judgment of a state court, his request for relief is governed by § 2254. Because a § 2254 petition is available to him, a writ under § 1651 is not." Id.
    Similarly, in *United States v. Barrett*, 178 F.3d 34, 56 (1st Cir. 1999), the First Circuit quoted with approval the Seventh Circuit's decision in *In re Davenport*, 147 F.3d 605 (7th Cir. 1998), in which that Court stated "[i]f Congress has forbidden federal prisoners to proceed under 2241 even when 2255 is closed to them[,] then it would be senseless to suppose that Congress permitted them to pass through the closed door simply by changing the number 2241 to 1651 on their motions," and further stated that "[t]he scope of relief obtainable under the All Writs Act is narrowed when a statute governing a particular issue [such as § 2254] is enacted." *Barrett*, 178 F.3d at 56 (quoting *Davenport*, 147 F.3d at 608). Here, Petitioners assert that their requested relief is available to them under § 2241 or § 2254. The relief they seek constitutes "a classic habeas corpus scenario, squarely within the heartland carved out by Congress in" § 2241 and § 2254. *Trenkler v. United States*, 536 F.3d 85, 97 (1st Cir. 2008).
    The Court does not view the All Writs Act as applying to Petitioners' claims.

*Rhode Island*, 187 F.3d 622, 1998 U.S. App. LEXIS 26084, at *1 (1st Cir. 1998) (per curiam) (unpublished table decision) ("A § 2241 habeas petition must exhaust his available state court remedies"). The United States Supreme Court addressed this exhaustion requirement in *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999):

> Section 2254(c) requires only that state prisoners give state courts a *fair* opportunity to act on their claims. *See Castille* v. *Peoples*, [489 U.S. 346,] 351 [1989]; *Picard* v. *Connor,* 404 U.S. 270, [275-76] (1971). State courts, like federal courts, are obliged to enforce federal law. Comity thus dictates that when a prisoner alleges that his continued confinement for a state court conviction violates federal law, the state courts should have the first opportunity to review this claim and provide any necessary relief. *Rose* v. *Lundy,* 455 U.S. 509, [515-516] (1982); *Darr* v. *Burford,* 339 U.S. 200, [204] (1950).

*Id.* at 844.  In *Scarpa v. Dubois*, 38 F.3d 1 (1st Cir. 1994), the First Circuit wrote:

> In *Gagne* v. *Fair*, 835 F.2d 6, 7 (1st Cir. 1987), we catalogued four ways in which the requirement of fair presentment may be fulfilled: "1) citing a specific provision of the Constitution; 2) presenting the substance of a federal constitutional claim in such manner that it likely alerted the state court to the claim's federal nature; 3) reliance on federal constitutional precedents; and 4) claiming a particular right specifically guaranteed by the Constitution."  We did not, however, attribute exclusivity to this compendium.  In *Nadworny* [*v. Fair*], 872 F.2d [1093,] 1099-1100 [(1st Cir. 1989)], we mentioned a fifth possibility, namely, the assertion of a state law claim that is functionally identical to a federal claim.

*Id.* at 6.

Here, the Court concludes that Mr. Denbow presented the Maine state court system with substantially the same question he raises here.  *Rosenthal v. O'Brien*, 713 F.3d 676, 688 (1st Cir. 2013) ("petitioner has exhausted state remedies when his claim is 'fairly present[ed]' to the state courts") (quoting *Baldwin v. Reese*, 541 U.S. 27, 29 (2004)).  On April 13, 2020, Mr. Denbow, through Attorney Bond, his same

counsel here, filed a petition for post-conviction review in the Maine Superior Court. *Pet.*, Attach. 2, *App. – State Court Action*.  In his state court habeas petition, Mr. Denbow cited as ground two that his continued confinement violates the Eighth Amendment of the United States Constitution due to the enhanced risk of the pandemic and he requests immediate release from custody.  *Id.* at 3, 11-12. Comparing the pending state action with the instant case, the Court concludes that the pending state action meets the requirements in *Scarpa*.  *See Gagne*, 835 F.2d at 7 (holding that a claim is fairly presented when, inter alia, the state court is likely alerted to the claim's federal nature).

Section 2254 contains two escape hatches from the exhaustion requirement. First, state exhaustion is not required if the federal plaintiff has demonstrated that "there is an absence of available State corrective process" or second, that "circumstances exist that render such process ineffective to protect the rights of the applicant."  28 U.S.C. § 2254(b)(1)(B)(i-ii).  Regarding the first issue, the Petitioners observed in their filings and at oral argument that the state post-conviction process in Maine is a criminal, not civil, matter and therefore, the rules of civil procedure do not apply. *Pet'rs' Mot.* at 10-11.  Consequently, they argue, a class action, such as the one the Petitioners brought here, is not available as a state remedy.  *Id.*  In its memorandum, Respondents argued both that the lack of a class action mechanism does not dispense with the exhaustion requirement, *Resp'ts' Opp'n* at 17, and at oral argument, that class actions are available in Maine under a common law habeas corpus petition and referred to a common law habeas petition involving a juvenile

40

detainee at Long Creek Youth Development Center, indicating that the Petitioners could have brought a state common law class habeas corpus action.[7]

The Court does not view Petitioners' memoranda and argument of counsel as sufficient to carry their burden for a TRO on whether a class action mechanism is unavailable in Maine state courts for cases of this sort; and if so, whether the lack of a class action mechanism dispels the need for state exhaustion. In drawing this conclusion, the Court emphasizes that it is addressing only the Petitioners' claim for emergency relief in the form of a TRO and is not issuing a ruling on the merits of that issue.

Regarding the second issue, futility, the Court concludes that the Petitioners have not carried their burden for purposes of issuing a TRO. In *Allen v. Attorney General of the State of Maine*, 80 F.3d 569 (1st Cir. 1996), the First Circuit wrote:

> If *stare decisis* looms, that is, if a state's highest court has ruled unfavorably on a claim involving facts and issues materially identical to those undergirding a federal habeas petition and there is no plausible reason to believe that a replay will persuade the court to reverse its field, then the state judicial process becomes ineffective as a means of protecting the petitioner's rights. In such circumstances, the federal courts may choose to relieve the petitioner of the obligation to pursue available state appellate remedies as a condition precedent to seeking a federal anodyne.

*Id.* at 573. Here, the Petitioners initiated their state case in April 2020 and have not presented the Court with a case from the Maine Supreme Judicial Court that would lead to the conclusion that the state judicial process is ineffective.

---

[7]     The Respondents did not make this point in their opposition memorandum and did not provide the Court with a citation. In the context of the motion for TRO, the Court accepts Respondents' representation that the Petitioners could bring a common law class action in Maine courts, but this issue merits more precision as the case progresses.

The Petitioners nevertheless argue that Mr. Denbow's state case meets the futility requirement because the Maine court system is overburdened, especially in coping with the COVIC-19 pandemic. They note that even though Mr. Denbow filed his emergency habeas corpus petition on April 21, 2020, his petition has "languished without a hearing for *five weeks . . . .*" *Pet'r's Mot.* at 10 (emphasis in original). In response, the MDOC states that the "Superior Court is moving forward with Petitioner Denbow's [Post Conviction Review] petition." *Def.'s Opp'n* at 17.

On May 20, 2020, the parties provided the docket sheet in *Joseph Denbow v. State of Maine*, No. OXFCD-CR-2020-00226. *Status Rep.*, Attach. 2, *Docket Record* at 1. In addition, the Petitioners supplied copies of several motions and responses, including written argument about whether Mr. Denbow is entitled to bail pending resolution of his state petition for post-conviction review. *Pet.*, Attach. 2, *App. – State Court Action*.

On April 23, 2020, a justice of the Superior Court entered an order establishing deadlines for the state response, after which the justice directed the Clerk of Court to schedule a conference. *Status Rep.*, Attach. 3, *Order Assigning Pet. for Post Conviction Review* at 1-3. In a footnote, the justice wrote that "[d]ue to the apparent time-sensitive nature of the petition, the assigned court undoubtedly has the discretion to modify the timelines prescribed by the Maine Rules of Unified Criminal Procedure governing petitions for post-conviction review." *Id.* at 1 n.1. The record does not reveal whether the parties requested shortened deadlines. At oral

42

argument, the DOC informed the Court that Justice McKeon has been assigned the case.

The Petitioners draw support for their conclusion that further exhaustion would be futile from *McPherson*, a recent case in the District of Connecticut. In *McPherson*, a district judge reviewed the impact that the COVID-19 virus has had on the state court system in Connecticut and concluded that the exhaustion requirement should be waived:

> Plaintiffs have adequately demonstrated that the state court system is operating at such a diminished capacity that it may not be able to timely respond to a massive volume of emergency habeas petitions—a number potentially in the hundreds or thousands, given the size of the putative class—in the urgent manner that those petitions require.

2020 WL 2198279, at *7.

Based on this record, this Court cannot make the same finding about the courts in the state of Maine. The parties in *McPherson* placed a far more robust record before the district judge than the parties here have presented for and against the TRO. Here, the only information about the status of the courts in the state of Maine is limited to cryptic docket entries and the docketed motions and memoranda. It is a leap on this record to make a finding that the courts in the state system are so overwhelmed that Mr. Denbow's pending case there is futile.

## 2.    Eighth Amendment Claim

"[H]aving stripped [incarcerated individuals] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Farmer*, 511 U.S. at 833. Prison

43

officials "must   ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Id.* at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). "[N]ot all shortages or failures in care exhibit the intent and harmfulness required to fall within [the] ambit" of the Eighth Amendment. *Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir. 2014). "[T]o prove an Eighth Amendment violation, a prisoner must satisfy both of two prongs: (1) an objective prong that requires proof of a serious medical need, and (2) a subjective prong that mandates a showing of prison administrators' deliberate indifference to that need." *Id.* (citing *Estelle*, 429 U.S. at 106). The Court addresses each prong in turn.

### a.    The Objective Prong

Respondents state that they do not dispute "that the COVID-19 is a highly contagious virus that puts everyone at risk, but compared to the community, where literally thousands more cases of COVID-19 have been identified, the conditions in MDOC's facilities do not reflect a level of risk actionable under the Eighth Amendment." *Resp'ts' Opp'n* at 11 n.8. The Respondents acknowledge that while incarcerated, inmates have limited ability to socially distance themselves. *See Thornell Aff.* ¶¶ 33, 42-43, 48. Depending on the place where an inmate is released, the inmate might well be able to exercise his own agency in limiting his social contact with others; yet, for other inmates, being released to an uncontrolled residence may result in greater exposure to the virus than the controlled space behind the prison walls.

44

The Court observes that the partially-developed record reflects that the DOC has taken this pandemic seriously and the actual number of inmates and staff who have tested positive for COVID-19 is remarkably low.[8]  At the oral argument, the MDOC represented that four individuals tested positive at the MCC and one staff member at Bolduc, in a total prison population of about 1,890 inmates.  The virus has been detected at two state correctional institutions and not at the Maine State Prison. The DOC also proffered its three-phase COVID-19 approach, which limited both transfers between and access to its facilities, and established testing protocols in consultation with the MCDC.  With that said, the Court takes the Petitioners' claims about the lack of the ability to maintain social distances in prison, the absence of easy access to alcohol-based sanitizer, and the lack of testing for the virus (except when symptomatic) in institutions other than MCC.  With the facts and arguments marshaled on both sides, the Court cannot in this narrow timeframe confidently make findings or draw conclusions without a more substantial record.

### b.    The Subjective Prong

Under the subjective prong, prison officials are liable for conditions of confinement "only if [they] know[] that inmates face a substantial risk of serious harm

---

[8]    The Court acknowledges that the MDOC controls who receives a test.  On this record, there is no basis to find that the MDOC is taking a "see-no-evil" approach, but the lack of testing in facilities other than the MCC makes it difficult to conduct an objective evaluation of the success of the MDOC's efforts.  The Court understands Respondents' argument that the MDOC is acting on the guidance of the MCDC, *see Resp'ts' Opp'n* at 5; however, the Court regards this testing opacity as a looming problem for resolution of the claims in this case.  Furthermore, it is not clear why the MCDC has recommended somewhat limited testing, especially as one of the most confounding and dangerous aspects of COVID-19 is the rapid onset of high contagiousness during an initial period of asymptomatology.  The Court does not know whether the MCDC's guidance to the MDOC is resource-based, data-based, caused by issues unique to the prison system, or some combination of factors.  The Court anticipates that this will become clear as the case develops.

and disregard[] that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. "For purposes of this subjective prong, deliberate indifference 'defines a narrow band of conduct' and requires evidence that the failure in treatment was purposeful." *Kosilek*, 774 F.3d at 83 (internal citation omitted) (quoting *Feeney v. Corr. Med. Servs. Inc.*, 464 F.3d 158, 162 (1st Cir. 2006)). "While deliberate indifference may also be exhibited by a 'wanton disregard' to a prisoner's needs, such disregard must be akin to criminal recklessness, requiring consciousness of 'impending harm, easily preventable.'" *Id.* (internal citations and quotations omitted). "'[W]ide-ranging deference' is accorded to prison administrators 'in the adoption and execution of policies and practices that in their judgment are needed to . . . maintain institutional security,'" and "[i]n consequence, even a denial of care may not amount to an Eighth Amendment violation if that decision is based in legitimate concerns regarding prisoner safety and institutional security." *Id.* (alterations in original) (quoting *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986)).

Petitioners' likelihood of success on the merits here turns entirely on factual questions the Court does not yet have enough information to resolve. Respondents lay out, as a matter of policy, a very reasonable course of action taken by the MDOC. Aware of the threat posed by COVID-19, the MDOC has consulted early and often with the MCDC and developed new policies and regulations that aim to reduce contact between inmates, increase the cleanliness of its facilities, and curtail the mobility of the virus into and between facilities. *Resp'ts' Opp'n* at 12. They promptly expedited review of those inmates they think are most likely to receive SCCP

46

placement and, once those reviews were finished, proceeded to reviews of other inmates. *Id.* at 5-6. They state that it would harm public safety and violate the SCCP statute to release certain individuals under the SCCP, no matter their level of medical vulnerability to COVID-19, and further argue that medical furlough is not an option because "[t]here is no monitoring of inmates on medical furlough." *Id.* at 6-7. Respondents point out that despite the rapid growth in COVID-19 cases across the country, "[the] MDOC has found only four confirmed inmate cases, all at one facility . . . ." *Id.* at 12.

Based on this view of the situation, Respondents state that "Petitioners cannot show that [the] MDOC's response to COVID-19 and the measures [the] MDOC has put in place to protect inmates and staff were reckless," arguing that "[t]hese proactive and serious steps show a robust response, not deliberate indifference." *Id.* Respondents differentiate their response from cases relied on by Petitioners. They point out that in *Wilson v. Williams*, No. 4:20-cv-00794, 2020 WL 1940882, at *2 (N.D. Ohio Apr. 22, 2020), the facility in question only conducted seventy-five total tests, *Resp'ts' Opp'n* at 12 n.9, and state that unlike the facility in *Martinez-Brooks*, which considered "only 159 of roughly 1,000 inmates for home confinement" and "approved only 21," Respondents have "considered for SCCP all of the eligible 900+ inmates in [the MDOC's] custody with a medical condition that increases their susceptibility to COVID-19—nearly half of all inmates—making 95 placements so far."[9] *Id.* at 13.

---

[9]     While the Court first interpreted Respondents' argument to be that it had made ninety-five SCCP placements during the COVID-19 pandemic based on medical need, the Court discovered at oral argument that this interpretation is not correct. The Court remains unclear as to how many—if any—SCCP placements have been made based on susceptibility to COVID-19.

They also note that "[the] MDOC has far less flexibility with regard to home confinement than did the defendants in *Martinez-Brooks*." *Id.*

By contrast, Petitioners contend that many of the measures put in place by the MDOC to combat COVID-19 are unavailable in practice, and Petitioners are not able to physically distance themselves or appropriately protect against COVID-19 within the confines of their carceral setting. *Pet'rs' Mot.* at 14; *Pet'rs' Reply* at 3. They argue that "the impossibility of physical distancing in [the M]DOC facilities means that transfer to the community is 'the only viable measure by which the safety of highly vulnerable inmates can be reasonably assured.'" *Pet'rs' Mot.* at 14 (quoting *Martinez-Brooks*, 2020 WL 2405350, at *23). They contend that the MDOC's "outright refus[al] to provide medical furlough during the deadly COVID-19 pandemic" and its "slow and inflexible implementation of its home confinement authority is deliberately indifferent to the rights of Class Members" and that the MDOC is in fact treating individuals' preexisting medical conditions as a factor weighing against release. *Id.* at 15.

Both sides, in other words, have painted quite different pictures of what is happening behind the walls of MDOC facilities. At this juncture, the Court has no reason to credit one picture over the other. Assuming Petitioners' assertions about on-the-ground life at MDOC facilities are true—they are not able to socially distance; masks, hand sanitizer, and cleaning of shared spaces are limited or unavailable on a practical level; inmates are scared to report symptoms of COVID-19; and the MDOC is considering preexisting medical conditions as a negative in making SCCP

48

decisions—they may well have made out an Eighth Amendment claim.  Assuming

Respondents' assertions are true, Petitioners' claim is highly likely to fail.[10]  The

Court thus cannot say that Petitioners have established a likelihood of success on the

merits with respect to the subjective prong of their Eighth Amendment claim.

### 3.  Federal Disability Rights Law Claims

Title II of the ADA requires that "no qualified individual with a disability shall,

by reasons of such disability, be excluded from participation in or be denied the

benefits of the services, programs, or activities of a public entity, or be subjected to

discrimination by any such entity."   42 U.S.C. § 12132.   "Federal regulations

implementing Title II require public entities to 'make reasonable modifications in

policies, practices, or procedures when the modifications are necessary to avoid

---

[10]      The Court notes the wide delta between the level of care Respondents assert they are taking at MDOC facilities and the record in *Martinez-Brooks*.  In that case, the Court was able to make findings that "true social distancing appears to be unachievable at" the facility in question and that the implementation of the home confinement program at the facility had "been slow and inflexible" and relied on criteria that "evidence[d] a disregard for the seriousness of the health risk faced by vulnerable inmates."  *Martinez-Brooks*, 2020 WL 2405350, at *5, *22.  These criteria categorically disqualified from home confinement  "any inmate with an incident report in the past 12 months—no matter the seriousness," and the facility had reviewed only sixteen percent of its population for possible home confinement.  *Id.* at *22.

In this case, while Respondents appear to acknowledge the roadblocks incarceration poses to social distancing, there is reason to believe that the containment procedures the MDOC has put in place have largely kept COVID-19 at bay (at least for now), and—in contrast to *Martinez-Brooks*, wherein thirty-four percent of inmates tested for COVID-19 tested positive and the Court was able to conclude, based on the amount of testing that had taken place, that this represented a likely undercount of the number of COVID-19 infections—a significant portion of the MDOC incarcerated population has been tested and only four inmates have tested positive.  Furthermore, while Petitioners assert that the MDOC is not properly considering COVID-19 risk or utilizing medical furlough, it is clear that Respondents have fast-tracked SCCP consideration and conducted a considerable number of reviews.

Again, there is the very real possibility that Petitioners' claims about the MDOC COVID-19 response will be borne out.  Such a factual development could greatly alter the Court's analysis.  But the record currently before the Court, unlike the record in *Martinez-Brooks*, is not enough to support a finding of the sort of "wanton disregard" necessary to establish deliberate indifference in this context. *Battista v. Clarke*, 645 F.3d 449, 453 (1st Cir. 2011).

discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.'" *Kiman v. N.H. Dep't of Corr.*, 451 F.3d 274, 283 (1st Cir. 2006) (quoting 28 C.F.R. § 35.130(b)(7)).   The Rehabilitation Act requires that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."  29 U.S.C. § 794(a).

For Petitioners to successfully make out a claim against a public entity under the ADA and Rehabilitation Act, they must establish:

> (1) that [they are] qualified individual[s] with a disability; (2) that [they were] excluded from participating in, or denied the benefits of a public entity's services, programs, or activities or w[ere] otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of [their] disability.

*Kiman*, 451 F.3d at 283 (quoting *Parker v. Universidad de P.R.*, 225 F.3d 1, 5 (1st Cir. 2000)).   Respondents do not appear to contest that Petitioners are qualified individuals with disabilities.  Petitioners may establish discrimination in three ways:

> First, a plaintiff can assert disparate treatment on account of disability, i.e., that the disability actually motivated the defendant's challenged adverse conduct. . . . Alternatively, in an appropriate case a plaintiff can claim that a government policy, though neutral on its face, falls more harshly on one group than another and cannot be justified by business necessity. . . . Finally, a plaintiff can pursue a third path, claiming that a public entity has refused to affirmatively accommodate his or her disability where such accommodation was needed to provide meaningful access to a public service.

50

*Nunes*, 766 F.3d at 144-45 (some alterations in original) (internal citation omitted) (quoting *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 273-76 (2d Cir. 2003)).

Petitioners pursue this third theory of failure to provide a reasonable accommodation.[11] *Pet'rs' Mot.* at 16.  They allege that, "[b]y refusing to allow [them] to perform physical distancing—in the prison, the community, or elsewhere—[the M]DOC excludes them from necessary medical care, rehabilitative programs, and other programs and services 'by reason of' their disabilities." *Id.* at 18.  Respondents argue, without presenting caselaw, that Petitioners' theory "misconstrues [the] MDOC's obligation under the ADA, which is to ensure that disabled inmates receive accommodations needed to allow them to access [the SCCP and medical furlough] to the same extent as non-disabled inmates." *Resp'ts' Opp'n* at 15.

As a preliminary matter, the Court is not convinced by Respondent's argument.  In the Court's view, adequate social distancing necessary to combat COVID-19 is a service provided to incarcerated individuals by the MDOC.  As the United States Supreme Court said in *Farmer*, incarcerated individuals are stripped "of virtually every means of self-protection and foreclosed [from] access to outside aid . . .."  511

---

[11]    In their reply, Petitioners also make a disparate treatment argument.  *Pet'rs' Reply* at 6.  Petitioners' choice to include this argument for the first time in their reply brief violates District of Maine Local Rule 7(c) and the Court deems it waived for the purposes of this motion as a matter of fairness.

The Petitioners appear to bring their ADA and Rehabilitation Act claims as part of their habeas petition, rather than as independent statutory claims.  *See Pet.* at 47-48.  To the extent at least that Petitioners are seeking a quantum change in the fact of their confinement, the Court believes this is likely the correct procedural vehicle.  *See Bogovich v. Sandoval*, 189 F.3d 999, 1002 (9th Cir. 1999) ("There is no reason to believe that ADA claims should be treated any differently than § 1983 claims when examining whether a prisoner's case should have been brought under habeas corpus.  Regardless of the type of claim asserted, the traditional purposes of habeas corpus must be preserved").

U.S. at 833.  Individuals incarcerated at MDOC facilities are only able to socially distance to the extent that MDOC facilities make social distancing possible.  If, by reason of a disability, a medically vulnerable inmate needs more social distancing than others, the Court does not immediately see why providing some measure of such additional social distance would not be a reasonable accommodation within the meaning of the ADA.  At the same time, the record does not contain enough information about Maine's correctional facilities for the Court to make any reasonable assessments on this issue.  It may be true that some enhanced social distancing for a limited number of inmates may be feasible in some facilities and not in others.

That aside, the same factual issues that the Court identified with regard to the Eighth Amendment claim are also relevant to the disability claims.  It may, in fact, be true—as Petitioners' assert—that it is effectively impossible to physically distance at MDOC facilities and that for the medically vulnerable, physical distancing is medically necessary during the COVID-19 pandemic.  It may also be true that the MDOC is disadvantaging those with preexisting medical conditions in conducting its SCCP review.  But the degree to which release of incarcerated individuals constitutes a "reasonable accommodation" within the meaning of the ADA and the Rehabilitation Act depends on the resolution of these factual questions.[12]  The Court thus cannot

---

[12]     The Court is somewhat skeptical that Petitioners will ultimately be able to show that release for all or even most members of what they term the Disability Subclass without giving significant discretion to the MDOC to weigh public safety concerns is a reasonable accommodation that has been denied.  "The reasonableness requirement calls for a factbound balancing of the benefits that would accrue to the handicapped individual against the burdens that the accommodation would entail."  *Summers v. City of Fitchburg*, 940 F.3d 133, 139 (1st Cir. 2019).  "Typically, 'an accommodation is "reasonable" when it imposes no "fundamental alteration in the nature of the program" or "undue financial and administrative burdens"' on the defendant."  *Id.* at 140 (alteration in original) (quoting *Batista v. Cooperativa de Vivienda Jardines de San Ignacio*, 776 F.3d 38, 43 (1st Cir. 2015)).  It is difficult for the Court to imagine a greater burden that could be imposed on Respondents than the sudden release of a large portion of the

say whether Petitioners have established a substantial likelihood of success on the merits with regard to their ADA and Rehabilitation Act claims.

### B.      Irreparable Harm

Irreparable injury  is "an injury that cannot adequately be compensated for either by a later-issued . . . injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). Petitioners must "demonstrate that irreparable injury is *likely* in the absence of an injunction," not merely that it is a possibility. *Winter*, 555 U.S. at 375 (emphasis in original); *see also Canadian Nat'l Ry. Co. v. Montreal, Me. & Atl. Ry., Inc.*, 786 F. Supp. 2d 398, 432 (D. Me. 2011) ("proof of a mere possibility of injury is insufficient to justify an injunction").

Once again, the Court views its inquiry as turning on as-yet unresolved factual questions. If Petitioners are correct in the picture they paint of COVID-19 response at MDOC facilities, then they have established a reasonable likelihood of irreparable harm, in that there would be a reasonable likelihood that the virus will "infiltrate[] the prisons," presenting "a high risk of infection, serious illness, and death due to impossibility of physical distancing and the absence of other protective measures." *Pet'rs' Mot.* at 12. But the Court is inclined to agree with Respondents that until lingering evidentiary questions can be resolved, "Petitioners have not shown that

---

MDOC's incarcerated population with the expectation that they continue under the monitoring of the MDOC. "The statutes entitle [the disabled] to reasonable accommodations, not to optimal ones finely tuned to [their] preferences." *Nunes*, 766 F.3d at 146. It seems unlikely to the Court that there is no accommodation short of releasing an as-yet-unidentified number of individuals with widely differing histories of criminality that would serve to address Petitioners' disabilities.

remaining in place creates a likelihood of irreparable injury" beyond the speculative. *Resp'ts' Opp'n* at 19.

Furthermore, the Court is cognizant of the limitation of its expertise relative to the MCDC and the MDOC. These two agencies employ subject matter experts who have formed a unified policy. The Court does not discount the possibility that it will, on a more fully developed record, order injunctive relief that alters that plan. But prior to the development of that record, and without evidence of increasing incidence of COVID-19 at MDOC facilities, the Court is reluctant to insert itself and upset the status quo in ways that might ultimately be more harmful than helpful. *See Simmons v. Galvin*, 575 F.3d 24, 33 (1st Cir. 2009) ("The state has . . . a strong interest in how its correctional systems are maintained and run" (citing *Preiser v. Rodriguez*, 411 U.S. 475, 491-92 (1973))).

### C.   Balance of the Equities and the Public Interest

Respondents assert that "[the] MDOC and the State of Maine as a whole have a compelling interest in having inmates serve the sentence imposed by the judicial system and completing the attendant rehabilitative programs." *Resp'ts' Opp'n* at 19. They assert that "[c]ertain putative class members are convicted of serious and violent crimes, and others are segregated from the general prison population because they pose a safety risk," and therefore "[i]ndiscriminately releasing these inmates into the community . . . would significantly threaten public safety." *Id.* Petitioners argue that this position "grossly mischaracterizes Petitioners' request to protect medically vulnerable prisoners using tools within existing [M]DOC authority—and

with prisoners remaining subject to [M]DOC oversight and control . . . ." *Pet'rs' Reply* at 6. The Court is inclined to agree with Petitioners; nowhere do they suggest that the medically vulnerable individuals they seek to represent should be released "indiscriminately" or without monitoring.

By contrast, Petitioners assert "[r]efusing injunctive relief . . . would risk greater community spread of COVID-19—among prisoners, prison staff, and the broader community—a result the State has taken other extraordinary steps to avoid." *Pet'rs' Mot.* at 20. Furthermore, they assert that they "face a heightened risk of serious and potentially permanent illness or death without injunctive relief," whereas Respondents "are simply being asked to ensure necessary care that they are constitutionally and statutorily obligated to provide." *Id.*

To accept the Petitioners' arguments that the MDOC should take a hard and quick look at its implementation of the SCCP in light of the COVID-19 pandemic to assess whether inmates, especially vulnerable inmates, could be released from incarceration does not mean that MDOC should simply open the prison gates and indiscriminately release vulnerable inmates before they have served their imposed sentences. The MDOC's exercise of its authority under the SCCP is substantially constrained by state law and regulation. *See* 34-A M.R.S. § 3036-A; 03-201 C.M.R. ch. 10, subs. 27.2.[13] The MDOC must satisfy itself that it is not only complying with

---

[13] The Petitioners urge the Court to conclude that the MDOC should use the medical furlough provision of Maine law, 34-A M.R.S. § 3035(2)(C), instead of its standard furlough program, to release vulnerable inmates. This subsection states that a "[f]urlough may be granted for the obtaining of medical services for a period longer than 10 days if medically required." *Id.* Without resolving this issue, the Court is skeptical that releasing a vulnerable inmate who has not tested positive for the COVID-19 virus and who is asymptomatic can properly be considered a release to obtain medical services.

state law, but also that it is protecting the public from harm, including contacting the victims of released individuals' crimes.  For example, before releasing an inmate from prison into an outside residential setting, it is imperative that the inmate does not carry COVID-19 into the community to which the inmate is returning.  In addition, for many inmates, a successful reentry into society must be carefully planned and monitored; the MDOC must be assured that the prospective residential placement is proper from a health and safety viewpoint and that the state Probation Office is able to monitor the released inmates, to insure they maintain substance abuse treatment, have access to medical and social services, and explore the possibility of employment, and enforce similar furlough requirements.  At a minimum, the MDOC must assure itself that the risk to the inmate outside the prison is less than the risk inside.  To suggest that the MDOC should administer the SCCP with a sense of urgency given the pandemic is not to suggest that the MDOC should not administer the program at all.

The Court views these factors in a precarious balance based on the record before it.  It may be that, once the record is more fully developed, the Court could craft an order of injunctive relief that protects public safety and maintains the ability

---

The Petitioners also cite 28 U.S.C. § 2243's language that directs courts to provide habeas relief "as law and justice require."  The Court is not clear whether the Petitioners are contending that this section provides the Court with an independent basis to order relief free from the procedural hurdles of § 2254.  If so, the Court disagrees.  *Hill v. Dailey*, 534 F. Supp. 2d 746, 748-49 n.1 (W.D. Ky. 2008) (citing *Felker v. Turpin*, 518 U.S. 651 (1996)).  If the Petitioners are only making the point that this provision emphasizes the Court's "broad equitable powers and authority," *Pet'rs' Reply* at 7, to order injunctive relief in habeas corpus cases, the Court agrees.

of the MDOC to administer its prisons, and yet responds to the legitimate fears of its most vulnerable inmates caused by the COVID-19 pandemic.[14]

### D.   Summary

In ruling on this motion, the Court is reminded of Justice Kennedy's quotation in *Davis v. Ayala* that "[t]he degree of civilization in a society can be judged by entering its prisons." *Davis v. Ayala*, 576 U.S. 257, 135 S. Ct. 2187, 2210 (2015) (Kennedy, J., concurring) (quoting THE YALE BOOK OF QUOTATIONS 210 (F. Shapiro ed. 2006)). The Court suspects that this sentiment is shared by both the Petitioners and the Respondents and both seek to have the Maine prison system meet the challenge implicit in Justice Kennedy's quotation.

This case represents the rare one, in the Court's experience, where both sides of the litigation are striving for the same result—in this case, the continued health and safety of the incarcerated population in the state of Maine—and the gulf between them stems only from their very different views about what is necessary, advisable, and feasible to achieve that result. The Court has heard and considered the concerns raised by Petitioners about Respondents' COVID-19 response. To dismiss the motion for a TRO does not diminish or resolve the Petitioners' concerns. But the Court is not prepared—prior to an evidentiary hearing and without a showing that disaster is truly imminent—to substitute its judgment for that of the MDOC and Commissioner Liberty when it comes to administration of their facilities. The Court plans on moving

---

[14]   The Petitioners stress that they are seeking relief only while the COVID-19 pandemic persists. But no one seems to know how long that might be: whether and when an effective vaccine will be developed and distributed, whether and when more effective treatments will be found and made available, and whether and when there will be a breakpoint in herd immunity all remain unanswered.

the Petitioners' request for a preliminary injunction in this case to resolution as swiftly as possible—an effort in which the Court expects the parties will assist. Given the relatively low number of confirmed cases of COVID-19 in MDOC facilities and what the Court expects will be a rapid resolution of the request for a preliminary injunction, the Court does not see the need for temporary injunctive relief at this time.

## V.   CONCLUSION

The Court DISMISSES without prejudice Joseph A. Denbow and Sean R. Ragsdale's Motion for Temporary Restraining Order (ECF No. 5).  The Court will schedule a telephone conference of counsel to discuss the next steps.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 8th day of June, 2020